**[J-65-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | |
|---|---|
| ALLEGHENY REPRODUCTIVE HEALTH CENTER, ALLENTOWN WOMEN'S CENTER, DELAWARE COUNTY WOMEN'S CENTER, PHILADELPHIA WOMEN'S CENTER, PLANNED PARENTHOOD KEYSTONE, PLANNED PARENTHOOD SOUTHEASTERN PENNSYLVANIA, AND PLANNED PARENTHOOD OF WESTERN PENNSYLVANIA, | : No. 26 MAP 2021<br>:<br>: Appeal from the Orders of the<br>: Commonwealth Court at No. 26 MD<br>: 2019 dated January 28, 2020, and<br>: March 26, 2021<br>:<br>: ARGUED: October 26, 2022 |
| Appellants | : |
| v. | : |
| PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, VALERIE A. ARKOOSH, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES, ANDREW BARNES, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DEPUTY SECRETARY FOR THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES' OFFICE OF MEDICAL ASSISTANCE PROGRAMS, AND SALLY KOZAK, IN HER OFFICIAL CAPACITY AS DEPUTY SECRETARY FOR THE PENNSYLVANIA DEPARTMENT OF HUMAN SERVICES' OFFICE OF MEDICAL ASSISTANCE PROGRAMS, | : |
| Appellees | : |

*Justice Donohue delivers the Opinion of the Court except for
the second paragraph of footnote 11, Part III.E. and
Part III.F.3.b.*

**OPINION**

**JUSTICE DONOHUE**                                    **DECIDED:  January 29, 2024**

### I.  Introduction

This appeal arises out of an order of the Commonwealth Court sustaining preliminary objections and dismissing a petition for review seeking declaratory and injunctive relief from Sections 3215(c) & (j) of the Pennsylvania Abortion Control Act.[1] Multiple abortion providers[2] sued the Department of Human Services and several individuals in their official capacities (collectively, "DHS") claiming that Sections 3215(c) & (j) violate the Equal Rights Amendment and equal protection provisions of the Pennsylvania Constitution.  PA. CONST. art. I, § 28 (Equal Rights Amendment); PA. CONST. art. I, §§ 1, 26 & art. III, § 32 (equal protection provisions).  Sections 3215(c) & (j) prohibit the expenditure of Commonwealth and Federal funds appropriated by the Commonwealth for the performance of an abortion except to avert the death of the mother or where the pregnancy was caused by rape or incest.   18 Pa.C.S.  §  3215(c),  (j)  ("Coverage

---

[1]  18 Pa.C.S. §§ 3201-3220.

[2]  The various abortion providers include:  the Allegheny Reproductive Health Center, Allentown Women's Center, Delaware County Women's Center, Philadelphia Women's Center, Planned Parenthood Keystone, Planned Parenthood Southeastern Pennsylvania, and Planned Parenthood of Western Pennsylvania (collectively, "Providers").

The individuals sued in their official capacities included:  Valeria A. Arkoosh, Acting Secretary of DHS; Andrew Barnes, Executive Deputy Secretary for DHS's Office of Medical Assistance Programs; and Sally Kozak, Deputy Secretary for the DHS Office of Medical Assistance Programs.

Exclusion").[3]  Providers brought suit on their own behalf and on behalf of patients who seek abortions and are enrolled in or eligible for aid under Pennsylvania's Medical Assistance program, but whose abortions are not covered because of the Coverage Exclusion.  Various public officials moved to intervene, and the Commonwealth Court granted their motions in a separate order.  DHS and Intervenors filed preliminary objections in the nature of a demurrer, asserting that the case is controlled by *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), wherein this Court upheld the Coverage Exclusion against constitutional challenges.  DHS submitted a separate preliminary objection asserting that Providers lacked standing.  The Commonwealth Court sustained both preliminary objections.

For the reasons that follow, the order of the Commonwealth Court granting Intervenors' application for leave to intervene is reversed.  The purported intervenors are accepted as amici aligned with DHS.  Further, the order of the Commonwealth Court sustaining preliminary objections and dismissing the petition for review is reversed, as we conclude that Providers have standing to pursue the petition for review and that their petition for review is legally sufficient to survive demurrer.

---

[3]  This Court's precedent, which Chief Justice Todd would continue to endorse, misstated the breadth of the Coverage Exclusion as extending only to non-therapeutic abortions. *See, e.g.*, Concurring & Dissenting Op. at 5, 9 (Todd, C.J.) (citing *Fischer v. Dep't of Pub. Welfare*, 502 A.2d 114, 118 (Pa. 1985)).  In fact, it excludes coverage regardless of whether the abortion is therapeutic, except in three limited circumstances.  As the Concurring Opinion observes, there are instances in which therapeutic abortions are denied coverage. *See, e.g.*, Concurring Op. at 17-18 (Wecht, J.) (observing that the Coverage Exclusion applies to abortions sought because the fetus is not viable or suffers from a fatal impairment and that the Coverage Exclusion "contains no exception for abortions that are medically necessary for the woman's health").

Relevant to this appeal, Pennsylvania's Medical Assistance program[4] is a public insurance system providing eligible Pennsylvanians with medical insurance through either a fee-for-service or managed care health plan. *See* 55 Pa. Code § 1101.31 (providing the scope of benefits available to recipients). Medical Assistance provides comprehensive medical care including inpatient hospital services, outpatient hospital services, physicians' services, clinic services at independent medical clinics and ambulatory surgical centers, and family planning services. 55 Pa. Code §§ 1101.31 (b)(1), (3), (8), (11), (16). It includes all pregnancy-related care, including prenatal care, obstetric, childbirth, neonatal and post-partum care. Petition for Review, 1/16/2019, ¶ 48. However, Medical Assistance does not cover all abortions.

The Abortion Control Act sets forth the following exclusion which is at the center of the present controversy:

> **§ 3215. Publicly owned facilities; public officials and public funds**
>
> *        *        *
>
> (c) **Public funds**.-- No Commonwealth funds and no Federal funds which are appropriated by the Commonwealth shall be expended by any State or local government agency for the performance of abortion, except:
>
> > (1) When abortion is necessary to avert the death of the mother on certification by a physician. When such physician will perform the abortion or has a pecuniary or proprietary interest in the abortion there shall be a separate certification from a physician who has no such interest.

---

[4] Medicaid is a joint federal-state program that provides medical assistance to the poor. 42 U.S.C. §§ 1396–1396w-6. Pennsylvania's Medical Assistance is the Commonwealth's Medicaid program. *See* 62 P.S. §§ 401–493; 55 Pa. Code §§ 1101–1251.81.

(2) When abortion is performed in the case of pregnancy caused by rape which, prior to the performance of the abortion, has been reported, together with the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction and has been personally reported by the victim.

(3) When abortion is performed in the case of pregnancy caused by incest which, prior to the performance of the abortion, has been personally reported by the victim to a law enforcement agency having the requisite jurisdiction, or, in the case of a minor, to the county child protective service agency and the other party to the incestuous act has been named in such report.

\* \* \*

(j) **Required statements**.--No Commonwealth agency shall make any payment from Federal or State funds appropriated by the Commonwealth for the performance of any abortion pursuant to subsection (c)(2) or (3) unless the Commonwealth agency first:

(1) receives from the physician or facility seeking payment a statement signed by the physician performing the abortion stating that, prior to performing the abortion, he obtained a non-notarized, signed statement from the pregnant woman stating that she was a victim of rape or incest, as the case may be, and that she reported the crime, including the identity of the offender, if known, to a law enforcement agency having the requisite jurisdiction or, in the case of incest where a pregnant minor is the victim, to the county child protective service agency and stating the name of the law enforcement agency or child protective service agency to which the report was made and the date such report was made;

(2) receives from the physician or facility seeking payment, the signed statement of the pregnant woman which is described in

paragraph (1). The statement shall bear the notice that any false statements made therein are punishable by law and shall state that the pregnant woman is aware that false reports to law enforcement authorities are punishable by law; and

(3) verifies with the law enforcement agency or child protective service agency named in the statement of the pregnant woman whether a report of rape or incest was filed with the agency in accordance with the statement.

The Commonwealth agency shall report any evidence of false statements, of false reports to law enforcement authorities or of fraud in the procurement or attempted procurement of any payment from Federal or State funds appropriated by the Commonwealth pursuant to this section to the district attorney of appropriate jurisdiction and, where appropriate, to the Attorney General.

18 Pa.C.S. § 3215(c), (j). The Coverage Exclusion is implemented through regulations which likewise prohibit abortion coverage except in the same three circumstances described in Section 3215. *See* 55 Pa. Code §§ 1141.57, 1163.62, 1221.57 (providing exclusion for coverage of physicians' services, hospital services, and clinic and emergency room services for abortions). Further, health care providers are prohibited from billing for services inconsistent with Medical Assistance regulations, and they are subject to sanctions if they violate these regulations. 55 Pa. Code §§ 1141.81, 1163.491, 1221.81 (providing for sanctions for improper billing of physicians' services, hospital services, and clinic and emergency room services for abortion); 55 Pa. Code § 1101.74 (providing for referral to federal prosecution where providers who are convicted of willfully defrauding Medicaid program are subject to $25,000 fine and up to five years of imprisonment).

On January 16, 2019, Providers filed a petition for review in the Commonwealth Court seeking declaratory and injunctive relief, complaining that the Coverage Exclusion

in Sections 3215(c) & (j) violates the Equal Rights Amendment and equal protection provisions of the Pennsylvania Constitution. In addition to summarizing the relevant regulatory framework for Medical Assistance and the Coverage Exclusion set forth in Sections 3215(c) & (j), Providers averred the following:

- Regardless of federal law (which bars use of federal Medicaid funds for abortion except in cases of rape, incest, or threat to the woman's life), "federal law does not prevent states from using state funds to provide coverage for a broader range of services[,]" and sixteen states allow state Medicaid funds to cover abortion beyond these narrow exceptions. Petition for Review, 1/16/2019, ¶ 53.

- There is no parallel exclusion of coverage for men. In fact, there is no medical condition specific to men for which Medical Assistance denies coverage. *Id*. ¶ 54.

- "When a male [Medical Assistance] recipient requires a covered service, including all services related to reproductive health, Medical Assistance covers it. In contrast, when a woman requires an abortion, Medical Assistance covers it only if she would otherwise die or if the pregnancy results from rape or incest." *Id*. ¶ 54.

- Medical Assistance covers all medical care for pregnancy and childbirth for women who choose to continue their pregnancy to term. *Id*. ¶ 55.

- "The medical costs to the Medical Assistance program associated with covering pregnancy and childbirth services far exceed the cost of an abortion, particularly for women with medically complicated pregnancies." *Id*. ¶ 55.

Providers then detailed the effects of the Coverage Exclusion. They alleged that both women on Medical Assistance who seek abortions and Providers themselves suffer significant harm from the Coverage Exclusion. As to the women, Providers maintained that it forces them to choose "between continuing their pregnancy to term against their will and using money that they would have otherwise used for daily necessities, such as shelter, food, clothing, or childcare, to pay for the procedure[,]" which is the exact choice

between health care and basic essentials that Medicaid was created to avoid. *Id*. ¶ 59 (citing Declaration of Colleen M. Heflin, Ph.D., 1/10/2019 (Exhibit A) and Declaration of Elicia Gonzales LSW, M.Ed., 1/11/2019 (Exhibit B)). They alleged that access to a provider of abortion care is a significant problem for poor women and women living in rural areas, many of whom must travel significant distances and incur substantial costs associated with travelling to obtain abortions. *Id*. ¶ 60. In many cases, these women are forced to delay care to raise funds for the abortion, *id*. ¶ 61, and in other cases, the obstacles are insurmountable. *Id*. ¶ 63 ("National studies show that roughly 25% of women on Medicaid who seek an abortion in a state with a coverage ban are forced to continue their pregnancies to term against their will because they are unable to acquire funds to pay for the procedure.") (Declaration of Terri-Ann Thompson, Ph.D., 1/11/2019 (Exhibit C)).

Providers further submitted that, as a result of the Coverage Exclusion, there are women who carry their pregnancies to term against their wills in Pennsylvania. *Id*. ¶ 64. Providers alleged specific harms suffered by women (1) who are forced to carry their pregnancies to term as a result of the Coverage Exclusion, *id*. ¶¶ 65-75; and (2) who are able to obtain an abortion despite the Coverage Exclusion and suffer because of it. *Id*. ¶¶ 76-83. For instance, "the maternal mortality risks associated with childbirth are approximately fourteen times greater than the risk associated with abortion care[,]" and the maternal mortality rate for African-American women is three times that of white women. *Id*. ¶ 67.

In addition, Providers averred that the "risks associated with pregnancy and childbirth are particularly acute for women with pre-existing conditions[.]" *Id*. ¶ 70. More specifically, continuing a pregnancy can exacerbate these conditions and pose serious threats to a woman's long-term health. The "health damage, though serious and

potentially life-threatening, is usually not imminent enough to qualify the patient for abortion coverage under the statutory exception to the coverage ban, which requires that the abortion be necessary to 'avert the death' of the woman, rather than to avoid serious long-term health consequences." *Id*.

For example, Providers explained that pregnancy can force women suffering from cancer to alter treatments and medication plans to their detriments for the safety of the fetuses. It can force women "to choose between halting or compromising critical medical care or placing the fetus at risk[,]" resulting in devastating health outcomes. *Id*. ¶ 71. They explained the severe mental health tolls of unwanted pregnancies, drawing attention to the fact that "[w]omen may suffer severe psychological distress as a result of being forced to continue an unwanted pregnancy… [.] Other women who learn the fetus they are carrying has a severe anomaly or has a condition incompatible with life may also suffer severe distress from being unable to terminate the pregnancy." *Id*. ¶¶ 73-74.

Providers also alleged that the Coverage Exclusion specifically harms them. *Id*. ¶¶ 84-87. It forces them to dedicate money and staff to help women on Medical Assistance who do not have enough money to pay for an abortion. *Id*. Providers lose money because they regularly subsidize abortions for women on Medical Assistance who are unable to pay the fee. *Id*. ¶ 85. Further, they expend valuable resources – including employing dedicated staff – to assist women on Medical Assistance to obtain private charitable funding. *Id*. ¶ 86.

Providers additionally averred that the Coverage Exclusion interferes with counseling their patients because it forces them to spend time delving into personal matters that patients may wish to keep private to determine eligibility for Medical Assistance. This counseling is at times "painful, intrusive and without any medical or

therapeutic purpose[.]"  *Id*. ¶ 87.  They stated that it may strain the patient-counselor relationship for patients who do not wish to talk about these private matters.  *Id*.

In Count One of the petition for review, Providers claimed that the Coverage Exclusion violates Pennsylvania's Equal Rights Amendment. The Amendment provides:

> **Art. I § 28 Prohibition against denial or abridgment of equality of rights because of sex**
>
> Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

PA. CONST. art. I, § 28.  Providers explained that this amendment, which is unique to our Commonwealth, "prohibits all sex-based discrimination by government officials in Pennsylvania."  Petition for Review, 1/16/2019, ¶ 89.  They stated that the Coverage Exclusion, by singling out and excluding abortion, "a procedure sought singularly by women as a function of their sex[,]"  denies women of the Commonwealth coverage for essential healthcare services "solely on the basis of their sex."[5]  *Id*. ¶ 90.  Further, they alleged that it "flows from and reinforces gender stereotypes about the primacy of women's reproductive function and maternal role, and thus offends the Pennsylvania Equal Rights Amendment's prohibition against sex discrimination[,]"  and "women's constitutional right to equality of rights under the law[.]"  *Id*. ¶¶ 91-92.

---

[5]  Pregnancy is a sex-based medical condition.  *See* Jillian Todd Weiss, *Transgender Identity, Textualism, and the Supreme Court: What is the Plain Meaning of "Sex" in Title VII of the Civil Rights Act of 1964?*, 18 TEMP. POL. & CIV. RTS. L. REV. 573, 603 (1984) (quoting Sex, THE RANDOM HOUSE COLLEGE DICTIONARY, Revised Edition 1206 (Jess Stein ed., 1982) (1968) (defining "Sex," first, as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions" and second, as "the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences"); Providers recognize that "transgender men and people whose gender identity is non-binary may have female reproductive organs and be capable of pregnancy and childbirth."  Providers' Brief at 4 n.3.

In Count Two of the petition for review, Providers stated that the Pennsylvania Constitution protects against denial of equal protection under the law through the following three provisions:

**Art. I § 1 Inherent rights of mankind**

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. I, § 1.

**Art. I § 26 No discrimination by Commonwealth and its political subdivisions**

Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

PA. CONST. art. I, § 26.

**Art. III § 32 Certain local and special laws**

The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:

1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts:

2. Vacating roads, town plats, streets or alleys:

3. Locating or changing county seats, erecting new counties or changing county lines:

4. Erecting new townships or boroughs, changing township lines, borough limits or school districts:

5. Remitting fines, penalties and forfeitures, or refunding moneys legally paid into the treasury:

6. Exempting property from taxation:

7. Regulating labor, trade, mining or manufacturing:

8. Creating corporations, or amending, renewing or extending the charters thereof:

Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.

PA. CONST. art. III, § 32. Providers contended that these provisions "together guarantee equal protection of the law and prohibit discrimination based on the exercise of a fundamental right." Petition for Review, 1/16/2019, ¶ 94.

Next, Providers stated that the Coverage Exclusion "singles out and excludes" women on Medical Assistance "from exercising the fundamental right to choose to terminate a pregnancy, while covering procedures and health care related to pregnancy and childbirth." *Id*. ¶ 95. They alleged that the exclusion discriminates against women throughout this Commonwealth for exercising their fundamental right to choose to terminate a pregnancy. *Id*. In sum, because the exclusion "operates to discriminate singularly against those women who seek abortion-related health care services by denying them coverage under Pennsylvania's Medical Assistance programs, the Pennsylvania [Coverage Exclusion], as enforced and administered by DHS, … discriminate[s] based on the exercise of a fundamental right under the equal protection principles of Article I, Sections 1 and 26, and Article III, Section 32 of the Pennsylvania Constitution." *Id.* ¶ 96. Based on these claims and allegations, Providers requested that the Commonwealth Court: (1) declare Sections 3215(c) & (j) as well as the implementing regulations, 55 Pa. Code §§ 1147.57, 1163.62, 1221.57, unconstitutional; and (2) enjoin their enforcement and declare that abortion is a fundamental right under the Pennsylvania Constitution. Petition for Review, 1/16/2019, at 30. Providers did not rely on a federal constitutional right to abortion as the basis for their equal protection arguments.

On April 16, 2019, DHS filed preliminary objections in the nature of a demurrer and on the basis that Providers lack standing.[6]  Therein, DHS recalled that in *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), this Court held that the Coverage Exclusion does not violate the constitutional provisions on which Providers base their claims.  DHS's Preliminary Objections, 4/16/2019, ¶ 4.  Next, DHS cited to an opinion it received from the OAG, stating that *Fischer* is a "'controlling decision from a court of competent jurisdiction,' that the abortion funding ban coverage is therefore constitutional, and that *Fischer* is binding upon [DHS]."  *Id*. ¶ 5 (citing Letter from Jonathan Scott Goldman, Executive Deputy Attorney General, to Teresa D. Miller, Secretary of DHS,

---

[6]  On February 15, 2019, DHS and the individually named respondents, through the Office of General Counsel, filed an unopposed application for enlargement of time to file their response.  In justifying their request for extra time, they explained that, pursuant to the Commonwealth Attorneys Act, 71 P.S. §§ 732-101–732-506, the petition for review was submitted to the Office of the Attorney General ("OAG") for a determination regarding representation.  Motion for Enlargement of Time, 2/15/2019, ¶ 4.

According to DHS, the OAG ultimately authorized the Office of General Counsel to defend this matter pursuant to Section 204(c) of the Commonwealth Attorneys Act, which provides, in pertinent part, that "[t]he Attorney General shall represent the Commonwealth and all Commonwealth Agencies … in any action brought by or against the Commonwealth or its agencies… ."  71 P.S. § 732-204(c).  The Commonwealth Attorneys Act further states that "[t]he Attorney may, upon determining that it is more efficient or otherwise in the best interest of the Commonwealth, authorize the General Counsel or the counsel for an independent agency to initiate, conduct or defend any particular litigation or category of litigation in his stead."  *Id*.

The Office of General Counsel continues to represent DHS in this Court.  Presumably at the behest of former Governor Tom Wolf, who was in office when briefing occurred in this matter, DHS clarifies in its briefing to this Court that "[t]he legal position taken herein regarding the abortion funding coverage ban, however, does not represent the policy position of the Governor's Administration."  DHS's Supplemental Brief at 2 n.1.  DHS further asserts that "the Department Appellees are defending the statute and regulations at issue pursuant to their responsibilities under the Commonwealth Attorneys Act.  71 P.S. § 732-301."  *Id.*

(2/19/2019)).[7]  "Because *Fischer* is controlling precedent that [the Commonwealth Court] lacks the authority to overrule, [Providers] have failed to state a claim upon which relief may be granted."  *Id*. ¶ 6.

Next, DHS asserted that Providers lack standing.  In this regard, DHS claimed that Providers failed to establish a direct and immediate interest in the outcome of the litigation because they failed to demonstrate that the alleged harm to their interests was within the "zone of interests" protected by the statutory or constitutional guarantee in question.  *Id*. ¶¶ 9-10, 14.  Further, DHS argued, Providers lack standing to vindicate constitutional rights of their patients who are not parties to this action.  *Id*. ¶ 14.

On April 17, 2019, certain members of the General Assembly's House of Representatives and separately, certain members of the Senate, filed applications for leave to intervene pursuant to the Pennsylvania Rules of Civil Procedure, Rule 2327(3) & (4).[8]

---

[7]  DHS explained that this opinion was provided pursuant to Section 204(a) of the Commonwealth Attorneys Act.  71 P.S. § 732-204(a)(1) (stating that, upon the request of the head of any Commonwealth agency, "the Attorney General shall furnish legal advice concerning any matter or issue in connection with the exercise of official powers or the performance of official duties …"); *see id.* §732-204(a)(3) ("It shall be the duty of the Attorney General to uphold and defend the constitutionality of all statutes so as to prevent their suspension or abrogation in the absence of a controlling decision by a court of competent jurisdiction.").  The letter indicates that the Secretary of DHS requested a legal opinion concerning the constitutionality of Section 3215(c), and that, after careful review, the OAG concluded that "at the present time, Section 3215(c) is constitutional."  Letter from Jonathan Scott Goldman, Executive Deputy Attorney General, to Teresa D. Miller, Secretary of DHS, (2/19/2019) at 1.  The letter advised that *Fischer* is "directly on point here and is still good law[.]"  *Id*. at 2.  However, it acknowledged that this Court could ultimately modify or overturn *Fischer*.  "Unless and until that time," the letter stated, "*Fischer* remains the controlling authority on this issue and is binding upon DHS."  *Id*.

[8]  Eight Representatives sought to intervene: Mike Turzai, Bryan D. Cutler, Stan. E. Saylor, Kerry A. Benninghoff, Marcy Toepel, Michael Reese, Kurt A. Masser, Donna Oberlander.

(continued…)

**Rule 2327. Who May Intervene**

At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if

\*　　　\*　　　\*

(3) such person could have joined as an original party in the action or could have been joined therein; or

(4) the determination of such action my affect any legally enforceable interest of such person whether or not such person may be bound by a judgment in the action.

Pa.R.C.P. 2327(3)-(4). Intervenors argued that they are permitted to intervene under Rule 2327 because they could have been joined as original parties and because the outcome of this case may affect their legally enforceable interests.

Providers objected to the intervention. Answer to Application for Leave to Intervene of Senators, 5/8/2019, at 2-4; Answer to Application for Leave to Intervene of Representatives, 5/8/2019, at 2-4. DHS took no position. Letter from Matthew J. McLees, Office of General Counsel, to Michael F. Krimmel, Chief Clerk, Commonwealth Court (5/1/2019). Following a hearing, a single judge sitting in the Commonwealth Court, Judge Robert Simpson, denied the applications to intervene.

As an initial matter, Judge Simpson required Intervenors to satisfy standing requirements to establish their right to intervene. *See* Judge Simpson's Opinion, 6/21/2019, at 13. Judge Simpson recalled that this Court applied these principles to

---

Nineteen Senators sought to intervene: Joseph B. Scarnati, III, Jacob Corman, Ryan Aument, Michele Brooks, John DiSanto, Michael Folmer, John Gordner, Scott Hutchinson, Wayne Langerholc, Daniel Laughlin, Scott Martin, Robert Mensch, Michael Regan, Mario Scavello, Patrick Stefano, Judy Ward, Kim Ward, Eugene Yaw, and David Arnold, who was added by stipulation on January 28, 2020.

We refer to the Representatives and Senators who applied to intervene collectively as "Intervenors" and separately, where necessary to distinguish between them, as "House Intervenors" and "Senate Intervenors."

address legislative standing in *Markham v. Wolf*, 136 A.3d 134, 138 (Pa. 2016). Applying the reasoning from *Markham*, he concluded that Intervenors' interests in the Coverage Exclusion and its implementing regulations are too indirect and insubstantial to establish standing. Judge Simpson's Opinion, 6/21/2019, at 15. He pointed out that Providers' request for relief sought a declaration that the Coverage Exclusion and its implementing regulations are unconstitutional, an order enjoining their enforcement, as well as a declaration that abortion is a fundamental right in the Commonwealth. *Id*. at 16. In so doing, he characterized Intervenors' personal stake as no different than any other citizen with an interest in the law being challenged. *Id*.

The Commonwealth Court granted reconsideration, following which a three-judge panel granted Intervenors' applications to intervene. *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 225 A.3d 902 (Pa. Commw. 2020). The panel concluded that Intervenors had established grounds to intervene pursuant to Rule 2327(4), agreeing with Intervenors' characterization of the object of the litigation. In the court's view, the litigation seeks to "change the substance and manner by which the General Assembly can appropriate funds for the Medical Assistance program." *Id*. at 911. Further, the panel reasoned that if Providers are successful, the constitutional principles established by the case "could bar the General Assembly from 'tieing legislative strings' to its appropriation of funds for the Medical Assistance program." *Id*. at 912 (quoting *Lewis v. State*, 90 N.W.2d 856, 860 (Mich. 1958)). According to the panel, the litigation could impact Intervenors' constitutional authority to control the Commonwealth's finances. *Id*. at 913.

After establishing that Intervenors had grounds to intervene, the Commonwealth Court considered whether, pursuant to Rule 2329, intervention is prohibited because the interests of Intervenors are otherwise adequately represented, or if intervention will cause undue delay or prejudice. The panel found that Intervenors' interests are not represented

by DHS "given the vastly different responsibilities and powers of the executive and legislative branches of government as they relate to the coverage ban." *Id.* (quoting Judge Simpson's Opinion, 6/21/2019, at 17). As for Providers' arguments that intervention would cause prejudice or delay, the panel found such claims to be unfounded and speculative. *Id.*

After holding oral argument, an en banc panel of the Commonwealth Court dismissed the petition for review. *Allegheny Reprod. Health Ctr. v. Pa. Dep't of Hum. Servs.*, 249 A.3d 598 (Pa. Commw. 2021). Regarding Providers' standing, the court considered and rejected two alternative bases for finding that they have standing in this matter. First, the court concluded that Providers failed to meet the requirements of the test for third-party standing articulated by the United States Supreme Court in *Singleton v. Wulff*, 428 U.S. 106 (1976) (plurality) and adopted by the Commonwealth Court in *Harrisburg School District v. Harrisburg Education Association*, 379 A.2d 893 (Pa. Commw. 1977).[9] The court acknowledged that it applied the *Singleton* exception in

_____

[9] In *Singleton*, a plurality of the High Court, drawing upon precedent, articulated a general rule: "Ordinarily, one may not claim standing in [the United States Supreme] Court to vindicate the constitutional rights of some third party." *Singleton*, 428 U.S. at 113-14 (citing, inter alia, *Barrows v. Jackson*, 346 U.S. 249, 255-56 (1953)). The plurality opinion stated the two reasons underlying the general rule. First, courts should not adjudicate constitutional rights unnecessarily because it may be that the third parties, i.e., the holders of these rights, "do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not." *Id*. Second, third parties themselves are usually the best proponents of their own rights. *Id*.

Significantly, the plurality opinion stated that the general rule should not be applied where those justifications are absent. More specifically, a court should examine the relationship between the litigant and the person whose rights are being asserted. *Id.* "If the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, the court at least can be sure that its construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id*. at 114-15. Courts should consider whether the litigant is "fully, or very nearly, as effective a proponent of the right as the latter." *Id*. at 115. Next, courts should weigh whether the third party has the ability to assert their right, and the plurality opinion provided the following guidance:

(continued…)

*Pennsylvania Dental Association v. Commonwealth, Department of Health*, 461 A.2d 329 (Pa. Commw. 1983), to find that a dental association had standing to challenge a contractual amendment that permitted the government to access patient files when auditing the dentist. *Allegheny Reproductive*, 249 A.3d at 606. By contrast here, the intermediate court stated that it was forced "to rule on constitutional questions when the [c]ourt has no way of knowing that the patients on whose behalf [they] purport to speak even want this assistance." *Id.* Further, unlike in *Pennsylvania Dental*, the court found that the petition did not establish that the patients' rights were "inextricably bound up" with the interests of Providers. Finally, whereas the patients in *Pennsylvania Dental* had no way of knowing that their privacy interests were at stake, Providers' patients "will be informed, in advance, that abortion services are not covered by Medical Assistance." *Id*. The court concluded that Providers lacked standing to vindicate the constitutional rights of women on Medical Assistance, "who may or may not agree with this litigation brought on their behalf." *Id.* at 608-09.

Second, the Commonwealth Court rejected Providers' argument that they have standing based on the pecuniary harms they suffer as a result of the Coverage Exclusion. The intermediate court acknowledged that standing in Pennsylvania requires a substantial, direct and immediate interest in the matter sought to be litigated pursuant to the well-established test articulated in *William Penn Parking Garage v. City of Pittsburgh*, 346 A.2d 269 (Pa. 1975) (plurality) ("*William Penn Parking*"). The court explained that

> Even where the relationship is close, the reasons for requiring persons to assert their own rights will generally still apply. If there is some genuine obstacle to such assertion, however, the third party's absence from court loses its tendency to suggest that his right is not truly at stake, or truly important to him, and the party who is in court becomes by default the right's best available proponent.

*Id*. at 116.

the "immediacy" component requires a causal connection between the actions complained of and the injury alleged. It elaborated: "[s]tated otherwise, to have standing, the litigant must show that its interest falls 'arguably within the zone of interests sought to be protected or regulated by the statute or constitutional guarantee in question.'" *Allegheny Reproductive*, 249 A.3d at 608 (citing *Application of Biester*, 409 A.2d 848, 851 n.6 (Pa. 1979)). The panel identified the zone of interests with reference to the interests protected or regulated by the Coverage Exclusion and the constitutional rights asserted. The court stated that the interests are "the life and health of the women subject to abortion and to protect the life and the health of the child subject to abortion[,]" and "the guarantee [of] equal protection of the laws and the prohibition against discrimination on the basis of sex." *Id.* The court held that the "asserted administrative and pecuniary interests do not fall within the 'zone of interests' addressed in either the Abortion Control Act or the Pennsylvania Constitution." *Id*. at 608.[10]

Next, with respect to DHS's assertion that Providers failed to state a claim upon which relief can be granted, the Commonwealth Court agreed with DHS that *Fischer* was dispositive and therefore concluded that it was bound to follow the decision. Because, in its view, all of Providers' legal claims were addressed and rejected in *Fischer*,[11] the court

---

[10]  Judge Ceisler wrote a concurring and dissenting opinion to state her view that Providers have standing to pursue this litigation. *Allegheny Reproductive*, 249 A.3d at 612 (Ceisler, J., concurring and dissenting).

[11]  As noted, Providers based their equal protection claim on an asserted fundamental right to abortion in the Pennsylvania Constitution, not the then-existing federal constitutional right to an abortion recognized in *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) and its progeny. The Commonwealth Court did not expressly recognize the predicate for Providers' claim. The court's reliance on *Fischer* (which we later discuss at length) implies either that it views the Constitution of this Commonwealth as securing a right to an abortion coterminous with the right secured at that time by the federal Constitution or that there is no right to an abortion under our Charter but the federal right was a baseline (continued…)

concluded that Providers failed to state a claim on which relief could be granted and dismissed the petition for review. *Id*. at 611.

Providers appealed to this Court. In their brief to this Court, Providers raise three issues:

> 1. Do [Providers] have standing to bring these constitutional claims on behalf of their Medicaid patients who seek an abortion?
>
> 2. Did the Commonwealth Court err in permitting individual members of the Senate and House to intervene as Respondents in this case?
>
> 3. Does the Pennsylvania [Coverage Exclusion] violate the Pennsylvania Constitution's explicit guarantee of equality on the basis of sex contained in PA. CONST. art. I, § 28 and its separate equal protection guarantee contained in PA. CONST. art. I, §§ 1, 26 & art. III, § 32?[12]

Providers' Brief at 2 (issues reordered).

---

protection that could not be undercut by a state Charter. *Fischer*, 502 A.2d at 116 (recognizing as starting point for analysis, that *Roe* established the right to an abortion).

Part III.E. of this opinion, which represents the views of only two Justices of this Court, concludes that we may reach the question and decide that the Pennsylvania Constitution secures the right to reproductive autonomy. Accordingly, Justice Donohue and Justice Wecht proceed to analyze Providers' equal protection challenge in Part III.F., addressing the issues in this order because if we found that our Charter did not protect the right, the outcome would moot the Article 1, Section 26 issue. *See* infra note 88. Chief Justice Todd dissents from our recognition that our Charter protects the right to reproductive autonomy. Concurring & Dissenting Op. at 2-3 (Todd, C.J.). As to Providers' equal protection challenge, Chief Justice Todd maintains that it is bound by *Fischer*'s Article I, Section 26 ruling because the "application of the penalty test [is] reasonable[.]" *Id*. at 14. This position is impossible because *Fischer*'s penalty analysis can have vitality only if there exists a fundamental right to reproductive autonomy.

[12] Imbedded in Providers' third issue is the request that this Court 1) recognize the right to an abortion guaranteed by the Pennsylvania Constitution; and 2) overrule *Fischer*.

While the appeal was pending in this Court, the United States Supreme Court overruled *Roe v. Wade*,[13] and held that the federal Constitution does not confer a right to abortion. *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2279 (2022). *Fischer*, which the Commonwealth Court relied on in this case, addressed the constitutionality of the Coverage Exclusion based on the holdings of *Roe v. Wade* and its progeny that the Fourteenth Amendment protected "a woman's decision whether or not to terminate her pregnancy[.]" *Roe*, 410 U.S. at 153*; see also Planned Parenthood v. Casey*, 505 U.S. 833, 860 (1992) (plurality) (recognizing that "it is the constitutional liberty of the woman to have some freedom to terminate her pregnancy"); *City of Akron v. Akron Ctr. for Reprod. Health, Inc*., 462 U.S. 416 (1983) (referring to abortion as a woman's "fundamental right"). On application of Providers, this Court issued an order granting Providers the opportunity to file supplemental briefing to address the impact of *Dobbs* on this case and directing the Prothonotary to accept all supplemental briefs for filing. Order, 8/18/2022.

As addressed below, Providers' supplemental brief argues, inter alia, that *Dobbs*' reasoning is irrelevant to their Pennsylvania Constitution claims, and *Dobbs*' rejection of a federal constitutional right to abortion provides a special justification for this Court to revisit *Fischer*. Providers' Supplemental Brief at 1-4. According to Providers, in the wake of *Dobbs*, "this Court's role in protecting the right to abortion under our state constitution takes on new importance[.]" *Id*.

In response, DHS observes that the Pennsylvania Constitution has long guaranteed "reproductive health care rights independent of, and more expansive than, any protection provided by the United States Constitution," and that it protects the

---

[13] *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022).

"fundamental right to abortion." DHS's Supplemental Brief at 2. Nonetheless, DHS maintains that *Dobbs* does not affect the analysis: *Fischer* remains the "controlling authority on the narrow question of whether the Pennsylvania Constitution provides a right to subsidized abortions[,]" and *Fischer* held that the Coverage Exclusion is constitutional. *Id*. at 3.

House Intervenors read *Dobbs* broadly, claiming that it refutes nearly every one of Providers' arguments. House Intervenors' Supplemental Brief at 2 (asserting that *Dobbs* refutes claims that the Pennsylvania Constitution provides greater protection than the federal Constitution); *id*. at 4 (arguing that *Dobbs* established that "courts should not be determining whether there is a right to abortion"); *id*. at 5-8 (claiming that *Dobbs* undercuts Providers' standing); *id*. at 8 (asserting that *Dobbs* supports intervention). They assert that *Dobbs*, at its core, held that the authority to regulate abortion falls with the people's elected representatives, and they claim that the Legislature in Pennsylvania "has determined that abortion is neither a Pennsylvania Constitutional right nor an appropriate use of public funds." *Id*. at 4.

Senate Intervenors filed a supplemental response asserting that this case does not concern the right to an abortion but instead is only about legislative funding, "an issue that no one disputes has always been within the exclusive purview of the General Assembly and not the judiciary." Senate Intervenors' Brief at 2-3. They assert that *Dobbs* does not change this fact. *Id*. at 3. Senate Intervenors call on *Dobbs* as supporting two points: first, they insist that our equal protection analysis is conducted using the same standards as the federal Equal Protection Clause test, and therefore, "there is plainly no support for [a right to terminate a pregnancy] under the Pennsylvania equal protection provisions." *Id*. at 5. Second, they argue that *Dobbs* made explicitly clear that laws related to abortion are not sex-based classifications. *Id*. at 4.

## II. Preliminary Issues

### A.     Providers' Standing

#### 1.     Scope and Standard of Review

The Commonwealth Court sustained DHS's preliminary objection, finding that Providers lack standing to pursue this litigation.  When evaluating an order sustaining a preliminary objection to standing, we deem true all material facts averred in the controlling pleading and all reasonable inferences that can be drawn therefrom.  *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 917 (Pa. 2013).  "We will affirm an order sustaining preliminary objections only if it is clear that the party filing the petition for review is not entitled to relief as a matter of law."  *Id.* (citing *Stilp v. Commonwealth*, 940 A.2d 1227, 1232 n.9 (Pa. 2007)).  We further observe that, generally speaking, issues of standing present questions of law; thus, our standard of review is de novo, and our scope of review is plenary.  *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 476 (Pa. 2021).

#### 2.     Relevant Principles of Pennsylvania's Law on Standing

This Court has characterized standing together with ripeness and political questions as issues "giv[ing] body to the general notions of case or controversy and justiciability."  *Robinson Township*, 83 A.3d at 916-17 (quoting *Rendell v. Pa. State Ethics Comm'n*, 983 A.2d 708, 717 (Pa. 2009)).  Though not constitutionally compelled, "our standing doctrine … has a long venerable history as a useful tool in regulating litigation." *In re Hickson*, 821 A.2d 1238, 1243 n.5 (Pa. 2003).  Pennsylvania's standing doctrine is judicially created in contrast to federal standing requirements, which derive from Article III of the United States Constitution.  *Johnson v. Am. Standard*, 8 A.3d 318, 330 (Pa. 2010); *Fumo v. City of Phila.*, 972 A.2d 487, 500 n.5 (Pa. 2009).

As observed by this Court in *Robinson Township*, "[i]n contrast to the federal approach, notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate, do not involve a court's jurisdiction, and are regarded as

prudential concerns implicating courts' self-imposed limitations." *Id.* (citing *Fumo*, 972 A.2d at 500 n.5; *Rendell*, 983 A.2d at 717 & n.9). Generally speaking, in our Commonwealth, standing is granted more liberally than in federal courts. Most critically, the federal standing analysis "does not control our resolution of the standing issue" because we are not bound by the dictates of Article III of the United States Constitution. *Erfer v. Commonwealth*, 794 A.2d 325, 329 (Pa. 2002) *disavowed on other grounds* by *League of Women Voters v. Commonwealth*, 178 A.3d 737, 813 (Pa. 2018).

Our inquiry is whether the putative plaintiff has demonstrated that she is "aggrieved," by establishing a substantial, direct and immediate interest in the outcome of the litigation. *Robinson Township*, 83 A.3d at 917 (citing *Fumo* 972 A.2d at 496). For instance, in *William Penn Parking*, this Court addressed whether parking garage operators had standing to challenge the imposition of the tax on their patrons established by City of Pittsburgh Ordinance No. 30 of 1973.[14] The City objected to the parking garage operators' standing, arguing that only the patrons paying the tax had standing to challenge its validity. *William Penn Parking*, 314 A.2d at 288. The parking garage operators alleged that the tax would cause pecuniary harm to them because they would either have to pass the tax on to their patrons and suffer a reduced patronage or, if they

---

[14] The parking garage operators and fifty-five residents/taxpayers brought the challenge pursuant to Section 6 of the Local Tax Enabling Act, Act of December 31, 1965, P.L. 1257, as amended, 53 P.S. § 6906 (1972), which provided, in relevant part, that for "taxpayers of the political subdivision not less than twenty-five in number aggrieved by the ordinance or resolution shall have the right to appeal" from the establishment of the tax. According to that provision, the court would review and uphold a tax unless it finds, inter alia, that the tax imposed "is excessive or unreasonable." *Id*. The parking garage operators and fifty-five residents/taxpayers challenged the tax on the grounds that it prevented them "from making a profit, that it discriminates against the operator-petitioners in favor of the Public Parking Authority of Pittsburgh and that it is excessive, unreasonable and unconscionable." *William Penn Parking*, 314 A.2d at 324 (internal footnote omitted).

decided not to pass the tax on, they would incur the tax and suffer a substantial loss to their net income. *Id*. at 287-88.

We concluded that the parking garage operators had standing, observing that the statutory scheme allowed a taxpayer to appeal if aggrieved by the ordinance, regardless of whether he is liable for the tax imposed. *Id*. at 289. We saw "no reason to restrict" the meaning of aggrieved "to refer only to those liable for the tax imposed by the ordinance." *Id*. The Court further determined that the parking garage operators' interest was direct because "a declaration that the ordinance is invalid would obviate either injury alleged." *Id*. In addition, we held that their interest was substantial because they claimed a pecuniary loss. *Id*. The only real question was whether the parking garage operators' interest was closely connected to the ordinance, such that their interest was "immediate rather than remote." *Id*. We concluded that it was, explaining that although the tax fell initially upon the patrons of the parking garages, it was levied upon the very transaction between the parking garage operators and the patrons. Thus, we resolved the question of immediacy on the grounds that "the effect of the tax upon their business [wa]s removed from the cause by only a single short step." *Id*.

We have utilized this three-prong approach to standing, even when faced with scenarios where it was argued that the interests of the plaintiffs–whose professional conduct was concretely impacted by the challenged laws–paled in comparison to the alleged harms incurred by the third parties whose rights were at the core of the disputes. *Dauphin County Public Defender's Office*, 849 A.2d 1145, 1148-49 (Pa. 2004); *Robinson Township*, 83 A.3d at 923-25. In those circumstances, we did not see fit to modify the test for third-party standing, and we did not premise our standing analysis on the Article III factors utilized by the United States Supreme Court in *Singleton* or applied by the Commonwealth Court here.

In *Dauphin County Public Defender's Office*, we addressed the standing of the Dauphin County Public Defender's Office ("Public Defender") to challenge new eligibility requirements imposed by the President Judge of the Dauphin County Court of Common Pleas ("Dauphin County CCP").[15] The President Judge issued an Administrative Order that dictated new eligibility requirements for criminal defendants seeking representation from the Public Defender, including an income threshold that was inconsistent with the Public Defender's multi-factor analysis of eligibility. *Dauphin County Public Defender's Office*, 849 A.2d at 1148. The Public Defender sought a stay of the Administrative Order and a writ prohibiting the Dauphin County CCP from interfering with the Public Defender's qualification process. The Dauphin County CCP challenged the Public Defender's standing, because "[a]ny injury" in that case "would be to the criminal defendant who will go unrepresented unless he retains counsel, not to the public defender." Dauphin County CCP's Brief, 11/4/2003, at 9-10.

This Court disagreed with the notion that only the indigent defendants could be "aggrieved" so as to confer standing based on our application of the three-part standing test from *William Penn Parking*. We determined that the Public Defender's interest in the litigation was substantial as it exceeded that of the common citizen in procuring obedience to the law because the Public Defender, unlike the general public, has a statutory

---

[15] The grounds for the Public Defender's challenge were various, though primarily focused on how the Administrative Order violated the Public Defender Act, 16 P.S. §§ 9960.1-9960.13 and the separation of powers doctrine. *See* Public Defender's Brief, 10/10/2003, at 7-14 (arguing that the Administrative Order violated, inter alia, Article V, Section 1 of the Pennsylvania Constitution and the right to counsel for indigent defendants as established in the Sixth and Fourteenth Amendments to the United States Constitution). We resolved the claim based on our interpretation of the Public Defender Act, which required the Public Defender to provide legal representation "to any individual that it concludes does not have the financial wherewithal to hire private legal counsel," and which did not authorize the Dauphin County CCP to override the Public Defender's decisions. *Dauphin County Public Defender's Office*, 849 A.2d at 1150.

obligation to provide legal representation to financially eligible criminal defendants. *Dauphin County Public Defender's Office*, 849 A.2d at 1148. Further, the Public Defender's interest was direct because the Administrative Order at issue stripped the Public Defender of its traditional discretion in making decisions regarding an applicant's eligibility for services when the applicant's income exceeds the poverty line. Finally, we stated that there was a clear and immediate causal connection between the Administrative Order and the Public Defender's diminished ability to make eligibility determinations and to provide representation to the defendants of its choice. Therefore, we concluded that the Public Defender was an aggrieved party with standing. *Id*. at 1149.

To reiterate, our standing analysis focused on how the Administrative Order impacted the Public Defender, whose responsibility it was to represent financially eligible criminal defendants. Based on this professional relationship representing indigent defendants and on the Public Defender's discretion to make decisions regarding eligibility for representation, the Public Defender's interests were substantial, immediate and direct. Thus, we held that the Public Defender's interests were sufficient to establish standing. Importantly, we were not troubled that the representation concerns and the constitutional right at the core of the lawsuit – the right to counsel – were more connected to the indigent defendants than to the Public Defender.

In *Robinson Township*, 83 A.3d at 923-25, this Court addressed the standing of a physician to challenge an oil and gas drilling statute. The statute at issue, Act 13, inter alia, placed restrictions on a physician's ability to obtain and share information with other physicians regarding the chemicals used in drilling operations. Dr. Khan was a physician who treated patients in the area where the drilling operations were taking place, and he alleged that Act 13's restrictions impeded his ability to diagnose and treat patients.

Of note, Dr. Khan contended that Act 13 was an unconstitutional "special law" in violation of Article III, Section 32 of the Pennsylvania Constitution[16] and that it violated the single-subject rule of Article III, Section 3 of the Pennsylvania Constitution because it dealt with both patient health care and regulation of oil and gas operations. Further, he maintained that the challenged provision prevented physicians from sharing diagnostic test results and a patient's history of exposure, both of which are essential tools of treating patients and competently practicing medicine. *Id*. at 923-24. Dr. Khan alleged that Act 13's restrictions placed medical professionals in a position to choose between abiding by its mandate and adhering to a physician's ethical and legal duties to report findings in medical records and to make those records available to patients and other medical professionals.

The Commonwealth Court in *Robinson Township* found that Dr. Khan lacked standing because his alleged harm was prospective and speculative insomuch as he was not yet in the situation of being refused necessary patient information pursuant to Act 13 or being unable to provide proper medical care. *See Robinson Twp. v. Commonwealth*, 52 A.3d 463, 477-78 (Pa. Commw. 2012). This Court reversed. *Robinson Township*, 83 A.3d at 923-25.

---

[16] The Commonwealth Court summarized the claim as follows:

> Act 13 is an unconstitutional "special law" in violation of Article 3, § 32 of the Pennsylvania Constitution because it restricts health professionals' ability to disclose critical diagnostic information when dealing solely with information deemed proprietary by the natural gas industry while other industries under the federal Occupational and Safety Act have to list the toxicity of each chemical constituent that makes up the product and their adverse health effects[.]

*Robinson Twp. v. Commonwealth*, 52 A.3d 463, 470 (Pa. Commw. 2012).

In finding that Dr. Khan had standing, this Court highlighted that Act 13 placed Dr. Khan in the untenable position of choosing between violating the law, violating his ethical obligations to treat a patient by acceptable standards and refusing a patient medical care. We did not credit the Commonwealth's argument "that Dr. Khan's harm [wa]s speculative because it [wa]s based on the rights of his patients and on serial mights which are unfounded." *Id*. at 924 (internal quotation marks omitted). Acknowledging that Dr. Khan was not yet in such a position, we stated that our jurisprudence allows pre-enforcement review of statutory provisions in cases in which the parties at issue must choose between equally unappealing options and where the third option is equally undesirable. *Id.* "In light of Dr. Khan's unpalatable professional choices in the wake of Act 13," we held that the interest he asserted was substantial and direct. *Id*. Further, we rejected the notion that his interest was remote, explaining that a decision regarding the constitutionality of Act 13 "may well affect" whether he and other similarly situated medical professions would accept patients, and it may affect subsequent medical treatment decisions. We therefore concluded that the physician had standing. *Id*.

As in *William Penn Parking* and *Dauphin County Public Defender's Office*, our analysis in *Robinson Township* highlighted the professional harms faced by the plaintiff, then found that the plaintiff's interests were adequately substantial, immediate and direct to confer standing. Consistent with the other cases, we were not swayed by arguments that the core legal rights being vindicated by the lawsuit belonged to other persons (whether patrons of parking garages, indigent defendants, or medical patients).

### 3. Parties' Arguments
### Providers' Arguments

Providers urge this Court to apply the *William Penn Parking* three-prong standing test. They emphasize that *William Penn Parking* applied these rules in a case in which

the litigants – parking garage operators – invoked the rights of third parties – patrons – to challenge a city tax being imposed upon the third parties. They argue that this case is on all fours with *William Penn Parking*. Providers' Brief at 12-13.

Providers contend that they were injured by the legal harm inflicted on their patients because Providers have increased expenditures in covering patients' costs, lost staff time in working to help patients obtain funding, and a compromised provider-patient relationship. *Id.* at 14-15. They argue that their interest is direct because striking the exclusion would obviate the injury alleged, and that their interest is immediate because there is "only a single short step" between the patients' lack of coverage and the Providers' harm. *Id*. at 15. Providers highlight that this Court has repeatedly assessed third-party standing under the basic three-factor test. *Id*. at 16-19 (citing *Robinson Township*, 83 A.3d at 923-25; *Dauphin County Public Defender's Office*, 849 A.2d 1148-49; *In re Hickson*, 821 A.2d at 1245-46). Providers assert that the Commonwealth Court erroneously inserted a "zone of interests" requirement into the three-prong test and note that this Court has stated that such consideration "is merely a guideline that may be used to find immediacy," but it is not an absolute requirement. *Id*. at 19-20 (citing *Johnson*, 8 A.3d at 333). In their view, this Court's inquiry into immediacy having been satisfied, there is no need to consider zones of interests. *See also* Providers' Reply Brief at 28 (criticizing DHS for misreading precedent to "graft a hard and fast 'zone of interests' rule into this Court's standing jurisprudence").

In the alternative, Providers argue that even if this Court adopts the third-party standing test as articulated in *Singleton,* they have established standing. Providers' Brief at 21. They emphasize that in *Singleton*, the United States Supreme Court allowed abortion providers to assert the constitutional rights of their patients in challenging a state's ban on Medicaid coverage of procedures and services related to abortion. *Id*. at

22 (citing *Singleton*, 428 U.S. at 118 ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision.")). Because the facts here are nearly identical to those in *Singleton*, they urge this Court to reach the same result in this case.[17]

### DHS's Arguments

DHS insists that Providers are unable to establish an immediate interest. In DHS's view, the harm alleged by Providers is purely pecuniary and administrative and is not within the zone of interests sought to be protected by the constitutional provisions on which Providers rely. DHS's Brief at 12. DHS acknowledges that the "zone of interests" concept applies when the party's immediate interest is not apparent "to assist a court in determining whether a party has been sufficiently aggrieved, and therefore has standing." *Id*. (citing *Johnson*, 8 A.3d at 333). DHS argues that there is no immediate interest because Providers only "assert pecuniary and administrative-related harms" in connection with the purported violations of third parties' rights, and therefore, DHS urges this Court to undertake a zone-of-interests analysis. *Id*. at 13.

In advancing that argument, DHS states the following:

> Within the requirement that the interest of the plaintiff be "immediate" in order to confer standing is the concept that the "protection of the type of interest asserted is among the policies underlying the legal rule relied upon by the person claiming to be 'aggrieved.'" [*William*] *Penn Parking*, 346 A.2d at 284. The United States Supreme Court has phrased this guideline as whether 'the interest the plaintiff seeks to protect

---

[17] The National Women's Law Center writes in support of Providers' position, and presents a more ample view of the genuine obstacles faced by a woman who would otherwise seek to raise these claims on their own behalf. National Women's Law Center Brief at 2-30. The Obstetrical Society of Philadelphia also supports Providers' position. It critiques the Commonwealth Court's misconceptions of the doctor-patient relationship, arguing that healthcare professionals must have standing to advance the rights and interests of their patients because their interests are, as an ethical rule, aligned. Obstetrical Society of Philadelphia Brief at 14-16.

is arguably within the zone of interests sought to be protected by the statute or constitutional guarantee in question." *Upper Bucks* [*Cnty. Vocational-Tech. Sch. Educ. Ass'n v. Upper Bucks Cnty. Vocational-Tech. Sch. Joint Comm.*, 474 A.2d [1120,] 1122-23 [(Pa. 1984)] (quoting *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150 (1970)). Should a party's immediate interest not be apparent, a zone of interests analysis may and **should** be employed to assist a court in determining whether a party has been sufficiently aggrieved, and therefore has standing. *Johnson*[,] 8 A.2d [at] 333[.]

*Id*. at 12-13.

DHS then asserts that the purposes of the Equal Rights Amendment and equal protection provisions "do not encompass protecting reproductive healthcare providers against pecuniary or administrative-related burden incurred when providing services to low-income individuals." *Id*. at 13. According to DHS, Providers have not alleged that they have suffered harm to a constitutionally-protected interest or discrimination, and "the only individuals who could potentially assert that they suffer the type of harm that is protected by the cited constitutional provisions are individuals who were enrolled in or eligible for [Medical Assistance] and sought abortion services that were not covered due to the [Coverage Exclusion]." *Id*. at 13-14.

DHS asks this Court to follow *Upper Bucks*, wherein this Court conducted a zone-of-interests analysis to determine that teachers lacked standing to seek a declaration that their school district must be open for 180 days in accordance with state law and regulations, despite sixteen days of closures they experienced during a teacher strike. This Court determined that "the sole purpose" of the statutory and regulatory 180-day requirement was to benefit students of the Commonwealth and that any benefit to the teachers of that requirement was "purely incidental[.]" *Upper Bucks*, 474 A.2d at 1123. DHS asserts that the present circumstances are analogous: Providers' harm does not fall within the zone of interests protected by the Equal Rights Amendment or the equal

protection guarantees of the Pennsylvania Constitution, and any harm that Providers suffer is incidental. DHS's Brief at 15.

DHS then argues that *William Penn Parking, Dauphin County Public Defender's Office* and *Robinson Township* are all factually distinguishable from the instant matter because the plaintiffs in those cases were asserting their rights and not relying on the rights of clients or patients. *Id*. at 16-17 (citing *William Penn Parking*, 346 A.2d at 289; *Dauphin County Public Defender's Office*, 849 A.2d at 1149; *Robinson Township*, 83 A.3d at 924-25). Relying on case law from the United States Supreme Court and the Commonwealth Court, DHS states that "one ordinarily has no standing to vindicate the constitutional rights of third persons." *Id*. at 16 (citing *Warth v. Seldin*, 422 U.S. 490 (1975); *Pequea Valley Sch. Dist. v. Dep't of Educ.*, 387 A.2d 1022 (Pa. Commw. 1978)).

In the alternative, if this Court adopts the test articulated in *Singleton*, DHS argues that Providers do not meet that test either. In this regard, DHS relies almost entirely on a recitation of the Commonwealth Court's application of the *Singleton* test, as detailed above. DHS also critiques Providers' reliance on *Singleton* by reminding this Court that only a plurality of the High Court endorsed the notion that women seeking abortions face a hindrance in asserting their rights. Instead, DHS argues, in the years since *Singleton*, "women have challenged abortion-related restrictions on their own behalf in case after case across this country." *Id*. at 20. In sum, DHS asks for this Court to affirm the Commonwealth Court's determination that Providers lack standing. *Id*.[18]

---

[18] The Senate Intervenors do not address standing. The House Intervenors contend that Providers lack standing because they are not aggrieved. House Intervenors' Brief at 14-15. The House Intervenors also argue that the harms to Providers' interests result not from constitutional violations but from Providers' business practices. *Id*. at 16. They also assert that Providers are unlike many of the plaintiffs in the cases relied upon by Providers because Providers are corporations trying to minimize profit losses, not doctors prohibited from practicing their profession. *Id*. at 19. They urge this Court to require any party seeking to establish "a new right not previously acknowledged…, the right to demand tax-
(continued…)

### 4. Analysis

Accepting all well-pled material facts in the petition for review as true, we conclude that Providers have plainly established that they are aggrieved by the Coverage Exclusion. Unlike members of the general public, Providers have a substantial interest in the outcome of this litigation as medical institutions that provide treatment and services to women receiving Medical Assistance, including abortion services. *See Dauphin County Public Defender's Office*, 849 A.2d at 1149 (finding Public Defender's interests to be substantial based on its obligation to provide legal representation to financially eligible criminal defendants).

In addition, Providers' interests are direct because, as they allege, when patients who are beneficiaries of Medical Assistance seek abortions, Providers must modify their treatment plans to counsel patients to determine whether the abortions are covered by Medical Assistance, and when they are not, they incur additional expenses to further counsel patients, secure funding, and provide medical care. Petition for Review, 1/16/2019, ¶¶ 84-87. Further, the regulations implementing the coverage exclusion apply directly to Providers, prohibiting them from billing for abortions and subjecting them to sanctions and criminal penalties if they do so. 55 Pa. Code §§ 1141.81, 1163.491, 1221.81; 55 Pa. Code § 1101.74. If the Coverage Exclusion were struck as unconstitutional, then Providers would no longer need to modify their counseling of patients for these unique circumstances, and they would not have to incur additional expenses to assist Medical Assistance patients seeking abortions. That is, a declaration that the Coverage Exclusion is invalid would obviate Providers' injury. *See William Penn*

---

payer funding for elective abortion, to demonstrate that the third party actually wants the right asserted on their behalf." *Id*. at 20-21.

The American Center for Law & Justice and New Wave Feminists write in support of DHS, and they advance similar arguments as DHS in challenging Providers' standing. American Center for Law & Justice Brief at 11-20; New Wave Feminists' Brief at 3-17.

*Parking*, 346 A.2d at 287-88 (finding directness requirement met because "a declaration that the ordinance is invalid would obviate either injury alleged").

As in *William Penn Parking*, the only real question here is whether Providers' interests are adequately immediate, and as in that case, we answer this question in the affirmative. Providers' interest is immediate because they are currently subject to regulations prohibiting them from billing for these medical services, and they face the possibility of sanctions and criminal penalties if they violate the regulations. *See Firearm Owners Against Crime*, 261 A.3d at 488 (stating that firearm owners interest in challenging firearm ordinances "is immediate because they are currently subject to the challenged ordinances, which the City is actively enforcing, and must presently decide whether to violate the ordinances, forfeit their rights to comply with the ordinances, or avoid the City altogether[]").

Moreover, the Coverage Exclusion clearly affects Providers' counseling of patients and results in additional costs to Providers. These effects of the Coverage Exclusion on Providers' businesses are thus removed from the cause "by only a single short step." *William Penn Parking*, 346 A.2d at 289. This analysis also is consistent with *Dauphin County Public Defender's Office*, where we rejected arguments that only indigent defendants (and not the Public Defender) had standing to challenge new eligibility requirements for public representation, and with *Robinson Township*, where we were unconvinced by arguments that Dr. Khan's harm was based on his patients' rights. Similarly, here, we reject DHS's arguments that women on Medical Assistance seeking abortions are the only possible plaintiffs for the same reason that we did not credit Dauphin County CCP's arguments that criminal defendants were the proper plaintiffs and the Commonwealth's arguments that patients (not Dr. Khan) were the proper plaintiffs.

We focus our inquiry on whether Providers were aggrieved, and because they are, they have established a cognizable injury for standing purposes.

Immediacy having been clearly established, there is no reason to delve into a "zones of interests" analysis. *Johnson*, 8 A.3d at 333. We acknowledge that, in resolving questions of immediacy in other cases, we have considered whether the plaintiffs' alleged harms fall within the interests protected by the provisions at issue. As this Court stated in *Johnson*, should "**a party's immediate interest not be apparent**, a zone of interests analysis may (and should) be employed to assist a court in determining whether a party has been sufficiently aggrieved, and therefore has standing." *Johnson*, 8 A.3d at 333 (emphasis added). Here, Providers' immediate interest is apparent, obviating any potential need to employ a zone-of-interests analysis. To the extent *Upper Bucks* could be misread as requiring a "zone of interests" analysis, we reiterate the clarification made in *Johnson* that there is no "requirement that one be in the zone of interests for the immediacy prong of a standing analysis to be satisfied." *Id.* at 331. Therefore, to the extent the Commonwealth Court required a showing that Providers were in the zone of interests protected by the applicable statute and constitutional provisions, it erred.

In this vein, DHS acknowledges that a zone-of-interests analysis is not always required. DHS's Brief at 12. However, in analyzing Providers' standing, DHS applies such a requirement to this case. *Id*. at 10 (asserting that Providers "do not have an immediate interest in the outcome of this case … because the alleged harm suffered by [Providers] is not within the zone of interests sought to be protected by the constitutional provisions on which [they] rely"). By conducting this analysis, DHS attempts to inject federal third-party standing considerations into Pennsylvania's prudential "immediacy" requirement. To justify this approach, DHS cites to Commonwealth Court decisions applying the federal third-party standing principle that "one ordinarily has no standing to

vindicate the constitutional rights of third persons." *See id*. at 10 (citing *Warth*, 422 U.S. at 490; *Phila. Facilities Mgmt. Corp. v. Biester*, 431 A.2d 1123, 1131 (Pa. Commw. 1981); *Pequea Valley Sch.*, 387 A.2d at 1022). The lower court's application of the federal third-party standing doctrine cannot be reconciled with our three-prong approach that solely asks whether the plaintiff is aggrieved.

The federal doctrine creates a requirement **in addition to** a showing that plaintiffs are aggrieved.[19] "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement," the High Court holds that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499; *see also Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (providing that one of the main reasons for the doctrine is concern that

---

[19] Though the Commonwealth Court referred to it as the "*Singleton* analytical framework," the United States Supreme Court developed the third-party standing doctrine outside of the abortion context. It has applied the test to prohibit and allow third-party standing in varying circumstances. *See, e.g.*, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 536 (1925) (allowing corporations that established and operated private schools to challenge a statute requiring children to attend public schools by asserting the parents' Fourteenth Amendment rights, noting that this was consistent with "many other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers"); *Barrows*, 346 U.S. at 255-256 (deciding that the rule against third-party standing did not apply to respondent in action for failing to honor restrictive race-based covenant, though respondent was relying on the equal protection rights of others); *Warth v. Seldin*, 422 U.S. 490 (1975) (holding that housing organizations and residents of Rochester lacked standing to challenge town's zoning ordinance for effectively excluding persons of low and moderate income from living in the town); *Craig v. Boren*, 429 U.S. 190 (1976) (explaining that vendor had "jus tertii" standing to challenge Oklahoma statutory scheme prohibiting sale of 3.2% beer to males under the age of 21 and to females under the age of 18 on the basis that it constituted gender-based discrimination that denied males ages 18 to 20 equal protection of the laws); *Powers v. Ohio*, 499 U.S. 400, 410 (1991) (determining that a criminal defendant has standing to raise the equal protection rights of a juror excluded from service); *Kowalski v. Tesmer*, 543 U.S. 125 (2004) (holding that a lawyer cannot invoke a future client's Sixth Amendment right to a fair and speedy trial).

"the party with the right has the appropriate incentive to challenge (or not challenge) governmental acting and to do so with the necessary zeal and appropriate presentation").

We are mindful of DHS's observation that this Court's opinions in *Robinson Township*, *Dauphin County Public Defender's Office*, and *William Penn Parking* did not expressly indicate that the putative plaintiffs were asserting rights that belonged to third parties. However, DHS overlooks that in each of those cases, the putative plaintiffs actually relied on the rights of their clients. Most obviously, the parking garage operators in *William Penn Parking* were challenging a tax **imposed on their patrons**. They complained of harm to their businesses–that the tax prevented them from making a profit– but the main grounds for their challenge was statutory language prohibiting the tax imposed on their patrons from being excessive and unreasonable. In *Robinson Township*, Dr. Khan, like Providers, was a medical provider bringing a constitutional claim under Pennsylvania's equal protection provision in Article III, Section 32. He was complaining that Act 13 was a special law that interfered with his treatment of patients, just as the Providers here complain that Sections 3215(c) & (j) and the implementing regulations are special laws that interfere with their treatment of patients. Further, the defendants in each of those cases made the same arguments that DHS makes now, but this Court rejected them, instead applying the established three-factor standing test to determine whether the plaintiff was aggrieved.

As demonstrated above, the standing question is more than adequately resolved with reference to the well-established principles and test announced in *William Penn Parking* and applied in its progeny. We heed the lesson of *Johnson* that a zone-of-interests analysis is not a necessary component of immediacy. Further, we decline to adopt a fourth factor to require proof that the plaintiff is not bringing a challenge to vindicate the rights of others. In reaching this conclusion, we reiterate that "[u]nder

Pennsylvania law, the doctrine of standing is a prudential, judicially-created tool, affording discretion to courts. In the federal system, by contrast, standing is both constitutional, implicating Article III's case or controversy requirement, and prudential, involving judicial limits on federal jurisdiction." *Firearm Owners Against Crime*, 261 A.3d at 481-82. Neither DHS nor the Commonwealth Court has offered an adequate rationale for seeking out and adopting another test.

We observe that the Commonwealth Court's rationale for adopting the federal standing principles articulated in *Singleton* was that courts should not adjudicate constitutional rights unnecessarily because it may be that the third parties, i.e., the holders of these rights, do not wish to assert them, and that those third parties are usually the best proponents of their rights. *Allegheny Reproductive*, 249 A.3d at 605.[20] In other words, the court justified applying third-party standing out of concern that: (1) the Providers might be unnecessarily vindicating constitutional rights; and (2) the Providers might not be the best advocates. The Commonwealth Court's foray into this line of inquiry

---

[20]  The Commonwealth Court relied on *Harrisburg School District*, 379 A.2d at 895-97 and *Pennsylvania Dental Association*, 461 A.2d at 331, to establish the applicability of the *Singleton* framework. In both cases, the Commonwealth Court applied the framework without any deliberation about the propriety of importing the federal constitutional doctrine into our prudential state-specific approach to standing. The court simply cited the federal standard, then applied it, without considering whether the concerns animating the federal standing doctrine have equal force in the courts of our Commonwealth. These cases are unresponsive to the question of whether this Court should adopt the third-party standing doctrine in the Commonwealth.

In *Harrisburg School District*, the Commonwealth Court was addressing the District's assertion that striking teachers' conduct, in picketing at school board members' homes, violated the school board members' constitutional rights to privacy. The Commonwealth Court observed that *Singleton* was decided a year prior, then employed *Singleton*'s framework. Subsequently, citing to *Harrisburg School District*, the court in *Pennsylvania Dental Association* summarily applied the *Singleton* doctrine to determine that the dental association had standing to challenge a contractual amendment that permitted the government to access patient files when auditing the dentist on the grounds that it violated patients' privacy rights.

ignores our resolution of the analogous issues in the above-discussed cases.[21]  For the sake of completeness, we note that the Commonwealth Court's predicates are faulty.

First, with regard to the notion that "the [c]ourt has no way of knowing that the patients on whose behalf [Providers] purport to speak even want this assistance[,]" *id*. at 607, we observe that Providers bring these claims in support of women seeking abortions who live close to or below the poverty line and who qualify for Medical Assistance.  The petition alleges that Providers work with women who have sought abortions in their clinics but were denied coverage because of the Coverage Exclusion.  *See, e.g.*, Petition for Review, 1/16/2019, ¶¶ 56-64.  The holders of these rights have thus sought to assert their rights by appearing before Providers and seeking abortion services.

Further, there can be no genuine dispute that pregnant women seeking abortions are not in the best position to act as proponents of their rights.  Pregnant women face a genuine obstacle to asserting their rights as a function of the short nature of pregnancy and the statutory temporal limit on a woman's right to seek an abortion,[22] as compared to the prolonged nature of litigation.  Litigation will often outlast the window of opportunity to

---

[21]  The Commonwealth Court also ignores that among the reasons for the federal third-party standing doctrine is the High Court's effort to exercise restraint when interpreting state law, a concern irrelevant to our prudential standing analysis. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 & 13 n.5 (2004) (stating that its prudential standing analysis and decision to reject standing in that case are informed by the fact that family law rights—rights which "belong[] to the laws of the States and not to the laws of the United States"—"are entwined inextricably with the threshold standing inquiry"); *Barrows*, 346 U.S. at 256 (stating that one reason for this rule "is that the state court, when actually faced with the question, might narrowly construe the statute to obliterate the objectionable feature, or it might declare the unconstitutional provisions separable[]"); *New York ex rel. Hatch v. Reardon*, 204 U.S. 152, 160-61 (1907) (expressing concern that "it may be more or less of a speculation to inquire what exceptions the state court may read into general words, or how far it may sustain an act that partially fails").

[22]  The Abortion Control Act contains the following general prohibition: "no person shall perform or induce an abortion upon another person where the gestational age of the unborn child is 24 or more weeks."  18 Pa.C.S. § 3211(a).

seek an abortion even if one presupposes a woman's timely awareness of a pregnancy and the knowledge of and availability of legal services to seek expedited relief from the court. A poor pregnant woman's individual ability to assert her own constitutional rights in this context is illusory at best. We also note that a woman's interest in privacy is implicated by any requirement that she be the plaintiff bringing this lawsuit to vindicate her constitutional rights. *New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 847 (N.M. 1998) ("[P]rivacy concerns and time constraints impose a significant hindrance on the ability of Medicaid-eligible women to protect their own interest in obtaining medically necessary abortions.").

Thus, the Commonwealth Court erred in reverting to consideration of the unique third-party standing test from federal jurisprudence as articulated in *Singleton*. Because Providers have established that they are aggrieved by the Medical Assistance Coverage Exclusion, the Commonwealth Court erred in denying them standing.[23]

---

[23] Our conclusion that Providers have standing is consistent with many other courts' conclusions that abortion providers have standing to challenge state abortion laws, albeit those conclusions are often reached through application of *Singleton*. *See Comprehensive Health of Planned Parenthood of Kan. and Mid-Mo v. Kline*, 197 P.3d 370, 374, 394 (Kan. 2008) (applying *Singleton* to determine that an abortion provider had standing); *Feminist Women's Health Ctr. v. Burgess*, 651 S.E.2d 36, 37-39 (Ga. 2007) (applying *Singleton* to determine that a physician and several health care facilities had standing); *Planned Parenthood of Kan. and Mid-Mo v. Nixon*, 220 S.W.3d 732, 736-738 (Mo. 2007) (applying *Singleton* to determine Planned Parenthood had standing both independently and on behalf of minor patients); *State v. Planned Parenthood of Alaska*, 35 P.3d 30, 34 (Alaska 2001); *Armstrong v. State*, 989 P.2d 364, 369-370 (Mont. 1999) (applying *Singleton* to determine health care providers had standing); *Pro-Choice Miss. v. Fordice*, 716 So.2d 645, 662-65 (Miss. 1998) (applying *Singleton* to determine doctors and health care providers had standing); *New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 846-47 (N.M. 1998) (applying, inter alia, the rationale of *Singleton* to determine that health care providers and organization representing Medicaid-eligible women had standing); *Planned Parenthood League v. Bell*, 677 N.E.2d 204, 207-09 (Mass. 1997) (applying *Singleton* to determine that Planned Parenthood League of Massachusetts had standing); *Davis v. Fieker*, 952 P.2d 505, 508 (Okla. 1997) (applying "direct, immediate and substantial" test to determine that physician who practices medicine in state of Oklahoma has standing to challenge abortion regulations); *Cheaney* (continued…)

## B. Intervention

### 1. Scope and Standard of Review

Resolution of this issue requires an examination of whether the Commonwealth Court erred by concluding that the various state legislators who requested to intervene in this matter were permitted to do so pursuant to Pennsylvania Rule of Civil Procedure 2327. Generally speaking, such an issue presents a question of law; thus, our scope of review is plenary, and our standard of review is de novo. *Markham v. Wolf*, 136 A.3d 134, 138 (Pa. 2016).[24]

---

*v. State*, 285 N.E.2d 265, 266 (Ind. 1972) (pursuant to United States Supreme Court rule that an accessory has standing to assert that the offense of which she is charged with assisting cannot constitutionally be a crime, determining that abortion provider (not a doctor) had standing); *Ballard v. Anderson*, 484 P.2d 1345, 1348 (Cal. 1971) (determining that physician had standing arising from his right to practice medicine consistent with law and his potential liability if he performs an abortion).

[24] Senate Intervenors challenge any reliance on the standard and scope as set forth in *Markham* to address the instant question because "the legal question *Markham* held was subject to this standard and scope was whether 'legislative standing' exists." Senate Intervenors' Brief at 57 n.21 (citing *Markham*, 136 A.3d 138). Here, the Senate Intervenors highlight that they are intervening as Respondents, not as Petitioners, and therefore need not establish legal standing, despite recognizing that "the standing analysis is useful for assessing whether a legally enforceable interest exists" for them to intervene. *Id.* While we acknowledge that both Senate and House Intervenors are attempting to intervene as Respondents, rather than Petitioners, this does not impact our standard and scope of review.

The Senate Intervenors contend that this Court should apply an abuse of discretion standard to the instant question. *See* Senate Intervenors' Brief at 1 (citing *Pa. Ass'n of Rural & Small Sch. v. Casey*, 613 A.2d 1198, 1200 n.1 (Pa. 1992)). However, as the Commonwealth Court observed below, "the court is given the discretion to allow or to refuse intervention only where the petitioner falls within one of the classes enumerated in Rule 2327 and only where one of the grounds under Rule 2329 is present which authorizes the refusal of intervention." *Allegheny Reproductive*, 225 A.3d at 908 (quoting *Larock v. Sugarloaf Twp. Zoning Hearing Bd.*, 740 A.2d 308, 313 (Pa. Commw. 1999)). As the question of whether a party falls into one of the categories set forth in Rule 2327 raises a question of law, we review such matters de novo. *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 956 A.2d 956, 963 (Pa. 2008).

## 2. Relevant Principles of Pennsylvania's Law on Intervention

Pennsylvania Rule of Civil Procedure 2327 governs who may intervene in a civil action, and it provides, in relevant part:

> At any time during the pendency of an action, a person not a party thereto shall be permitted to intervene therein, subject to these rules if ... (3) such person could have joined as an original party in the action or could have been joined therein; or (4) the determination of such action may affect any legally enforceable interest of such person whether or not such person may be bound by a judgment in the action.

Pa.R.C.P. 2327(3)-(4).

To intervene, the prospective intervenor must first establish that she has standing.[25] *Markham*, 136 A.3d at 140. The concerns animating the concept of standing are inextricably linked to questions of intervention pursuant to Rule 2327. *Id.* at 139; *see also Application of Biester*, 409 A.2d 848, 850 n.2 (Pa. 1979) (concluding that because the proposed intervenor "lack[ed] standing to advance the petition for review, he ha[d] no legally enforceable interest to assert as an intervenor"). Given that the foundational principles of standing were discussed in detail in the immediately preceding section of this opinion, we only will reiterate that for a party to a legal action to have standing, they must be aggrieved or "negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 660 (Pa. 2005). Such intervention

---

[25] Because Intervenors are proposing to intervene as Respondents, rather than Petitioners, Senate Intervenors assert that standing is irrelevant to our analysis, despite acknowledging the applicability of standing principles to at least one of their bases for intervention. Senate Intervenors' Brief at 69. As Judge Simpson acknowledged below, neither our Rules of Civil Procedure nor our case law have made any distinction based upon a proposed intervenor's status as petitioner or respondent. *See* Judge Simpson's Opinion, 6/21/2019, at 13; *see also* Pa.R.C.P. 2327. In fact, this Court has applied the same legislative standing principles to individual legislators who sought to intervene as Respondents. *See Robinson Twp. v. Commonwealth*, 84 A.3d 1054 (Pa. 2014) (per curiam).

is as permissible for individual legislators as anyone else "where there [is] a discernible and palpable infringement on their authority as legislators." *Fumo*, 972 A.2d at 501.

### 3.    Parties' Arguments

**Providers' Arguments**

Providers argue that this Court has limited individual legislator intervention to situations where the legislators' "ability to participate" in the voting process is negatively impacted or she is deprived of her authority to act as a legislator.  Providers' Brief at 77 (citing *Markham*, 136 A.3d at 145; *Fumo*, 972 A.2d 501).  Deeming neither condition present in the instant matter, Providers contend that Intervenors are merely attempting to defend the constitutionality of the statute, and thus have not established a right to intervene.  *Id.*

In directly responding to the Commonwealth Court's decision, Providers aver that the lower court fundamentally misunderstood what effect Intervenors' challenge would have if Providers were successful.  *Id.* 78-79.  Rather than force the Legislature to appropriate money for abortions, they argue, a decision that the Coverage Exclusion is unconstitutional would not implicate the legislators' powers in any way.  *Id.* at 78.  According to Providers, by holding otherwise, the court's reasoning "unduly expands the narrow circumstances under which individual legislators can intervene" to nearly every constitutional challenge to legislation.  *Id.* at 79-80.

**Intervenors' Arguments[26]**

Intervenors agree with the Commonwealth Court's analysis regarding legislative intervention.  House Intervenors' Brief at 23-24; Senate Intervenors' Brief at 56-58.

---

[26]    While the members of both the House and Senate have separately submitted arguments in their briefs on the issue of their right to intervene in this matter, their briefs largely share the same views and arguments.  Accordingly, we summarize their arguments together, and we highlight arguments that are unique to a particular group of legislators.

Relying on various constitutional provisions,[27] Intervenors assert that the power to raise and appropriate government funds lies exclusively within their branch of government, and that if the relief sought by Providers is granted, it would impair their ability to exercise that authority. House Intervenors' Brief at 25-29; Senate Intervenors' Brief at 60-63. Specifically, they argue that it would impair the Intervenors' ability to determine the amount of funds appropriated for Medical Assistance and how those funds should be utilized. House Intervenors' Brief at 29; Senate Intervenors' Brief at 63.

Although not addressed by the Commonwealth Court, Intervenors also argue that they are entitled to intervene as persons who could have been joined as original parties pursuant to Rule 2327(3). House Intervenors' Brief at 30-34; Senate Intervenors' Brief at 69-73.

### 4. Analysis

We find that our analysis in *Markham* is dispositive of this issue. This Court has limited legislator intervention to particular circumstances. Specifically, we have held that such standing exists when a legislator's direct and substantial interest in her ability to participate in the voting process is negatively impacted, or when a legislator has suffered a concrete impairment or deprivation of an official power or authority to act as a legislator. *Markham*, 136 A.3d at 145. In other words, legislators may challenge actions when the injuries diminish their unique legislative powers as set forth under our Constitution. *Id.* Legislators may not challenge actions when the injuries affect conduct outside the legislative forum unrelated to voting or the approval process, making their challenge "akin to a general grievance about the correctness of governmental conduct[.]" *Id.*

---

[27] House Intervenors' Brief at 25-26 (citing PA. CONST. art. III, §§ 10, 11, 14, 15, 17-19, 22, 24, 26, 29-30); Senate Intervenors' Brief at 59-60 (PA. CONST. art. II, § 1; PA. CONST. art. III, § 24).

In *Markham*, individual state legislators sought to intervene in a challenge to an executive order that provided direct care health workers with a process by which to seek representation and collectively bargain. *Markham*, 136 A.3d at 138-39. The legislators claimed that they were aggrieved by the executive order insofar as it violated the separation of powers doctrine by diminishing the effectiveness of prior-enacted legislation, "infringing upon their exclusive law-making authority and usurping the power of the General Assembly." *Id.* Specifically, the legislators in *Markham* sought to intervene pursuant to Rule 2327(3) & (4), arguing that the Governor's executive order "denie[d] every member of the General Assembly the opportunity to vote on whether direct care health providers may organize and collectively bargain[,]" which was not provided for in the relevant labor laws. *Id.* at 139.

In analyzing whether the legislators in *Markham* could intervene, we held that they were required to satisfy our standing requirements to demonstrate that they are actually aggrieved. *Id.* at 140. After reviewing relevant federal and Pennsylvania law, we concluded that the legislators could only demonstrate a direct and substantial interest when their ability to participate in the voting process is negatively impacted or when their authority to act as a legislator is impaired in some way. *Id.* at 145. With those principles in mind, we found that the legislators were only raising a claim that the executive order violated the separation-of-powers doctrine, but that the executive order neither inhibited the legislators' ability to vote on or enact legislation, nor prevented them from "advising, consenting, issuing, or approving matters within their scope of authority as legislators." *Id.* at 145. Accordingly, their interests in the underlying challenge were "too indirect and insubstantial," and thus were generalized interests no different than those "common to the general citizenry." *Id.* at 145-46. We further highlighted the following concern:

> [T]aking the unprecedented step of allowing legislators standing to intervene in, or be a party to, any matter in which

it is alleged that government action is inconsistent with existing legislation would entitle legislators to challenge virtually every interpretive executive order or action (or inaction). Similarly, it would seemingly permit legislators to join in any litigation in which a court might interpret statutory language in a manner purportedly inconsistent with legislative intent. Appellants offer no limiting principle which would permit their intervention in the instant matter, but constrain their ability to initiate litigation, seek declaratory relief, or to intervene in any matter which does not, under the principles we express today, impact them in their role of legislators.

*Id.* at 145. With that in mind, we observed that the legislators in *Markham* still had recourse, as our decision in no way precluded them from enacting future legislation in that area, and that they were permitted to participate as amici to be heard on the merits of the controversy. *Id.* at 145-46.

Here, Intervenors' interest in the Coverage Exclusion is too attenuated to satisfy our intervention requirements. With respect to any negative impact on their ability to vote, we find none. Other than passing budgets in contemplation of the parameters of Medical Assistance, the last time that the Legislature voted on the Coverage Exclusion at issue in this case was in 1989, and thus, it cannot be said that this litigation directly affects Intervenors' ability to vote with respect to this exclusion. *See Wilt v. Beal*, 363 A.2d 876, 881 (Pa. 1976) ("Once, however, votes which they are entitled to make have been cast and duly counted, their interest as legislators ceases."). In other words, Intervenors' direct connection with this specific piece of legislation ceased when it was last voted on and went into effect. Thus, Intervenors have no interest greater than the ordinary citizen to have duly-enacted statutes enforced. If anything, Intervenors' only concern appears to be with voting on **future** legislation. *See* Senator Intervenors' Brief at 67 ("[T]he entire purpose of Providers' action is not only to enjoin the existing statute, but to prevent members of the General Assembly from ever voting in favor of future legislation containing similar funding restrictions."). This is too speculative of a concern and too

attenuated from the exclusion that is under review. We have before us a challenge to the Coverage Exclusion that is presently in effect and not a hypothetical statutory provision that has yet to be drafted. There is no defined legislative right to vote on future appropriation bills that specifically refuse public funding for abortions, particularly when the constitutionality of such a provision is currently under review by the courts. If it is ultimately decided that the challenged provisions are unconstitutional, then the legislators cannot genuinely claim that their future interests in unconstitutional legislation are violated. *See Healthsystem Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 598 (Pa. 2013) (stating that "regardless of the extent to which the political branches are responsible for budgetary matters, they are not permitted to enact budget-related legislation that violates the constitutional rights of Pennsylvania citizens"). This further illustrates that Intervenors' interest is merely defending the constitutionality of the Coverage Exclusion, making their interests no greater than that of the general citizenry.

Along these lines, Intervenors advance an argument supported by the Commonwealth Court, that a determination of the constitutionality of this statute—or any piece of legislation for that matter—implicates the legislative authority to appropriate government funding. House Members' Brief at 25-29; Senator Intervenors' Brief at 60-63. There is no question that Article III of the Pennsylvania Constitution endows the Legislature with authority over the appropriation of government funds. PA. CONST. art. III, §§ 3, 11, 24. However, the Commonwealth Court's negative inference that a ruling on the constitutionality of the exclusion "will directly limit the General Assembly's exclusive authority to appropriate moneys from the treasury" fails to appreciate the traditional function of judicial review. *Allegheny Reproductive*, 225 A.3d at 911.

Applying this concept broadly, there is no discernible limiting principle to individual legislator intervention. Nearly all matters of state government implicate the appropriation

of government funding in some form or fashion. While the degree may change, government funding underlies all government action. Thus, individual legislators' interests would arise in every instance that there is a question with respect to a law's constitutionality. To endorse the Commonwealth Court's rationale would broaden the scope of individual legislator intervention to such a degree that any of the 253 state legislators would be permitted to intervene in virtually any case in which the constitutionality of a piece of legislation is being challenged.

Not only is this position untenable, but it is contrary to our existing jurisprudence concerning individual legislator intervention. *Markham*, 136 A.3d at 145 ("[T]he assertion that another branch of government … is diluting the substance of a previously-enacted statutory provision is not an injury which legislators, as legislators, have standing to pursue."). Like the legislators in *Markham*, Intervenors in the instant matter are raising concerns that a co-equal branch of government is exercising its authority in a way that will diminish (or in this case, nullify) previously enacted legislation. Despite Intervenors' attempts to frame this constitutional determination as a deprivation of their appropriation authority, we respectfully conclude that this attempt misses the mark.

This Court regularly and appropriately measures the constitutionality of legislation, and by suggesting that each time we do so implicates the Legislature's appropriation authority, Intervenors turn the separation-of-powers doctrine on its head. "Indeed, '[o]rdinarily, the exercise of the judiciary's power to review the constitutionality of legislative action does not offend the principle of separation of powers[.]'" *Robinson Township*, 83 A.3d at 927-28 (quoting *Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 596 (Pa. 2013)). It is precisely this Court's role to determine what is within the bounds of our Charter. *Id.* at 926 ("[T]he Pennsylvania

Supreme Court in particular, ha[s] the power to determine the constitutionality of statutes[.]").

The Commonwealth Court and Intervenors appear to share a fundamental misunderstanding of the relief sought by Providers and the impact that any decision supporting it would have on the Legislature's appropriation of government funds. Providers are not asking the judiciary to mandate funding for abortion coverage but, rather, are seeking a judicial declaration that the Coverage Exclusion and its implementing regulations are unconstitutional and that its enforcement be enjoined. Providers' Brief at 78. If successful, the ultimate decision in this appeal will fulfill the Court's constitutional mandate to adjudicate such matters. Following our decision, Intervenors may vote or legislate however they so choose in conformity with their constitutional prerogatives and obligations.

Furthermore, we find no merit to Intervenors' alternative argument that their intervention in this matter is proper pursuant to Rule of Civil Procedure 2327(3), which provides that a party shall be permitted to intervene when "such person could have joined as an original party in the action or could have been joined therein." Pa.R.C.P. 2327(3). In support of this position, Intervenors cite to several cases in which individual legislators and/or the General Assembly itself were named as defendants. House Intervenors' Brief at 30-33 (citing *Finn v. Rendell*, 990 A.2d 100 (Pa. Commw. 2010); *Stilp v. Commonwealth*, 974 A.2d 491 (Pa. 2009); *Sears v. Wolf*, 118 A.3d 1091 (Pa. 2015); *William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 170 A.3d 414 (Pa. 2017); *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018)); Senate Intervenors' Brief at 70-72 (citing, inter alia, *Pa. State. Ass'n of Jury Comm'rs v. Commonwealth*, 78 A.3d 1020 (Pa. 2013); *Pa. State Ass'n of Cnty. Comm'rs v. Commonwealth*, 52 A.3d 1213 (Pa. 2012); *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205 (Pa. Commw. 2018); *Leach*

*v. Commonwealth*, 141 A.3d 426 (Pa. 2016)). These cases do not support their intervention in this matter. In this regard, we agree with Judge Simpson's observation that "there is no indication" in any of the relied upon cases "that joinder was contested." Judge Simpson's Opinion, 6/21/2019, at 13. Here, intervention has been vigorously contested throughout the matter.

These cases are inapposite on not only procedural grounds, but substantive grounds, as well. In most of these cases, the plaintiffs were attempting to directly challenge uniquely legislative functions. *See Stilp*, 974 A.2d 491 (challenging legislator compensation); *League of Women Voters*, 181 A.3d 1083 (challenging the drawing of district lines); *Leach v. Commonwealth*, 141 A.3d 426 (Pa. 2016) (challenging the enactment process pursuant to the single-subject rule); *William Penn Sch. Dist v. Pa. Dep't of Educ.*, 170 A.3d 414 (Pa. 2017) (claiming the General Assembly failed to enact legislation that would ameliorate education funding disparities). The remaining cases similarly involved the Legislature's functions because plaintiffs sought mandates that the General Assembly appropriate funds in a specific manner. *Sears*, 118 A.3d 1091 (requesting that government funds be redirected to a health insurance program); *Pa. State Ass'n of Cnty. Comm'rs*, 52 A.3d 1213 (seeking to compel General Assembly to provide funding for court system); *Finn*, 990 A.2d 100 (asking the judiciary to compel government entities to reimburse district attorneys' salaries). In the instant matter, Providers are not seeking to compel the General Assembly to do anything, nor are they implicating Intervenors' unique legislative authority for the reasons previously discussed.

As Providers have identified, they are asking the courts to review the constitutionality of the Coverage Exclusion, to enjoin DHS—the agency tasked with administering Medical Assistance—from enforcing the allegedly unconstitutional exclusion, and to recognize a right to abortion under Pennsylvania's Constitution. The

petition for review (and relief requested therein) implicates DHS's administrative functions and does not directly involve the legislative function such that Intervenors could have been joined as original parties. Therefore, Intervenors have no basis to defend the constitutionality of the statute pursuant to Rule 2327(3), and their argument in support of intervention pursuant to Rule 2327(3) is meritless.

For the above reasons, we reject the Commonwealth Court's rationale that Intervenors may intervene based on a theory that striking down the exclusion would affect their authority to appropriate government funds. Accordingly, we hold that Intervenors are not permitted to intervene in this action.[28, 29]

---

[28] After determining that the legislators could intervene pursuant to Rule 2327(4), the Commonwealth Court then turned its analysis to the corollary rule on intervention, Pennsylvania Rule of Civil Procedure 2329. *Allegheny Reproductive*, 225 A.3d at 913 (citing Pa.R.C.P. 2329). Rule 2329 prohibits intervention, as relevant to the lower court's analysis, where the intervenor is already adequately represented, or when intervention will cause undue delay or prejudice. *Id.* However, a court need only engage in an analysis under Rule 2329 when it finds that a proposed intervenor has satisfied one of the requirements of Rule 2327. Given that Intervenors have failed to demonstrate that they may intervene pursuant to Rule 2327, there is no need to address the grounds for disqualifying intervention pursuant to Rule 2329.

[29] Despite our conclusion that the Commonwealth Court erred by allowing intervention, we nonetheless will consider the pertinent portions of Intervenors' briefs as amici briefs in support of DHS's position that the Coverage Exclusion is constitutional. *In re Canvassing Observation*, 241 A.3d 339, 346 n.6 (Pa. 2020). Pennsylvania Rule of Appellate Procedure 531 recognizes that an amicus cannot raise an issue that has not been preserved by the parties, *see* Pa.R.A.P. 531, Note, but the legislators only provide arguments directly addressing the issues preserved by the parties. While DHS does not respond directly to the merits of the Providers' constitutional arguments, the Intervenors do. This does not disqualify their amici status. In fact, this Court is of the view that "[a]n amicus curiae brief that brings to the attention of the Court relevant matter not already brought to its attention by the parties [(e.g., relevant responsive arguments)] may be of considerable help to the Court." Pa.R.A.P. 531, Note (citing U.S. Supreme Ct. R. 37.1).

Because of the volume of amici in this appeal, for the sake of clarity, we refer to Intervenors as such throughout this opinion, despite their status as amici.

### III. Challenge to *Fischer* as controlling precedent

**A.      Scope and Standard of Review**

The Commonwealth Court rejected Providers' constitutional challenges by sustaining DHS's preliminary objection in the nature of a demurrer.  We review such decisions in a way that is substantially similar to the manner in which we review an order sustaining a preliminary objection to a party's standing.  *See* supra p. 23.  In addition to the principles of review discussed above, we note that "the standard of review for preliminary objections in the nature of a demurrer is limited; the question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible.  Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it."  *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 274 (Pa. 2005) (citation and internal quotation marks omitted).

**B.      Relevant Legal Principles**

When interpreting a constitutional provision, the polestar of our analysis must be the plain language.  *In re Bruno*, 101 A.3d 635, 659 (Pa. 2014).  Under such a reading, "this Court regards the language of our Constitution as the embodiment of the will of the voters who adopted it[.]"  *Washington v. Dep't of Pub. Welfare*, 188 A.3d 1135, 1144 (Pa. 2018) (citing *Stilp*, 905 A.2d at 939). When interpreting constitutional language, we are mindful that the language of the Constitution controls and that it must be interpreted "in its popular sense, as understood by the people when they voted on its adoption."  *Pa. Env't Def. Found. v. Commonwealth*, 161 A.3d 911, 929 (Pa. 2017).  In ascertaining the meaning of a word in accordance with its common and approved usage, this Court has found it helpful to consult dictionaries.  *Greenwood Gaming & Ent., Inc. v. Commonwealth*, 263 A.3d 611, 620 (Pa. 2021) (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 75 (Pa. 2014)).  Further, when reviewing statutory enactments, "we presume that the

General Assembly does not intend to violate the Pennsylvania Constitution[.]" *McLinko v. Dep't of State*, 279 A.3d 539, 563 (Pa. 2022).

Also relevant to the present analysis is the doctrine of stare decisis, pursuant to which courts are bound by previous decisions of the court in order to "promote[] the evenhanded, predictable, and consistent development of legal principles, foster[] reliance on judicial decisions, and contribute[] to the actual and perceived integrity of the judicial process." *See Commonwealth v. Alexander*, 243 A.3d 177, 195-96 (Pa. 2020) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)). To ensure certainty and finality, overturning a decision requires a "special justification, over and above the belief that the precedent was wrongly decided." *Id.* at 196 (quoting *Allen v. Cooper*, 140 S. Ct. 994, 1003 (2020)). The appropriateness of overruling a past decision depends on a number of factors, including the age and lineage of the decisions, as well as "'the quality of [its] reasoning, the workability of the rule it established, its consistency with other related decisions, … and reliance on the decision.'" *Id.* at 196-97 (quoting *Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2177-78 (2019)).[30] Additionally, the considerations for stare decisis are afforded "special force in the area of statutory interpretation[,]" resulting in courts adhering to a more strict application of the doctrine in this context as opposed to in the context of constitutional law. *Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991). Stare decisis is at its weakest in the context of constitutional interpretation. *Alexander*, 243 A.3d at 197 (citing *Agostini v. Felton*, 521 U.S. 203, 235 (1997)).

Although undoubtedly powerful, this Court has repeatedly recognized that "[w]hile the doctrine of stare decisis is important, it does not demand unseeing allegiance to things

---

[30] Justice Mundy's suggestion that we, as Justices, have overruled other Justices is, at best, curious. Concurring & Dissenting Op. at 3 n.2 (Mundy, J). Although presumably offered for its rhetorical effect, it is also dangerous. As a majority of the Justices adjudicating a case, we speak as the Supreme Court of this Commonwealth. Justice Mundy's pedestrian "observation" calls into question countless cases adjudicated by similarly constituted versions of this Court.

past." *Commonwealth v. Doughty*, 126 A.3d 951, 955 (Pa. 2015); *see also Alexander*, 243 A.3d at 196 ("No one would seriously maintain that stare decisis demands absolute fidelity to what came before."); *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 336 (Pa. 2014) (quoting *In re Carney*, 79 A.3d 490, 505 (Pa. 2013) ("[W]e have long recognized that the doctrine of stare decisis is not a vehicle for perpetuating error, but a 'legal concept which responds to the demands of justice, and, thus, permits the orderly growth process of the law to flourish.'")).

### C.   *Fischer v. Department of Public Welfare*

In *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), the Court addressed arguments like those presented here that the Coverage Exclusion found in Section 3215(c) of the Abortion Control Act violated equal protection principles embodied in the Pennsylvania Constitution and the Equal Rights Amendment because it provided all medically necessary services–including those related to reproductive health–to men but excluded women from access to medically necessary services.  The Court issued a unanimous opinion rejecting the constitutional challenges.  Whereas the Commonwealth Court viewed *Fischer* as dispositive, Providers challenge *Fischer*'s continued vitality.  We begin our analysis with a detailed discussion of *Fischer*.

The *Fischer* Court based its analysis on the proposition that the case did not concern the right to abortion.  It recognized that in *Roe v. Wade*, 410 U.S. 113 (1973),[31] the High Court "bottomed the right to expel an unwanted pregnancy on the choice of the

---

[31]   As previously noted, in 2022, while this appeal was pending in this Court, *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228, 2279 (2022) overruled *Roe*, holding that the federal Constitution does not confer a right to abortion, and "the authority to regulate abortion must be returned to the people and their elected representatives." *Id*. The *Fischer* Court's opinion was written with the understanding that there existed a federal right to abortion.  After *Dobbs* was announced, this Court issued an order granting Providers the opportunity to file supplemental briefing to address the impact of *Dobbs* on this case and directing the Prothonotary to accept all supplemental briefs for filing.  Order, 8/18/2022.

private uses of one's body." *Fischer*, 502 A.2d at 116. The *Fischer* Court, however, framed the question as whether, "because this Commonwealth provides funds to indigent women for a safe delivery, [it is] therefore equally obliged to fund an abortion." *Fischer*, 502 A.2d at 116.

In recounting the procedural history, the *Fischer* Court observed that the genesis of the dispute was a challenge to the constitutionality of the Coverage Exclusion brought by the appellants—a taxpayer, several medical assistance recipients who at the time the lawsuit was filed were pregnant and sought abortions, abortion providers, and a rape counseling organization ("Appellants").[32] Appellants filed their challenges in state and federal court, the latter of which they withdrew. With regard to the state court challenge, the Commonwealth Court preliminarily enjoined enforcement of the Coverage Exclusion, and this Court affirmed the preliminary relief. *Fischer v. Dep't of Public Welfare*, 439 A.2d 1172 (Pa. 1982). The case was returned to the Commonwealth Court, where ultimately, an en banc panel upheld the Coverage Exclusion against the constitutional challenges. On appeal to this Court, Appellants raised three issues based in Pennsylvania constitutional law: they asserted that the abortion exclusion violated the equal protection guarantees of Article I, Section 1 and Article III, Section 32 of the Pennsylvania Constitution; that it violated the non-discrimination provision of Article I, Section 26 of the

---

[32] The lawsuit originally challenged 62 P.S. § 453 of the Public Welfare Code, Act of December 19, 1980, P.L. 1321 No. 239 § 1 ("Act 239"), prohibiting State and local government agencies from expending Commonwealth funds for the performance of an abortion except upon certification that the mother's life would be endangered, or for victims of rape or incest. 62 P.S. § 453. Act 239 was repealed and the Coverage Exclusion was reenacted in 18 Pa.C.S. § 3215(c) of the Abortion Control Act of 1982, Act of June 11, 1982, P.L. 476, No. 138. For present purposes, there is no meaningful difference in the language of Act 239, the 1982 version of Section 3215(c), and the present version of the Section 3215(c), which would call for a different analysis.

Pennsylvania Constitution;[33] and that it violated the Equal Rights Amendment in Article I, Section 28 of the Pennsylvania Constitution.

Although recognizing that Appellants did not raise any federal claims, the *Fischer* Court began with an extensive examination of what it referred to as the "relevant federal constitutional authorities." *Fischer*, 502 A.2d at 118. The Court observed that in our federal system, individual states may make certain choices "as long as they do not transgress certain constitutional parameters" as defined by the United States Supreme Court. *Id*. (citing *Pruneyard Shopping Ctrs. v. Robins*, 447 U.S. 74 (1980)).

The Court then summarized the then-relevant federal constitutional parameters of the right to abortion as established in *Roe*. It found relevant the *Roe* Court's acknowledgement that states have an interest in "potential life which may be destroyed," an interest which can justify certain restrictions on the performance of abortions. *Id*. (citing *Roe*, 410 U.S. at 162). Further, "the states' interest in potential life is a significant one 'existing throughout the course of the woman's pregnancy' and ... states may take certain steps 'to further this unquestionably strong and legitimate interest in encouraging normal childbirth.'" *Id*. at 118 (citing *Beal v. Doe*, 432 U.S. 438, 446 (1977)).[34]

---

[33] The *Fischer* Court addressed Article I, Section 26 separately from the other equal protection provisions, reviewing it as a standalone "non-discrimination clause" of our Constitution. *Fischer*, 502 A.2d at 123. However, Section 26 has been consistently applied and adopted by this Court as one of our Charter's equal protection provisions. *See, e.g.*, *Commonwealth v. Parker White Metal Co.*, 515 A.2d 1358, 1362-63 (Pa. 1986); *Love v. Borough of Stroudsburg*, 597 A.2d 1137, 1139 (Pa. 1991); *Driscoll v. Corbett*, 69 A.3d 197, 212 (Pa. 2013).

[34] In *Beal v. Doe*, 432 U.S. 438, 440 (1977), a case involving statutory construction, the High Court held that Title XIX of the Social Security Act (a program "under which participating States may provide federally funded medical assistance to needy persons") did not require the funding of nontherapeutic abortions as a condition of participation in the joint federal-state medical program.

The *Fischer* Court also drew attention to the line of federal cases addressing state Medicaid funding and exclusions of abortion coverage. Namely, in *Maher v. Roe*,[35] the High Court held that states were not constitutionally required to "accord equal treatment to both abortion and childbirth." *Id*. (citing *Maher v. Roe*, 432 U.S. 464, 473-74 (1977)). Further, it was not unconstitutional for states to pay the expenses of childbirth while at the same time refusing to pay the expenses of abortions in non-life-threatening situations. *Id*. (citing *Maher*, 432 U.S. at 473-74). The *Maher v. Roe* Court explained:

> *Roe* did not declare an unqualified "constitutional right to an abortion" ... Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate the pregnancy. It implies no limitation on the authority of the State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.

*Id*. (citing *Maher*, 432 U.S. at 473-74).[36]

Three years later, in *Harris v. McRae,* 448 U.S. 297 (1980), the High Court addressed the constitutional validity of the Hyde Amendment, which was federal legislation providing for Medicaid funding and prohibiting the funds from being "used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service." *Id*. at 119 (citing Pub.L. 96–123, § 109, 93 Stat. 926).

---

[35] In *Maher v. Roe*, 432 U.S. 464 (1977), the High Court addressed an Equal Protection Clause challenge to a Connecticut regulation under which Medicaid recipients received full coverage of childbirth medical services but no coverage of medical services incidental to nontherapeutic abortions. Ultimately, the High Court emphasized that the woman's indigency is at fault for the woman's difficulty. It therefore concluded that the Connecticut regulation "d[id] not impinge upon the fundamental right recognized in *Roe*." *Id*.

[36] The *Fischer* Court also highlighted that in *Williams v. Zbaraz*, 448 U.S. 358 (1980), the High Court held that a state may enact a statute limiting medically necessary abortion funding without offending the federal Constitution. *Fische*r, 502 A.2d at 118.

The *Fischer* Court focused on two constitutional challenges raised and rejected in *Harris* as being most relevant, i.e., whether the Hyde Amendment impinged a fundamental right or violates the Equal Protection Clause.

First, in finding that the Hyde Amendment's restrictions did not impinge on a liberty interest protected by the Due Process Clause, the *Harris* Court cited to *Maher*'s distinction "between direct state interference with a protected activity and state encouragement of an alternative activity consistent with legislative policy." *Fischer*, 502 A.2d at 119 (citing *Harris*, 448 U.S. at 315 (citing *Maher*, 432 U.S. at 475-76)). Further, "[c]onstitutional concerns are greatest when the state attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." *Id.* (citing *Harris*, 448 U.S. at 315 (citing *Maher*, 432 U.S. at 475-76)). The High Court in *Harris* explained that, "regardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty recognized in [*Roe v.*] *Wade*, it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself to the full range of protected choices." *Id.* (citing *Harris*, 448 U.S. at 316-17). The *Harris* Court reiterated the reasoning from *Maher* that "although government may not place obstacles in the path of a woman's exercise of her freedom of choice, [the government] need not remove those not of its own creation. Indigency falls in the latter category." *Id.* (citing *Harris*, 448 U.S. at 316-17).

The *Harris* Court explained that indigency itself is to blame for restricting the indigent woman's ability to exercise her right to abortion, not governmental restrictions on access to abortions. According to the High Court, "the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had

chosen to subsidize no health care costs at all." *Id.* (citing *Harris*, 448 U.S. at 316-17). Reasoning that the Hyde Amendment merely encouraged childbirth and did not place obstacles or interfere with a woman's freedom of choice, the *Harris* Court concluded that the Hyde Amendment did "not impinge on the due process liberty rights" recognized in *Roe*. *Id.* (citing *Harris*, 448 U.S. at 318).

Next, the *Fischer* Court recognized that the *Harris* Court rejected an argument that the Hyde Amendment violates the Equal Protection Clause of the Fifth Amendment to the United States Constitution. Given that the High Court had not recognized indigency as a suspect classification for purposes of a federal equal protection analysis, the *Harris* Court stated that the Hyde Amendment did not operate to the detriment of a suspect class. *Id.* (citing *Harris*, 448 U.S. at 323). Therefore, the *Harris* Court reviewed the Hyde Amendment under rational basis, i.e., looking at whether it operates in a manner that "is rationally related to the legitimate governmental objective of protecting potential life." *Id.* at 120 (citing *Harris*, 448 U.S. at 325). It found that Congress used the Hyde Amendment to encourage childbirth except in the most urgent circumstances. Further, the incentives created by subsidizing medical expenses of indigent women who carry their pregnancies to term while not subsidizing those of indigent women who undergo abortions "bear a direct relationship to the legitimate congressional interest in protecting potential life." *Id.* (citing *Harris*, 448 U.S. at 325). Based on *Maher* and *Harris*, the *Fischer* Court observed that pursuant to the High Court's interpretation of the United States Constitution, "it is obvious that funding limitations which favor childbirth over abortion do not offend constitutional safeguards." *Id.*

Turning to the case before it, the *Fischer* Court recounted that the Commonwealth argued that the rights and privileges accorded Pennsylvania citizens are no greater than those afforded under the federal Charter with regard to abortion in this context, while the

Appellants argued for the Court to interpret the Pennsylvania Constitution in a more expansive manner than its federal counterpart. *Id*. Specifically, Appellants argued that the analysis differs from that undertaken in *Harris*, urging the Court to "consider either that abortion, when necessary to preserve one's health, is a fundamental right, or that the classification of indigent women is a suspect one; and that the statute would not bear up under strict scrutiny." *Id.* Alternatively, Appellants argued that the statute would fail under rational basis review.

The *Fischer* Court began what it referred to as its equal protection analysis deriving from Article I, Section 1 and Article III, Section 32 by drawing from the previously discussed federal precedent. It recognized that merely because all have the right, it does not mean that the Commonwealth is required to fund the right. Nonetheless, when the Commonwealth offers to fund a right, it "must fund it for all, unless they [sic] have a constitutionally valid reason to specify only a certain class as their beneficiaries. It is the nub of equal protection that the Commonwealth cannot give or take from one and not the other unless their reason is to advance or protect a constitutionally recognizable interest of the common weal." *Id.* at 120-21. The Court further recognized that it was "free to interpret our Constitution in a more generous manner than the federal courts[]" interpret the federal Charter, and it observed that it has done so in the past. *Id*. (citing *Commonwealth v. Sell*, 470 A.2d 457 (Pa. 1983); *Commonwealth v. Tate*, 432 A.2d 1382 (Pa. 1981); *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979)).[37] However, the Court

---

[37] In this trio of cases, this Court recognized that the Pennsylvania Constitution may provide greater protection than its federal counterpart. *Sell*, 470 A.2d 457 (holding that under Article I, Section 8, a defendant charged with a possessory offense has automatic standing to challenge the admissibility of evidence alleged to be the fruit of an illegal search or seizure despite that automatic standing had been abolished with regard to the Fourth Amendment); *Tate*, 432 A.2d at 1387 (recognizing that a state "may provide through its constitution a basis for the rights and liberties of its citizens independent from that provided by the Federal Constitution, and that the rights so guaranteed may be more (continued…)

observed that it often turns to federal constitutional analysis "as an interpretational aid." *Id*. at 121.

It identified *Kroger v. O'Hara Township*, 392 A.2d 266 (Pa. 1978) as establishing "the preferred manner" to analyze state equal protection claims.[38]  According to *Kroger*, though the High Court's interpretation of the federal Constitution is not binding on this Court's interpretation of the Pennsylvania Constitution, "we should be guided by the same principles in interpreting our Constitution." *Fischer*, 502 A.2d at 121 (citing *Kroger*, 392 A.2d at 274; *Commonwealth v. Kramer*, 378 A.2d 824 (Pa. 1977) (rejecting statutory challenge raised under Article III, Section 32 and treating it as a federal Equal Protection Clause challenge); *Baltimore and Ohio R.R. v. Commonwealth, Dep't of Lab. and Indus.*, 334 A.2d 636 (Pa. 1975) (same)).

Next, the *Fischer* Court observed that *James v. Southeastern Pennsylvania Transportation Authority*, 477 A.2d 1302 (Pa. 1984), describes the analytical framework for reviewing government actions which affect disparate classes.[39]  Namely, "classifications implicating neither suspect classes nor fundamental rights" are reviewed

---

expansive than their federal counterparts[;]" then holding that appellants could not, consistent with their rights under the Pennsylvania constitution to freedom of speech, assembly and petition, be convicted for defiant trespass, when they staged a peaceful protest during the public presentation of then-FBI Director Kelley on the college campus); *DeJohn*, 403 A.2d at 1291-92 (holding that under the Pennsylvania Constitution, Article I, Section 8, defendant had a legitimate expectation of privacy in his bank record, despite not having such an interest under the Fourth Amendment).

[38]  In holding that the Sunday Trading Law violated equal protection, the *Kroger* Court indicated that it was required to recognize the specific language in our Constitution insofar as it differed from that of the federal Constitution.  *Kroger*, 392 A.2d at 274.  The Court ultimately stated that it would be guided by the same principles in interpreting Article III, Section 32, as employed by the United States Supreme Court in interpreting the Equal Protection Clause.  *Id*. at 274-75.

[39]  *James* was based on federal Equal Protection Clause precedent.  *James*, 477 A.2d at 1305-07.

under a "rational basis" test. *Fischer*, 502 A.2d at 121 (citing *James*, 477 A.2d at 1306). "[W]here a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny." *Id.* (citing *James*, 477 A.2d at 1306). Finally, "if 'important,' though not fundamental rights are affected by the classification, or if 'sensitive' classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review." *Id.* The *James* Court explained that the applicability of any of these three standards depends upon "the type of right which is affected by the classification." *Id*. (citing *James*, 477 A.2d at 1306).

The *Fischer* Court identified the right with which it was confronted. It identified it as "the purported right to have the state subsidize the individual exercise of a constitutionally protected right, when it chooses to subsidize alternative constitutional rights[,]" a right which it stated was "found nowhere in our state Constitution," and therefore under the framework described in *James*, such a right cannot be considered fundamental. *Id.* Further, the Court stated that the statute does not affect a suspect class. It reiterated the High Court's reasoning that "financial need alone" does not identify a suspect class for purposes of equal protection analysis, and it stated that no other jurisdiction had recognized indigency as a suspect class. *Id.* at 122. Therefore, the *Fischer* Court reasoned, "since the statute affects neither a fundamental right nor a suspect class, the interest of the state need not be a compelling one in order to sustain the burden of justifying the disparate treatment of the two classes of women." *Id*.

Though it ultimately stated that the distinction only need be supported by rational basis, it alternatively explored and applied intermediate scrutiny. The Court reiterated that the second or intermediate level of scrutiny involves instances where "an 'important' interest has been affected,' and/or 'whether sensitive, though not suspect classifications

have been made." *Id.* (citing *James*, 477 A.2d at 1306). Also, those rights important enough to warrant this heightened scrutiny "have been described as those affecting 'liberty' interests, or a 'denial of a benefit vital to the individual.'" *James*, 477 A.2d at 1306 (citing Laurence Tribe, AMERICAN CONSTITUTIONAL LAW, § 16–31 (1978)). The *Fischer* Court noted that the High Court in *Harris* determined that the Hyde Amendment's funding restrictions affected neither an important interest nor a sensitive classification. *Fischer*, 502 A.2d at 122.

Then it stated, "[h]owever, even assuming, as [A]ppellants impliedly argue, that the funding distinction made in the Abortion Control Act constituted a 'denial of a benefit vital to the individual' claimants," it would satisfy intermediate scrutiny. *Id.* Again, relying on *James*, it characterized intermediate scrutiny as requiring (1) that the governmental interest be an important one; (2) that the governmental classification be drawn so as to be closely related to the objectives of the legislation; and (3) that a person excluded from the benefit be permitted to challenge the denial on the grounds that his particular denial would not further the governmental purpose of the legislation. *Id.* at 121 (citing *James*, 477 A.2d at 1307).

In identifying the important governmental interest, the *Fischer* Court explained: "the importance of the governmental interest of preserving potential life has been consistently recognized by the United States Supreme Court[]" as "valid and important," *Beal*, 432 U.S. at 445; "important and legitimate," *Harris*, 448 U.S. at 324 (citing *Roe v. Wade*, 410 U.S. at 162); "significant" and, "unquestionably strong," *Beal*, 432 U.S. at 446. The *Fischer* Court next drew attention to the High Court's recognition of "the unique aspect of abortion as being the only medical procedure involving 'the purposeful termination of a potential life.'" *Fischer*, 502 A.2d at 122 (citing *Harris*, 448 U.S. at 325). Therefore, the *Fischer* Court announced that "the Commonwealth's interest in attempting to preserve a potential

life" is important. *Id.* ("[T]o say that the Commonwealth's interest in attempting to preserve a potential life is not important, is to fly in the face of our own existence.").

Next, the Court explained that the classification was "specifically related to the ends sought[.]" *Id*. That is, the Act encouraged childbirth "in all situations except where another life would have to be sacrificed[,]" and thus, it preserved "the maximum amount of lives: i.e., those unaborted new babies and those mothers who will survive though their fetus be aborted." *Id*. at 122-23. Finally, the Court reasoned that Appellants had not shown how the "Commonwealth's denial of funds would fail to accomplish the governmental purpose of preserving the life of the unborn child." *Id*. at 123.

The *Fischer* Court therefore stated that, even if it were to find that the present classification warranted heightened scrutiny, it would nevertheless find that the distinction passed constitutional muster. However, it reiterated, as the United States Supreme Court concluded in *Harris*, the appropriate standard of review is rational basis. It observed that this test–i.e., the deferential standard by which legislative enactments are reviewed–is the standard it had traditionally used to assess the constitutionality of distinctions within government benefit programs. *Id.* (citing *Martin v. Unemployment Comp. Bd. of Rev.*, 466 A.2d 107 (Pa. 1983)).[40]

---

[40] In *Martin*, this Court addressed an appeal of a denial of unemployment compensation benefits. *Martin*, 466 A.2d at 108. The appellant, a claimant denied unemployment benefits, asserted that the statutory scheme to determine the levels of monetary earnings qualifying a worker for unemployment benefits violated the Equal Protection Clause of the Fourteenth Amendment by creating an invidious eligibility classification. "The statute applicable to this case required that claimants earning $3,738.00 or more in their highest quarter also earn the maximum of $6,000.00 in fixed qualifying wages in their base year, with a minimum 20% of such base year wages earned outside their highest quarter. On the other hand claimants earning less than $3,738.00 in their highest quarter had to earn 35% to 38% of their wages outside their highest quarter without any higher fixed constant amount." *Id.*

In determining the proper test to evaluate the challenge, the Court recalled that the United States Supreme Court "has consistently applied only minimal scrutiny to statutory (continued…)

Under the rational basis standard, the classification "need only be directed at the accomplishment of a legitimate governmental interest, and to do so in a manner which is not arbitrary or unreasonable." *Id*. The Court recounted that on the reasons already stated, "and for those stated by the United States Supreme Court, [it had] no hesitation in concluding that the present classification had, and continues to have, a rational basis." *Id*.

Next, the *Fischer* Court addressed Article I, Section 26, what it characterized as "the Commonwealth's non-discrimination clause." *Id*. Appellants argued that the state impermissibly discriminated against persons who would have abortions, "by limiting funding to those mothers who elect to carry the baby to full term, or who are faced with a life threatening choice." *Id*. They argued also that Article I, Section 26 affords different and greater guarantees than the other equal protection provisions of the Pennsylvania Constitution. The Court disagreed.

In support, it recalled the Commonwealth Court's treatment of Article I, Section 26 in *McIlvanie v. Pennsylvania State Police*, 296 A.2d 630 (Pa. Commw. 1972), an opinion which this Court subsequently adopted, *McIlvaine v. Pennsylvania State Police*, 309 A.2d 801 (Pa. 1973),[41] in which the Commonwealth Court stated that

> "Article I § 26 does not in itself define a new substantive civil
> right."[15] [*McIlvanie*, 296 A.2d] at 633. What Article I § 26 does
> is make more explicit the citizenry's constitutional safeguards

classifications employed in the regulation of economic activity or in the distribution of economic benefits so long as those classifications do not discriminate against 'suspect classes.'" *Id*. at 111. The Court observed that insofar as the unemployment compensation law creates a classification based on wealth, such a classification does not trigger heightened scrutiny. *Id*. at 113-14. Neither did the statutory scheme impact a fundamental right. Therefore, the Court concluded that there was a rational relationship between the classifications and the legitimate government interest, and thus, found that it did not violate the federal Equal Protection Clause. *Id*.

[41] *See* infra p. 186.

not to be harassed or punished for the exercise of their constitutional rights. It can not [sic] however be construed as an entitlement provision; nor can it be construed in a manner which would preclude the Commonwealth, when acting in a manner consistent with state and federal equal protection guarantees, from conferring benefits upon certain members of a class unless similar benefits were accorded to all.

> [15] In *Harris v. McRae*, 448 U.S. 297 (1980), the Majority's comments on the breadth of the equal protection clause are analogous.

> > The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classification and other government activity.

> *Id*. at 322.

*Fischer*, 502 A.2d at 123 & n.15.

The *Fischer* Court then considered the mode of analyzing Article I, Section 26, and in the following brief passage, opted to adopt the "penalty" analysis discussed in a footnote from *Maher*, as cited above. The *Fischer* Court observed that it had "not previously embraced a mode of analyzing claims under Article I, Section 26," and it found that the most appropriate analysis was that utilized by the United States Supreme Court in *Shapiro v. Thompson*, 394 U.S. 618 (1969)[42] and *Memorial Hospital v. Maricopa*

---

[42] In *Shapiro v. Thompson*, 394 U.S. 618 (1969), which implicated the fundamental right of interstate travel, the High Court held that statutory prohibitions in Connecticut, Washington and the District of Columbia that denied welfare assistance to residents of the state or district who had not resided within their jurisdictions for at least one year preceding their applications for welfare assistance created a "classification which constitute[d] an invidious discrimination denying them equal protection of the laws." *Id*. at 627. The High Court stated that "[t]he interests which appellants assert[ed] are promoted by the classification[,]" such as "to discourage the influx of poor families in need of assistance[,]" either may not constitutionally be promoted by government or are not compelling government interests. *Id*. at 627, 629. The High Court recalled that "[i]f a law (continued…)

*County*, 415 U.S. 250 (1974),[43] i.e., the "penalty" analysis, "whereby the focus is whether a person has been somehow penalized for the exercise of a constitutional freedom." *Fischer*, 502 A.2d at 123-24. The *Fischer* Court then recalled the footnote in *Maher*, providing that the penalty "analysis does not warrant relief in a situation such as here where a state merely seeks to encourage behavior by offering incentives, as distinct from where a state refuses to subsidize a person's exercise of a constitutional right." *Id.* It cited the following passage from the High Court:

---

has 'no other purpose … than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it (is) patently unconstitutional.'" *Id.* at 631 (citing *United States v. Jackson*, 390 U.S. 570, 581 (1968)). The Court recognized that a state has a valid interest in preserving the fiscal integrity of its government programs, but explained that the state "may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Id.* at 633. The Court recounted the traditional equal protection test, pursuant to which equal protections is denied only if the classification is without any reasonable basis, and it stated that the residency classification "would seem irrational and unconstitutional." *Id.* at 638 & n.20 (internal citations omitted). Then it explained that, rather than apply the traditional criteria, it would apply "the stricter standard of whether it promotes a compelling state interest" because the classification of welfare applicants "touches on the fundamental right of interstate movement[.]" *Id.* at 638. Under that standard, the "waiting-period requirement clearly violates the Equal Protection Clause." *Id.*

[43] In *Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974), relying upon *Shapiro*, the High Court held that an Arizona statute requiring a year's residence in a county as a condition of receiving nonemergency hospitalization or medical care at the county's expense was repugnant to the Equal Protection Clause. The High Court first looked to the "nature of the classification and the individual interests affected" to determine what burden of justification must be met. *Id.* at 253. Because the right of interstate travel is a "basic constitutional freedom" and because Arizona's "durational residence requirement for free medical care penalize[d] indigents for exercising their right to migrate to and settle in that State[,]" the classification would be unconstitutional, "unless shown to be necessary to promote a compelling government interest." *Id.* at 261-62 (citing *Shapiro*, 394 U.S. at 634). The High Court found that the classification was not justified by a compelling government interest. Instead, it stated, the durational residency requirement created invidious discrimination "that impinge[d] on the right of interstate travel by denying newcomers 'basic necessities of life.'" *Id.* at 269. The Arizona statute violated the Equal Protection Clause.

> Penalties are most familiar to the criminal law, where criminal sanctions are imposed as a consequence of proscribed conduct. *Shapiro* and *Maricopa County* recognized that denial of welfare to one who had recently exercised the right to travel across state lines was sufficiently analogous to a criminal fine to justify strict judicial scrutiny.
>
> If [a state] denied general welfare benefits to all women who had obtained abortions and who were otherwise entitled to the benefits, we would have a close analogy to the facts in *Shapiro*, and strict scrutiny might be appropriate under either the penalty analysis or the analysis we have applied in our previous abortion decisions. But the claim here is that the State "penalizes" the woman's decision to have an abortion by refusing to pay for it. *Shapiro* and *Maricopa County* did not hold that States would penalize the right to travel interstate by refusing to pay the bus fares of the indigent travelers. We find no support in the right-to-travel cases for the view that Connecticut must show a compelling interest for its decision not to fund elective abortions.

*Fischer*, 502 A.2d at 124 (citing *Maher*, 432 U.S. at 474, 475 n.8). The *Fischer* Court explained that "since the Commonwealth here has not otherwise penalized [A]ppellants for exercising their right to choose, but has merely decided not to fund that choice in favor of an alternative social policy, … the Commonwealth's actions are not offensive to the Constitutional guarantees protected under Article 1[, Section] 26." *Id*.

Turning next to Appellants' challenge under the Equal Rights Amendment, the *Fischer* Court briefly addressed the "purpose and intent" of the Equal Rights Amendment to "eliminate sex as a basis for distinction," and that "[t]he law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman." *Id*. (citing *Henderson v. Henderson*, 327 A.2d 60, 62 (Pa. 1974)). The *Fischer* Court recognized that it had applied the Equal Rights Amendment numerous times to strike or modify rules of law which it "found to be offensive to its terms." *Fischer*, 502 A.2d at 124-25 (citing ten cases).

The *Fischer* Court observed that in each of the cases applying the Equal Rights Amendment, the Court "vigilantly protected the rights of women and men to be treated without reliance upon their sexual identity." *Id*. at 125. In doing so, this Court has "recognized that distinctions which 'rely on and perpetuate stereotypes' as to the responsibilities and capabilities of men and women are anathema to the principles of the [Equal Rights Amendment]." *Id*. (citing *Hartford Accident and Indem. v. Insur. Comm'n*, 482 A.2d 542, 548 (Pa. 1984)).

However, the *Fischer* Court decided that the challenge to the Coverage Exclusion did not implicate the Equal Rights Amendment because the distinction in Medical Assistance coverage was not made because of the sex of the individual. The Court gave two reasons. First, the Coverage Exclusion found in Section 3215(c) does not use sex as a basis for distinction. Instead, the distinction is based on abortion. In other words, the exclusion is not based on sex but "based on a voluntary choice made by the women." *Id*.

Second, the *Fischer* Court acknowledged that "only women are affected" by the challenged provision, but it stated that this fact "does not necessarily mean that women are being discriminated against on the basis of sex." *Id*. (emphasis added). The Court explained as follows:

> In this world there are certain immutable facts of life which no amount of legislation may change. As a consequence there are certain laws which necessarily will only affect one sex. Although we have not previously addressed this situation, other [equal rights amendment] jurisdictions have; and the prevailing view amongst our sister state jurisdictions is that the [equal rights amendment] "does not prohibit differential treatment among the sexes when, as here that treatment is reasonably and genuinely based on physical characteristics unique to one sex." *People v. Salinas*, 551 P.2d 703, 706 (Colo. 1976). *See, State v. Rivera*, 612 P.2d 526 (Ha. 1980); *City of Seattle v. Buchanan*, 584 P.2d 918 (Wash. 1978). *See also, Holdman v. Olim*, 581 P.2d 1164 (Ha. 1978).

*Id*. at 125. The *Fischer* Court thus recognized an exception to the Equal Rights Amendment, i.e., where the distinction is based on physical characteristics unique to only one sex. According to *Fischer*, the Equal Rights Amendment is not implicated when a statute uses physical characteristics unique to one sex, but not sex itself, as a basis for distinction. Consequently, the *Fischer* Court held that when the state uses unique physical characteristics of a sex rather than sex itself to distinguish, no Equal Rights Amendment analysis follows.

After establishing that the government may discriminate on the basis of physical characteristics unique to one sex without implicating the Equal Rights Amendment, the *Fischer* Court briefly responded to Appellants' argument that treating women differently based on pregnancy or their unique physical properties constitutes sex-based discrimination. The Appellants asked the Court to recognize what had been firmly established under Pennsylvania case law relating to the Pennsylvania Human Relations Act ("PHRA"), that "to treat women differently on the basis of pregnancy is to discriminate on the basis of their sex." *Fischer* Appellants' Brief at 52 (citing, inter alia, *Cerra v. East Stroudsburg Area Sch. Dist.*, 299 A.2d 277 (Pa. 1973)). In sum, the Appellants argued that the *Cerra* case precluded the Court from considering the unique reproductive capabilities of women as a basis for upholding the present statute.

The *Fischer* Court disagreed with the Appellants' characterization of *Cerra*. It explained that in *Cerra*, the Court invalidated a school district regulation that required women who were more than five months pregnant to resign, because it violated the Pennsylvania Human Relations Act. *Fischer*, 502 A.2d at 125 n.17. *Cerra* did not address the Equal Rights Amendment.

According to the *Fischer* Court, "[t]he basis of the Court's decision was that Ms. Cerra was the victim of a presumption that her pregnancy constituted a disability which

warranted her dismissal, whereas men 'who might well be temporarily disabled from a multitude of illnesses, have not and will not be so harshly treated.'" *Id*. at 125. According to *Fischer*, the *Cerra* Court was "obviously" focused "on the varying treatment accorded the state of pregnancy, where despite objective evidence to the contrary, women were presumed to be totally disabled, yet there was not an equivalent presumption applicable to any disability attributable to men." *Id*. (citing *Cerra*, 299 A.2d at 280).

The *Fischer* Court found that *Cerra*'s logic did not extend to abortion, stating that "the decision whether or not to carry a fetus to term is so unique as to have no concomitance in the male of the species." *Id*. at 126. According to the *Fisher* Court, the Coverage Exclusion was "solely directed to that unique facet" and it was "in no way analogous to those situations where the distinctions were based exclusively on the circumstance of sex, social stereotypes connected with gender, or culturally induced dissimilarities." *Id*. (internal citations omitted). Therefore, the *Fischer* Court stated that, in the context of the challenge to Section 3215(c), the Equal Rights Amendment afforded no basis for relief. *Id*.

**D.      Equal Rights Amendment Challenge**

By its express terms, the Equal Rights Amendment prohibits the abridgment of rights based on the sex of the individual. As discussed, the *Fischer* Court held that discrimination based on physical characteristics unique to one sex does not implicate the Equal Rights Amendment. Thus, the question we need to decide is whether the Equal Rights Amendment prohibits statutory classifications based on "physical characteristics unique to one sex" just as it prohibits other statutory classifications that depend on the sex of a person. If so, the only remaining question is whether under principles of stare decisis, we are still bound to follow the *Fischer* Court's interpretation of the Equal Rights Amendment.

### 1. Parties' Arguments
### Providers' Arguments

Providers argue that this Court has applied the Equal Rights Amendment to strike down legislative classifications that confer benefits or burdens unequally on women and men and that the Court has employed "intense and unflinching" judicial review of sex-based classifications rooted in traditional gender stereotypes. Providers' Brief at 31. According to Providers, the *Fischer* Court abandoned those principles and the language of the Equal Rights Amendment when it held that the Coverage Exclusion was beyond the reach of the Equal Rights Amendment because pregnancy is so "unique as to have no concomitance in the male of the species[.]" *Id*. at 34 (citing *Fischer*, 502 A.2d at 126). Providers urge this Court to overrule *Fischer* because it was not "adequately supported in reason." *Id.* at 34-35 (citing *Commonwealth v. Resto*, 179 A.3d 18, 22 (Pa. 2018) (providing that "the doctrine of stare decisis does not apply to pronouncements that are not adequately supported in reason")).

In contending that the Coverage Exclusion implicates the Equal Rights Amendment, Providers submit that the exclusion is explicitly sex-based, in that it treats women differently "on the basis of a physical condition peculiar to their sex[.]" *Id*. at 35. They state that the *Fischer* Court created a broad exception to the Equal Rights Amendment for "physical characteristics unique to one sex"—an exception which removed from the Equal Rights Amendment's reach the "very characteristic that has historically been invoked to justify unfavorable treatment of women[,]" i.e., their reproductive capacity. *Id*. at 36. Providers invoke this Court's jurisprudence holding that treating women differently based on their pregnant status is sex discrimination under the Pennsylvania Human Relations Act. *Id*. at 35 (citing *Cerra*, 299 A.2d at 280). To further illustrate their point, Providers posit that the Coverage Exclusion is "sex-based," in the same way that a hypothetical Medicaid program covering uterine cancer treatment but

not prostate cancer treatment would necessarily be explicitly sex-based, and thus invalid under the Equal Rights Amendment. *Id*. at 36.

Providers argue that even if one views the Coverage Exclusion as "facially neutral," it runs afoul of the Equal Rights Amendment for two reasons. First, the Equal Rights Amendment prohibits legislative regimes that appear to be neutral but are discriminatory in fact. *Id*. at 38. Second, the Coverage Exclusion is entirely rooted in gender-based stereotypes regarding "the primacy of childbearing and childrearing for women[.]" *Id*. at 39-40. Because the Coverage Exclusion both relies on and perpetuates gender stereotypes, Providers insist that it violates the Equal Rights Amendment. *Id*. at 40.

Providers then assert that the *Fischer* Court's starting point was to define the classification not as sex but as abortion, a paradigm adopted from federal jurisprudence. *Id.* at 41 (citing *Moe v. Sec'y of Admin. and Fin.*, 417 N.E. 2d 387, 405 (Mass. 1981) (Hennessy, C.J., dissenting) (citing *Harris*, 448 U.S. 297)). Providers then contend that the application of the *Edmunds* framework,[44] a framework that did not exist at the time *Fischer* was decided, makes obvious the *Fischer* Court's interpretive error. Providers' Brief at 43 (citing *Commonwealth v. Edmunds*, 586 A.2d 887, 895 (Pa. 1991)).

Pursuant to *Edmunds*, Providers first emphasize that the text of the Equal Rights Amendment is distinct from the federal Constitution which contains no express prohibition against sex discrimination and only provides equal protection of the laws against sex discrimination through judicial interpretation. *Id*. at 44-45. Next, with regard to the history of the provision, Providers emphasize the historical backdrop: though the Equal Rights

---

[44] This Court announced, in *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991), that in assessing a claim that a provision of the Pennsylvania Constitution provides greater protection than its federal counterpart, courts employ a four-factor test considering: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other states; and (4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence.

Amendment lacks a legislative history, various sources including the Pennsylvania Human Relations Commission, the Attorney General, and this Court, all have interpreted pregnancy discrimination as a form of sex discrimination in other contexts. *Id*. at 45-48 (citing, inter alia, *Cerra*, 299 A.2d 277 (holding that termination of a pregnant employee on the basis of a physical condition peculiar to her sex was "sex discrimination pure and simple" under the Human Relations Act); PA. HUM. RELS. COMM'N, *Guidelines on Discrimination Because of Sex*, 1 (24) Pa. Bull. 707-08 (Dec. 19, 1970) (explaining that treating employees who took time away from work due to childbirth differently was sex discrimination); Pa. Att'y Gen. Op. No. 9 (1974) (explaining that three provisions of the Unemployment Compensation Law that presumed that women were incapable of working and hence ineligible for unemployment benefits "unlawfully discriminate against women on the basis of their sex")). Providers also argue that the Equal Rights Amendment provides greater protection than the federal Equal Protection Clause and that it would be unreasonable to equate the two. *Id*. at 48.

In addressing the third *Edmunds* factor, Providers draw attention to the practices of sister states, seventeen of which cover abortion in their state Medicaid programs. *Id*. at 49. In twelve of these states, courts have held that excluding abortion violates their state constitutions. In Connecticut and New Mexico, the courts have specifically held that exclusion of abortion from their states' Medicaid program coverage violated their states' Equal Rights Amendment. *Id*. (citing *Doe v. Maher*, 515 A.2d 134 (Conn. Super. 1986); *New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 859 (N.M. 1998)). They argue that the *Right to Choose* opinion from New Mexico is persuasive given the similarities between the Equal Rights Amendment provisions of the constitutions of New Mexico and Pennsylvania. *Id*. at 49-51. By contrast, *Bell v. Low Income Women of Texas*, 95 S.W.3d 253 (Tex. 2002), the only case in which a state supreme court has held

that a coverage exclusion does not violate the state's Equal Rights Amendment, is inapposite because the court exclusively followed federal jurisprudence, and because "Texas law uniquely requires that Medicaid coverage match federal law for all procedures[.]" *Id*. at 49-50 n.28.

Fourth, Providers suggest that policy considerations support the notion that "women need to be able to control their reproductive lives, including having real access to abortion, to be fully equal in society." *Id*. at 51. While "American abortion jurisprudence had little recognition of the importance of abortion access to women's equality at the time of *Fischer*, that has changed in the decades since." *Id*. at 52. In support, Providers focus on Justice Ginsburg's dissent in *Gonzales v. Carhart*, 550 U.S. 124, 172 (2007) (Ginsburg, J., dissenting), wherein she wrote that legal challenges to undue restrictions on abortion "center on a woman's autonomy to determine her life's course, and thus to enjoy equal citizenship stature."

Providers further bolster their argument with reference to statistics—that one-quarter of Medicaid-eligible Pennsylvania women who would otherwise choose to have an abortion carry their pregnancies to term as a result of the exclusion. Providers' Brief at 53; *see also* Declaration of Terri-Ann Thompson, Ph.D., 1/11/2019 (Exhibit C), at 11-13, ¶¶ 21-23 (citing, inter alia, Ushma D. Upadhyay et al., *Denial of Abortion Because of Provider Gestational Age Limits in the United States*, 104 AM. J. PUB. HEALTH 1687, 1692 (2014)). They detail the effects on the lives of women forced to carry their pregnancies to term, including that they are more likely to be impoverished, depressed, unemployed, and suffer physical and mental health problems than women who were able to obtain abortions. Providers' Brief at 53-54. For women on Medical Assistance who pay for an abortion, they can be pushed deeper into poverty. *Id*. at 55. Finally, Providers emphasize

that these harms fall more on women of color. *Id*. (citing *Harris*, 448 U.S. at 344 (Marshall, J., dissenting)).

In sum, Providers argue that *Fischer*'s Equal Rights Amendment holding should be overruled because it is wrongly tied to federal rather than Pennsylvania jurisprudence, and because in the nearly four decades since *Fischer* was decided, major doctrinal shifts and factual developments have taken place with respect to independent analysis of the Pennsylvania Constitution as well as connecting abortion and sex equality. According to Providers, these developments clearly demonstrate that the *Fischer* Court's Equal Rights Amendment analysis is "manifestly out of accord with modern conditions of life [and] should not be followed as controlling precedent." *Id*. at 56 (citing *Ayala v. Phila. Bd. of Pub. Educ.*, 305 A.2d 877, 888 (Pa. 1973)).

**DHS's Arguments**

DHS's position rests entirely on stare decisis, describing *Fischer* in detail and citing the Attorney General's opinion letter indicating that *Fischer* is "directly on point here and … still good law[.]" DHS's Brief at 26-27 (citing OAG letter).[45, 46] DHS highlights that stare decisis provides stability and certainty in our system of jurisprudence and that the doctrine demands that there be "'a special justification, over and above the belief that the precedent was wrongly decided,' to reverse a decision." *Id*. at 26 (citing *Commonwealth*

---

[45] As previously noted, DHS asserts that it is defending the statute and regulations at issue pursuant to its duties under the Commonwealth Attorneys Act, following the binding advice of the Attorney General indicating that the Coverage Exclusion was constitutional. DHS's Brief at 21-22.

[46] DHS reiterates two points that the *Fischer* Court made in determining that the Coverage Exclusion did not trigger further inquiry under the Equal Rights Amendment: first, that the basis for the distinction in coverage "was not sex, but abortion[;]" and second, that the statute accorded different benefits to one class of women against another class of women "based on a voluntary choice of whether or not to have an abortion." DHS's Brief at 25 (citing *Fischer*, 502 A.2d at 125-26).

*v. Alexander*, 243 A.3d 177, 196 (Pa. 2020) (internal citation omitted)).  According to DHS, Providers do not present any special justification to overrule *Fischer*.

**Intervenors' Arguments**

House Intervenors write in opposition to Providers, arguing that our Equal Rights Amendment is intended generally to equalize the benefits and burdens between the sexes, but it was "not intended to prohibit the recognition of, or erase the commonsense distinctions between, men and women."  House Intervenors' Brief at 78.  They argue that in the context of becoming pregnant and giving birth, "[c]omparing the treatment of women who can become pregnant to the treatment of men who can never become pregnant is not discrimination because you cannot discriminate between the sexes" where the different treatment is due to "innate fundamental biological differences[.]"  *Id*. at 80.

Senate Intervenors also oppose Providers' position, arguing that *Fischer* did not adopt a broad exception to the Equal Rights Amendment for classifications based on physical characteristics unique to one sex.  Senate Intervenors' Brief at 18.  Instead, the Senate Intervenors read *Fischer* as simply explaining that a law that affects only one sex is not per se invalid.  *Id*. at 18-19.  Senate Intervenors find fault with Providers' analogy to a hypothetical Medical Assistance coverage exclusion for prostate cancer.  They state that this analogy fails because "(1) there is no state interest in promoting life that would be advanced by the program; (2) there could be no possible reason, under any standard of review, not to fund treatment for [uterine and not prostate cancer]; and (3) cancer is life-threatening, and the Coverage Ban does not apply when a woman's life is endangered."  *Id*. at 19 n.4.  Senate Intervenors also suggest that it would be inconsistent to recognize (as amici in favor of Providers do) that public assistance programs may treat pregnant women favorably because that also would constitute discrimination based on reproductive capacity.  *Id*. at 20.  They argue that *Fischer* clearly and thoughtfully decided

that the Coverage Exclusion did not violate the Equal Rights Amendment and that the Commonwealth Court's order should be affirmed. *Id*. at 21-22.

Senate Intervenors emphasize that the *Fischer* Court correctly decided that the distinction made here is based not on sex but on abortion. And the relevant question "is not whether a law **affects** only one sex because that sex has a unique immutable characteristic, but whether the law **discriminates** on the basis of sex, which the Coverage Ban does not." *Id*. at 24 n. 7. They argue that in 1972, a member of the General Assembly stated during the debate on the ratification of the proposed federal Equal Rights Amendment that she "did not believe adopting the federal [equal rights amendment] would affect abortion laws," and therefore, "one can only reasonably conclude that [the General Assembly] would have viewed Pennsylvania's [Equal Rights Amendment] the same way." *Id*. at 28.

Senate Intervenors then argue that nothing in an *Edmunds* analysis—not the text, history, case law from other states, or policy—would justify overturning *Fischer*. They contend that much of the focus of Providers' arguments is "that it has always been unlawful to discriminate 'on the basis of pregnancy.'" *Id*. at 29 (citing Providers' Brief at 45). This argument misses the mark, according to Senate Intervenors, because none of the decisions relate to laws governing abortion. *Id*. With regard to other states' case law, Senate Intervenors point out that thirty-three other states do **not** cover most abortions in their state Medicaid programs, positioning Pennsylvania in accord with the overwhelming majority of states. *Id*. at 31-33 (citing, inter alia, *Bell*, 95 S.W.3d at 253).

Finally, Senate Intervenors challenge Providers' policy arguments, highlighting, inter alia, that the United States Supreme Court has approved of state efforts to further "its legitimate goal of protecting the life of the unborn… even when in so doing the State expresses a preference for childbirth over abortion." *Id*. at 36 (citing *Planned Parenthood*

*v. Casey*, 505 U.S. 833 (1992) (plurality)). They also claim that there is no limiting principle for Providers' novel constitutional argument that any law that implicates characteristics unique to one sex is immediately suspect under the Equal Rights Amendment, and they urge the Court to reject this approach. *Id*. at 37.

**Providers' Reply**

In their reply brief, Providers reiterate that the Coverage Exclusion is an inherently sex-based classification, drawing support from Intervenors' arguments that "[o]nly women can give birth or have an abortion[.]" Providers' Reply Brief at 6 (citing House Intervenors' Brief at 80-81; Senate Intervenors' Brief at 24 n.7). Because the Coverage Exclusion affects only women, and there is no other carve-out for medical coverage for men, the exclusion is subject to scrutiny. *Id*. at 6-7.

Providers address the *Fischer* Court's statement, as reiterated by DHS, that the Coverage Exclusion does not distinguish based on sex but, rather, on the choice to have an abortion versus childbirth, thus distinguishing only between two classes of women. Providers argue that this logic "manipulat[es] the delineation of the affected class" in a way that "would eviscerate the [Equal Rights Amendment]." *Id*. at 7-8. According to Providers, "[a]ny statute that exposes a subset of members of only one sex to harm (whether based on the biological functions that define their sex or in any other manner) has created a sex-based classification, regardless of whether every member of the disadvantaged class actually suffers harm." *Id*. at 8.

Providers state that another reason that the Coverage Exclusion is a sex-based classification is that it invokes the stereotype that birthing and raising children is the proper choice for pregnant women. *Id*. (stating that the exclusion "promotes and reinforces women's socially-prescribed, traditional maternal role and expresses distrust and disapproval of the reproductive decisions of women who deviate from such a role"). Next,

Providers challenge DHS and its amici embracing the "unique physical characteristics" exception to the Equal Rights Amendment. Providers argue that the exception has no basis in Pennsylvania case law or the Equal Rights Amendment's text, and that it "largely swallows the rule, because sex-linked characteristics can easily serve as a proxy for sex." *Id*. at 9. Further, women's unique physical characteristics "have historically been the justification for disadvantageous treatment at work, at school, and in civic life." *Id*.

Providers then distinguish the four out-of-state cases relied on by the *Fischer* Court for recognizing that statutes regulating unique physical characteristics of a sex do not trigger the state Equal Rights Amendment, pointing out, inter alia, that these cases all relied on the work of influential equal rights amendment scholars to justify excepting from other state's equal rights amendments' protections any classifications based on the unique physical characteristics of one sex. However, the cases (including *Fischer*) ignored the same scholars' explanation that sex-based classifications should be subject to strict scrutiny. *Id*. at 11 (citing Brown, Emerson, Falk, and Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women*, 80 YALE L.J. 871, 893 (1971); Barbara A. Brown et al., WOMEN'S RIGHTS AND THE LAW: THE IMPACT OF THE ERA ON STATE LAWS 16 (1977)). In Providers' view, once a court identifies that a statute is based on a unique physical characteristic, it should engage in a "searching examination into whether the disparate treatment of people with a unique physical characteristic is truly unavoidable, or whether it entrenches gender-based stereotypes and assumptions that the [Equal Rights Amendment] was designed to combat." *Id*. at 12 (internal footnote omitted).

Providers cite the New Mexico *Right to Choose* opinion as supporting this analysis. They highlight that the New Mexico Supreme Court situated its analysis within the historical context of the state's "evolving concept of gender equality." *Id*. (citing *Right to*

*Choose*, 975 P.2d at 852). After the court determined that the New Mexico coverage exclusion disadvantaged women based on their reproductive capacity and that the unique physical characteristics of women did not except the exclusion from a searching judicial inquiry, the court analyzed whether the exclusion disadvantaged women such that it was presumptively unconstitutional. *Id*. at 13 (citing *Right to Choose*, 975 P.2d at 851-53). The court determined that it did and then conducted an inquiry into whether there was a compelling justification for the differential treatment of women and whether the abortion coverage exclusion was the least restrictive means of advancing those state interests. *Id*. (citing *Right to Choose*, 975 P.2d at 857). The New Mexico court concluded that the state's justifications were not sufficiently compelling and that the coverage exclusion was not the least restrictive means of advancing these interests. *Id*. Providers advocate that, if this Court conducts a similar analysis of Pennsylvania's Coverage Exclusion by looking behind the assertion of "unique physical characteristics," it will discover that there is no basis for the disadvantageous treatment of women. *Id*.[47]

### 2. *Edmunds* Analysis

We address the protections afforded by the Pennsylvania Constitution's Equal Rights Amendment and whether it prevents the General Assembly from electing to provide medical assistance for all reproductive healthcare for men, while only providing

---

[47] Multiple amicus briefs have been filed in support of both parties. For example, the Equal Rights Amendment Project at Columbia Law School grounds its argument, naturally, in our Article 1, Section 28, drawing attention to its proscription of laws that differentiate on two bases: sex and gender. *See, e.g.*, Equal Rights Amendment Project's Brief at 9 (arguing that Section 28's prohibition applies to "sex-based classifications, including classifications based on pregnancy" as well as "lawmaking that is based on or perpetuates stereotypes about the proper roles and abilities of women and men").

Writing in support of DHS, the Pennsylvania Pro-Life Federation and the Thomas More Society argue that nothing in the text, history or interpretation of the Equal Rights Amendment can lead to a conclusion that it requires that Pennsylvania fund abortion. Thomas More Society Brief at 28-30.

limited reproductive healthcare for women, excluding most abortions, as it does in Sections 3215(c) & (j).  The *Fischer* Court explained that Section 3215(c) denies medical care coverage because of the voluntary choice of certain women to have abortions, i.e., because of a physical condition unique to their sex, which is a special category excepted from Equal Rights Amendment coverage.  After the *Fischer* Court concluded that the provision did not implicate the Equal Rights Amendment, it declined to conduct any Equal Rights Amendment analysis. The following examination of the text of the Equal Rights Amendment demonstrates that its constitutional protections are triggered when the state treats a person differently because of the person's sex.  Our consideration of the *Edmunds* factors leads to the unremarkable conclusion that to treat a woman differently based on a characteristic unique to her sex is to treat her differently because of her sex, which triggers enforcement of our Equal Rights Amendment.[48]

a.     **Text of the Equal Rights Amendment**

Article I, Section 28 provides:

---

[48]  The Chief Justice seems to question the propriety of conducting an *Edmunds* analysis to construe the meaning of Article I, Section 28 because it has no federal constitutional counterpart.  Concurring & Dissenting Op. at 13 (Todd, C.J.).  This Court has employed the *Edmunds* factors in cases implicating the Pennsylvania Constitution where no federal constitutional counterpart exists.  *See, e.g.*, *League of Women Voters*, 178 A.3d at 802-03 ("certain of the *Edmunds* factors obviously may assist us in our analysis[]"); *Robinson Township*, 83 A.3d at 944 ("some of the *Edmunds* factors obviously are helpful in our analysis[]"); *see also McLinko*, 279 A.3d 539 (although not labelled as an *Edmunds* analysis, all four factors discussed).  Regardless of how we label the framework, we always begin with a text-driven analysis of constitutional provisions, which *Fischer* did not do.  *See, e.g.*, *League of Women Voters*, 178 A.3d at 802 ("The touchstone of interpretation of a constitutional provision is the actual language of the Constitution itself.") (internal citation omitted); *see* supra p. 53 (discussing how the plain language of the constitutional text is the polestar of the analysis).  Our conclusions emanate from the text of the Equal Rights Amendment and our adherence to the principle that this Court has no authority to judicially modify the text or meaning of a provision of the Pennsylvania Constitution.  The Chief Justice and Justice Mundy ultimately find themselves bound by *Fischer* which, in fact, modified the text of Article I, Section 28 to reach its conclusion.

### §28. Prohibition against denial or abridgment of equality of rights because of sex

Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.

PA. CONST. art. I, § 28.

The meaning of the phrase—"equality of rights under the law[49] shall not be denied or abridged"—is unambiguous. It means that the government cannot "withhold the … enjoyment of" the rights. *Deny*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION, 356 (Laurence Urdang ed. 1968).[50] Separately, the equality of rights may not be "abridged," meaning that they can neither be "reduce[d] or lessen[ed] in … scope[,]" nor can they be "diminish[ed]" or "curtail[ed]." *Abridge*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION, 5 (Laurence Urdang ed. 1968); *see also Abridge*, BLACK'S LAW DICTIONARY, 8 (11th ed. 2019) (defining "abridge" as "To

---

[49] We interpreted "under the law" in the context of Section 28 in *Hartford Accident and Indemnity Co. v. Insurance Commissioner of the Commonwealth*, 482 A.2d 542, 586 (Pa. 1984). We held:

> The text of Article I, Section 28 makes clear that its prohibition reaches sex discrimination "**under the law**." As such, it circumscribes the conduct of state and local government entities and officials at all levels in their formulation, interpretation and enforcement of statutes, regulations, ordinances and other legislation as well as decisional law.

*Id.*

In disassembling the equality of rights of women from those of men, Justice Mundy asks "equal to what" based on her perspective that only women have reproductive functions. Concurring & Dissenting Op. at 9 n.7 (Mundy, J.). We recall that the record in this appeal is the petition for review filed by Providers in which they plead that the Medical Assistance Program funds all male reproductive health procedures but not all female reproductive healthcare procedures. Petition for Review, 1/16/2019, ¶ 54; *see also* Providers' Brief at 35. This is the lack of "equality under the law" that Providers advance.

[50] We look to definitions from dictionaries in circulation at the time of the adoption of Section 28.

reduce or diminish <abridge one's civil liberties>"). Accordingly, the Commonwealth cannot withhold or diminish the scope of the rights of an individual under the qualifying circumstances: "because of the sex of the individual." Parsing this phrase, because means "by reason; on account (usually fol[lowed] by **of**)." *Because*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION, 119 (Laurence Urdang ed. 1968). Thus, we are concerned with whether a law withholds or diminishes the scope of the rights on account of an individual's sex.

"Sex" is defined as:

> 1. either the male or female division of a species, esp. as differentiated with reference to the reproductive functions.
>
> 2. the sum of the structural and functional differences by which the male and female are distinguished, or the phenomena or behavior dependent on these differences.

*Sex*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION, 1206 (Laurence Urdang ed. 1968).

The sum of the definitional parts of our Equal Rights Amendment is that the rights of an individual shall not be withheld or diminished on account of membership in either the male or female division of our species. The distinction is made with reference to the reproductive functions and the sum of the physical and functional differences that distinguish the male and the female.[51]

---

[51] To the extent Justice Mundy engages in a textual analysis of the Equal Rights Amendment, she reverts to the reasoning of the *Fischer* Court that the Coverage Exclusion does not "treat[] men as a class more favorably than women so as to bring it within the scope" of the Equal Rights Amendment but instead treats a woman differently based on her "voluntary choice." Concurring & Dissenting Op. at 4 (Mundy, J.) (citing *Fischer*, 502 A.2d at 125); *see similarly* Concurring & Dissenting Op. at 9 (Todd, C.J.). This reasoning ignores the plain text of Section 28 prohibiting denial or abridgment of the equality of rights "because of the sex of the **individual**." PA. CONST. art. I, § 28 (emphasis added). Section 28 is triggered when an individual woman is treated unequally because of her sex. Further, the clear text of the Equal Rights Amendment is unequivocal and (continued…)

b. **History of the Equal Rights Amendment, including Pennsylvania case law**

**History**

The Equal Rights Amendment is located in Article I of our Charter, the Declaration of Rights. Article I "delineates the terms of the social contract between government and the people that are of such 'general, great and essential' quality as to be ensconced as 'inviolate.'" *Robinson Township*, 83 A.3d at 947. It embodies the recognition that certain rights are inherent to human nature, and thus, it can only preserve, rather than create, these rights. *Id.* at 948. The significance of Article I rights is clearly prescribed in Section 25:

> **§ 25. Reservation of powers in the people**
>
> To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.

PA. CONST. art. I, § 25.

There is no federal counterpart to our Equal Rights Amendment. Therefore, we do not find guidance from the federal Constitution, as there is no comparable provision to our Equal Rights Amendment.[52] There is no question that our interpretation of the Equal

prohibits denial of rights, regardless of whether biology is used as a pretext. It bears repeating that the voters approved the Equal Rights Amendment without exceptions, conditions, or qualifications.

[52] As Professor Nancy Burkoff from the University of Pittsburgh explained, the courts are able to address the Equal Rights Amendment "without the confusion of any parallel federal doctrine, since there is no comparable provision in the federal [C]onstitution." Nancy M. Burkoff, *State Action and the Declaration of Rights*, in THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, § 35.3, 952 (Ken Gormley & Joy G. McNally eds. 2nd ed. 2020) (speaking to whether state action is required under the Equal Rights Amendment, Professor Burkoff writes that the answer "can be determined **only** by analyzing the specific provision of the state constitution, entirely divorced from the federal state action doctrine").

Rights Amendment adheres to principles of state law and finds no guidance from the federal Constitution. While the federal Constitution and the debates surrounding the adoption of a proposed federal equal rights amendment do not guide our analysis of the text of the provision, they provide context to the history of the adoption of Article I, Section 28.

Our Court "regards the language of our Constitution as the embodiment of the will of the voters who adopted it," and therefore "it is instructive to begin our consideration" with a brief historical overview to establish the environment in which the Equal Rights Amendment was adopted. *Washington*, 188 A.3d at 1144. The historical origins of the unequal treatment of women under the law predates the creation of this Commonwealth. Centuries of inequality influenced the legal systems and principles that served as the foundation for all of Great Britain's American colonies, including, of course, Pennsylvania. *See* Linda Grant De Pauw, *Women and the Law: The Colonial Period*, 6 Hum. Rts. 107, 108-10 (1977). Colonial Americans adhered to the English tradition, which did not view women as equal to men. *Id.*

By way of example, the concept of "coverture" demanded that, once a woman married, her "legal existence disappeared." *Id.* By operation of this doctrine, a married woman's rights and obligations were entirely subsumed by her husband. *Id.* As provided by William Blackstone in his Commentaries on the Laws of England during the late-eighteenth century:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband; under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-french a feme-covert under the protection and influence of her husband, her baron, or lord; and her condition during her marriage is called her coverture...

1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, *442 (1765). The malleability of a woman's very legal existence demonstrates the system of laws to which women were once subjected.

Even as society made significant and yet glacial progress toward legal equality, those interpreting the law continued to view women as not only having fewer legal rights than men but also as lesser human beings by design. For instance, when Caroline Burnham Kilgore–a pioneer for women's rights in this Commonwealth in the late-nineteenth century and the first female attorney admitted to the Pennsylvania bar–first sought admission to the bar,[53] one of the judges who rejected her admission explained that

> the Creator of the universe, for a reason which any reasonable being ought to consider self-evident, made a distinction between the sexes and saw fit ... to place under the protection of the male sex the female, simply because as a general and universal law applicable to all created living organisms the female requires protection.

Elizabeth K. Maurer, *The Sphere of Carrie Burnham Kilgore*, 65 TEMP. L. REV. 827, 845 (1992) (citing *In re Kilgore*, 14 WEEKLY NOTES OF CASES 255-56 (Phila. CCP 1884)).

These assumptions supporting the destiny of women to hold an inferior legal status were primarily justified by biological differences between men and women. Sylvia A. Law, *Rethinking Sex and the Constitution*, 132 U. PA. L. REV. 955, 958 & n.13 (1984). "Since time immemorial, women's biology and ability to bear children have been used as a basis for discrimination against them." *Doe v. Maher*, 515 A.2d 134, 159 (Conn. Super. 1986) (citing *Hoyt v. Florida*, 368 U.S. 57, 62 (1961) (upholding a statute exempting women from jury duty because they are "regarded as the center of home and family life")); *Muller*

---

[53] At that time, "admission to the bar in Pennsylvania was county by county and court by court." Elizabeth K. Maurer, *The Sphere of Carrie Burnham Kilgore*, 65 TEMP. L. REV. 827, 832-41 (1992).

*v. Oregon*, 208 U.S. 412, 421 (1908) (upholding a statute that restricted women's work hours but not men's); *Bradwell v. Illinois*, 86 US. (16 Wall.) 130, 141-42 (1872) (Bradley, J., concurring) (prohibiting women from the practice of law because of the "natural" differences between the sexes)). Justice Bradley's concurring opinion in *Bradwell* provides an insight into the law's view of women in the nineteenth century:

> [T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman. Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. …
>
> The paramount destiny and mission of woman are to fulfill the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things[.]

*Bradwell*, 83 U.S. at 141-42 (Bradley, J., concurring).

The High Court continued to espouse this view into the early twentieth century:

> [T]hat woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. This is especially true when the burdens of motherhood are upon her. Even when they are not, by abundant testimony of the medical fraternity[,] continuance for a long time on her feet at work, repeating this from day to day, tends to injurious effect upon the body, and as healthy mothers are essential to vigorous offspring, the physical well-being of woman becomes an object of public interest and care in order to preserve the strength and vigor of the race.

*Muller*, 208 U.S. at 421.

Despite landmark achievements, such as women's suffrage in 1919, many of the Commonwealth's laws continued to reflect the common-law view that women were incapable of functioning independently from men, thereby forcing them into their

predetermined societal roles as wives and mothers. *See, e.g.*, *Commonwealth ex rel. Krouse v. Krouse*, 289 A.2d 233 (Pa. Super. 1972) (recognizing that husbands have a legal obligation to support their wives); *Commonwealth ex rel. Glenn v. Glenn*, 222 A.2d 465 (Pa. Super. 1966) (acknowledging that the law recognizes husbands and fathers as the head of the household). It was within this context of persistent relegation of women to subservient and dependent roles that Pennsylvania voters ratified the Equal Rights Amendment.

The impetus for an Equal Rights Amendment in Pennsylvania's Constitution came about during a 1969 meeting of the Pittsburgh Chapter of the National Organization for Women ("NOW"). Margaret K. Krasik, *A Review of the Implementation of the Pennsylvania Equal Rights Amendment*, 14 DUQ. L. REV. 683, 684 (1978). According to commentators, the failed federal effort to advance an equal rights amendment was the impetus for action at the state level, and many state equal rights amendment efforts in the 1970s were the result of frustrations inspired by the lack of success in adopting a federal equal rights amendment. Hon. Phyllis W. Beck & Patricia A. Daly, *Prohibition Against Denial or Abridgment of Equality of Rights Because of Sex*, THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, § 31, 833 (Ken Gormley & Joy G. McNally eds. 2nd ed. 2020). Based on reports by advocates for the federal amendment, the Equal Rights Amendment was "needed because the United States Supreme Court had not responded more affirmatively to sex discrimination charges under the federal [C]onstitution." Krasik, supra, at 685. Although commentators have regarded the adoption of a state equal rights amendment[54] as a response to frustration at federal

---

[54] Congress eventually passed a federal equal rights amendment in 1972, which included a preface providing seven years for ratification by three-fourths of the states' legislatures in order to become an amendment to the federal Constitution. H.R.J.Res. 208, 92d Cong. (1972) (providing that "[e]quality of rights under the law shall not be denied or abridged (continued…)

inaction both by the High Court and Congress in failing to pass a federal equal rights amendment, we emphasize that there is no legislative history accompanying what would be ratified as Section 28 of Article I of our Charter. *Id.* at 685-86.

The passage of Pennsylvania's Equal Rights Amendment brought on a flurry of legal action—in the executive, legislative and judicial branches—to bring the law into conformity with the new order in which sex was no longer a permissible factor in determining an individual's rights. Shortly after the ratification of the Equal Rights Amendment, the Governor and the Attorney General attempted to "cleanse both the statutory law and the regulations governing the conduct of the government and its agencies' discriminatory provisions, whether directed at men or women." Hon. Phyllis W. Beck & Joanne Alfano Baker, *An Analysis of the Impact of the Pennsylvania Equal Rights Amendment*, 3 WIDENER J. OF PUB. L 743, 767 (1994). The Attorney General issued several opinions on the subject of sex discrimination at this time. *Id.* at 767-68. For example, the Attorney General directed the Liquor Control Board to no longer issue or renew liquor licenses to anyone who discriminated on the basis of sex in either employment or service to the public, and he authorized the Board to suspend or revoke licenses from people engaging in such practices. *Id.* (citing Pa. Op. Attorney General 55 (1974)). Other opinions concerned sex discrimination in government employment including discontinuing the prohibition of a parole officer of one sex being assigned to a parolee of the other sex; discontinuing the prohibition of women between the ages of twelve and twenty-one being news carriers; and directing the state police to no longer implement its requirement that applicants be at least five-feet-six inches tall, thereby excluding women of average height. *Id.* at 767 (citing Pa. Op. Attorney General 71 (1971);

---

by the United States or by any State on account of sex."). This has yet to occur although Congress extended the ratification period. H.J.Res. 638, 95th Cong. (1978).

Pa. Op. Attorney General 150 (1972); Pa. Op. Attorney General 57 (1973)). It was also determined that married women could use their birth name instead of their husband's surname for purposes of voter registration or obtaining a driver's license after getting married. *Id.* (citing Pa. Op. Attorney General 62 (1973); Pa. Op. Attorney General 72 (1973)).

In 1975, the Governor established by executive order the Pennsylvania Commission for Women. Governor's Office, Executive Order, 1975-5 ("Commitment Toward Equal Rights"). The Commission was tasked with, inter alia, reviewing the law of Pennsylvania and recommending "legislative changes needed to further the goal of obtaining equal rights for all persons." *Id.* ¶ 2(a). The Commission recommended that twenty-six bills be passed to meet the goals of the Equal Rights Amendment. Beck & Alfano Baker, supra, at 768. These recommendations effected substantial changes to, inter alia, laws relating to intestacy and taxation.[55] In 1978, the Legislature likewise took action in response to the ratification of the Equal Rights Amendment. In 1978, it enacted the "Equalization Act,"[56] providing that a designation of a single sex will apply to both sexes generally when made in a statute, in public appointments requirements, and employment benefits and rights. 1 Pa.C.S. § 2301.

The judiciary, too, oversaw significant changes in laws when challenges based on Article I, Section 28 were lodged. Pennsylvania's Equal Rights Amendment was one of the most litigated state equal rights amendment provisions in the country. Brown et al.,

---

[55] *See, e.g.*, Act of July 9, 1976, P.L. 551, No. 135 (providing that neglect or failure to support by **either** spouse, rather than just a husband, forfeited any right or interest in the other spouse's real or personal estate); Act of July 15, 1976, P.L. 1047, No. 210 (defining "domicile" for purposes of earned income tax provisions as "the voluntarily fixed place of habitation of a **person**" rather than its previous definition of "the place in which a man has voluntarily fixed the habitation of himself and his family") (emphasis added).

[56] Act of October 4, 1978, P.L. 909, No. 173.

*Women's Rights and the Law*, at 19. In 1974 alone, this Court invalidated two statutes and a common law presumption violative of the Equal Rights Amendment.[57] During the flurry of court decisions in our Equal Rights Amendment's first decade, this Court repeatedly and without hesitation applied the requirement that equality of rights under the law shall not be denied or abridged because of the sex of the individual to dismantle common law presumptions about the stereotypical gender roles of woman as mother, homemaker, and primary caretaker and man as sole breadwinner.[58] We also interpreted the Equal Rights Amendment as being offended by an insurance company's assessment of higher automobile insurance rates for men than women, *Hartford Accident and Indemnity Co. v. Insurance Commission*, 482 A.2d 542 (Pa. 1984), and by a law granting women leniency based on their sex in criminal sentencing, *Commonwealth v. Saunders*, 331 A.2d 193 (Pa. 1975).

The momentum witnessed in the first decade of the Equal Rights Amendment tapered in the 1980s and beyond, with this Court engaging in substantive review of Equal Rights Amendment claims fewer times in the past forty years combined than it did during the first decade. Between 1981 and today, aside from *Fischer*, only three cases issued

---

[57] *Hopkins v. Blanco*, 320 A.2d 139 (Pa. 1974) (holding that the right to recover for loss of consortium extended to wives, replacing the previous rule that only husbands were entitled to pursue such a cause of action); *Commonwealth v. Butler*, 328 A.2d 851 (Pa. 1974) (holding that statutory minimum sentences applied equally to women and men, invalidating a statutory exemption from minimum sentences applicable only to women); *Henderson v. Henderson*, 327 A.2d 60, 62 (Pa. 1974) (holding that laws allowing payment of alimony pendente lite, attorneys' fees, and expenses to a wife (but not a husband) in a divorce action could not stand, because, the Equal Rights Amendment barred the use of sex as a permissible basis for making legal distinctions).

[58] *See DiFlorido v. DiFlorido*, 331 A.2d 174 (Pa. 1975); *Butler v. Butler*, 347 A.2d 477 (Pa. 1975); *Adoption of Walker*, 360 A.2d 603 (Pa. 1976); *Commonwealth ex rel. Spriggs v. Carson*, 368 A.2d 635 (Pa. 1977); *Commonwealth ex rel. Stein v. Stein*, 406 A.2d 1381 (Pa. 1979); *George v. George*, 409 A.2d 1 (Pa. 1979); *cf. Estate of Grossman*, 402 A.2d 726 (Pa. 1979) (overruling testimonial presumption based on unity of husband and wife without reference to the Equal Rights Amendment).

by the Court addressed the Equal Rights Amendment, the last being decided in 2009.[59] Despite the profusion of cases applying Section 28, none of the decisions involved a textual construction of the provision.

**Pennsylvania case law**

Following the *Edmunds* framework, we engage in a closer examination of Pennsylvania case law. Three years after the adoption of Section 28, this Court, in the seminal case *Henderson v. Henderson*, 327 A.2d 60 (1974), expressed a clear understanding of the meaning of the text of the provision that "the law will not impose different benefits or burdens upon the members of a society based on the fact that they may be man or woman." *Id*. at 62. The Court struck down a statute that allowed payment of alimony pendente lite, attorneys' fees, and expenses of a divorce action to the wife, but not to the husband. The *Henderson* Court elaborated:

> The thrust of the Equal Rights Amendment is to insure equality of rights under the law and to eliminate sex as a basis for distinction. The sex of citizens of this Commonwealth is no longer a permissible factor in the determination of their legal rights and legal responsibilities. **The law will not impose different benefits or different burdens upon the members of a society based on the fact that they may be man or woman.** Thus, as it is appropriate for the law where necessary to force the man to provide for the needs of a dependent wife, it must also provide a remedy for the man where circumstances justify an entry of support against the wife. In short, the right of support depends not upon the sex of the petitioner but rather upon need in view of the relative financial circumstances of the parties.

*Id.* (emphasis added).

---

[59] *Weaver v. Harpster*, 975 A.2d 555 (Pa. 2009) (rejecting argument that the Equal Rights Amendment invalidated the legislative exception that limited the application of the PHRA in an at-will employment scenario); *In re Estate of* Geyer, 533 A.2d 423 (Pa. 1987) (discussing application of the Equal Rights Amendment to interpretation of antenuptial agreements); *Snider v. Thornburgh*, 436 A.2d 593 (Pa. 1981) (rejecting an argument that a financial disclosure requirement implicated the Equal Rights Amendment).

Again in 1974, in *Commonwealth v. Butler*, 328 A.2d 851 (Pa. 1974), we struck, as violative of the Equal Rights Amendment, a statute that required men to serve minimum prison sentences but prohibited minimum sentences for women. We reasoned "that one person … should be eligible for parole at a different time than another person solely because of his or her sex is discrimination of the most obvious sort." *Id.* at 856; *see also Commonwealth v. Saunders*, 331 A.2d 193 (Pa. 1975) (same).

Eschewing maternalistic stereotypes attached to women, in *Adoption of Walker*, 360 A.2d 603 (Pa. 1975), we struck down a provision of the Adoption Act providing that in the case of the adoption of an illegitimate child, only the consent of the mother to the adoption was required and not the consent of the father. Our holding was crisp:

> This distinction between unwed mothers and unwed fathers is patently invalid under the Pennsylvania Constitution. Article I, section 28 of the Constitution provides that:
>
> > 'Equality of rights under the law shall not be denied or abridged in the Commonwealth of Pennsylvania because of the sex of the individual.'
>
> It is clear that, as a consequence of [the challenged provision], unwed fathers have no rights under the Adoption Act, while unwed mothers have all the rights of married parents. The only differences between unwed fathers and unwed mothers are those based on sex. This is an impermissible basis for denying fathers rights under the Act.

*Id.* at 605.

We did not spare from extinction sex-based common law principles created by the Court. In *Conway v. Dana*, 318 A.2d 324 (Pa. 1974), we held invalid a presumption that the father, "solely because of his sex and without regard to the actual circumstances of the parties," is primarily obligated to support his children. *Id.* at 326. "Such a presumption is clearly a vestige of the past and incompatible with the present recognition of equality of the sexes." *Id.*

That same year, in *Hopkins v. Blanco*, 320 A.2d 139 (Pa. 1974), we held that the right to recover for loss of consortium extended to wives, replacing the previous rule that only husbands were entitled to pursue such a cause of action. In so doing, we traced the "common law origin" of loss of consortium, noting that "at common law the wife was equated to a chattel of her husband … thus, the husband technically owned her." *Id.* at 140-41. However, we recognized that a "wife is her husband's equal, [and thus,] there is no valid justification for treating them differently in matters relating to the marital relationship." *Id.* at 141. Accordingly, we held that the Equal Rights Amendment required that the law extend the right to recover loss of consortium to women. *Id.* Likewise, in *DiFlorido*, we abandoned the presumption that household goods in the joint possession of a husband and wife belong to the husband. *DiFlorido*, 331 A.2d 174. The presumption created benefits based on the sex of the individual and thus violated the Equal Rights Amendment.

Consistent with the rationale of these decisions interpreting and applying Section 28, in *Cerra*, shortly after the passage of the Equal Rights Amendment, this Court held that a school district's termination of a tenured teacher on the basis of her pregnancy constituted sex discrimination under the PHRA.[60] In reaching that conclusion, the Court

---

[60] The relevant text of the PHRA provided that:

> It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification …
>
> > (a) For any employer because of race, color, religious creed, ancestry, age, sex or national origin of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, …

Act of Oct. 27, 1955, P.L. 744, as amended 43 P.S. § 955(a). This provision did not include an actionable claim for discrimination based on "handicap or disability" until 1974, (continued…)

addressed the school's argument that the termination was justified by willful violation of school laws—namely, her failure to resign in violation of a School Board regulation requiring that "any employee who becomes pregnant shall resign effective not later than the end of the fifth (5th) month of the pregnancy." *Cerra*, 299 A.2d at 278-79. The Court rejected this argument, finding that the termination was violative of the PHRA, and therefore illegal. *Id*. at 279. The Court reasoned that:

> Mrs. Cerra's contract was terminated absolutely, solely because of pregnancy. She was not allowed to resume her duties after the pregnancy ended, even though she was physically and mentally competent. There was no evidence that the quality of her services as a teacher was or would be affected as a result of the pregnancy. Male teachers, who might well be temporarily disabled from a multitude of illnesses, have not and will not be so harshly treated. In short, Mrs. Cerra and other pregnant women are singled out and placed in a class to their disadvantage. They are discharged from their employment on the basis of a physical condition peculiar to their sex. **This is sex discrimination pure and simple**.

*Id*. at 280 (emphasis added). Like the Equal Rights Amendment, the PHRA, which predated it, uses the word "sex" in its statutory proscription against discrimination. In *Cerra*, we definitively established that treating a woman differently based on pregnancy was to treat her differently based on sex. There is no reason to conclude, based on the text of Section 28, that there was an intention to give a different meaning to sex than the meaning given to it in the PHRA that preceded it.[61]

---

the year after *Cerra* was decided. Act of Dec. 19, 1974, P.L. 966, No. 318. Thus, Cerra's claim unquestionably required that she prove **sex** discrimination. The *Fischer* Court's effort to recharacterize the issue in terms of **disability** discrimination had no basis in the language of the PHRA as it existed at the time Cerra brought her claim, or at the time this Court issued its opinion.

[61] As we have previously discussed, *see* supra note 60, the *Fischer* Court's treatment of *Cerra* was inconsistent with prior case law and simply incorrect. The *Fischer* Court's fatal missteps were mischaracterizing *Cerra* by framing it as a disability case and (continued…)

The text of Section 28 is unambiguous, and this Court's application of its protections prior to *Fischer* made clear that its coverage was broad. The Equal Rights Amendment prohibits the denial or abridgment of rights under the law based on whether a person is a man or a woman. Imbedded in any definition of sex is that reproductive functions differentiate men and women.

The *Fischer* Court's conclusion that the Equal Rights Amendment does not prohibit differential treatment among the sexes based on physical characteristics unique to one sex[62] deviated from its own holding in *Cerra* applying the PHRA that used the same qualifier: sex. The *Fischer* Court's attempt to distinguish *Cerra* as a case involving discrimination based on disability ignores the central point that only women can become pregnant and that the discrimination was "on the basis of a physical condition peculiar to their sex." *Cerra*, 299 A.2d at 280. *Cerra* conclusively established that such differentiation is "sex discrimination pure and simple." *Id*. More critically, the *Fischer* Court ignored that reproductive functions, by definition, have historically been the primary basis for the distinction between men and women, i.e., physical characteristics that make one a member of the sex. The text of Section 28 does not support the exception created by *Fischer* that equality of rights can be denied or abridged based on a physical characteristic that makes a person a member of the male or female sex.

---

distinguishing pregnancy from abortion. *Fischer*, 502 A.2d at 125-26. Although the Chief Justice is not wholly inaccurate in stating that *Fischer* discussed the same cases cited in our analysis, we do not quibble with the *Fischer* Court's statement of the holdings of any of those Pennsylvania cases with the exception of *Cerra*. *See* Concurring & Dissenting Op. at 13 (Todd, C.J.) (asserting that "every Pennsylvania case cited by the majority in its *Edmunds* analysis was discussed and/or acknowledged by this Court in *Fischer*"). Though *Fischer* did not cite and discuss every case to the degree of this opinion, that is of no moment. The crucial point is that *Fischer*'s recharacterization stripped *Cerra* of its intended and actual meaning.

[62] *Fischer*, 502 A.2d at 125.

### c. Related case law from other states

Next, pursuant to *Edmunds*, we address related case law from other states. The *Fischer* Court relied on cases from Colorado,[63] Hawaii[64] and Washington[65] for its creation of the exception to our Equal Rights Amendment. *Fischer*, 502 A.2d at 125. It relied on these cases for what it referred to as the prevailing view that the Equal Rights Amendment "does not prohibit differential treatment among the sexes when, as here, that treatment is reasonably and genuinely based on physical characteristics unique to one sex." *Id*. (internal quotations omitted). Each of these cases in turn cited directly to a law review article recognized at the time as the leading scholarly writing on the topic of the proposed federal equal rights amendment. However, contrary to those state courts' interpretations relied on by *Fischer*, and even if there was a principled reason to look to a proposed federal amendment for guidance, Brown's *The Equal Rights Amendment* article does not support the adoption of a sweeping exception to the Equal Rights Amendment. Brown et al., *The Equal Rights Amendment*, supra, at 890-92. The authors, in fact, advocated for the federal equal rights amendment to be "applied comprehensively and **without exception**." *Id*. at 890 (emphasis added); *see also id.* at 892 ("[T]he constitutional mandate must be absolute. The issue under the [equal rights amendment] cannot be different but equal, reasonable or unreasonable classification, suspect classification, fundamental interest [of the state], or the demands of administrative expediency. Equality of rights means that sex is not a factor.").

---

[63] *People v. Salinas*, 551 P.2d 703, 706 (Colo. 1976).

[64] *State v. Rivera*, 612 P.2d 526 (Haw. 1980); *Holdman v. Olim*, 581 P.2d 1164 (Haw. 1978).

[65] *City of Seattle v.* Buchanan, 584 P.2d 918 (Wash. 1978).

The authors of that article addressed various types of laws which might be subject to judicial review, including laws based on physical characteristics unique to one sex. In their view, a fundamental legal principle underlying the federal proposal was that the law "must deal with particular attributes of individuals, not with a classification based on the broad and impermissible attribute of sex." *Id*. at 893. Based on that principle, they hypothesized that laws addressing purely physical characteristics that are unique to one sex do "not ignore individual characteristics found in both sexes in favor of an average based on one sex." *Id*. Such legislation would not, without more, violate the basic principles underlying the federal proposal, although this would be determined through application of strict scrutiny. *Id*.

Brown's *The Equal Rights Amendment* article cautioned that laws making distinctions based on physical characteristics unique to one sex create legal issues that should be "carefully scrutinized by the courts." *Id*. at 894.

> [W]hile differentiation on the basis of a unique physical characteristic does not impair the right of a man or a woman to be judged as an individual, it does introduce elements of a dual system of rights. That result is inevitable. Where there is no common factor shared by both sexes, equality of treatment must necessarily rest upon considerations not strictly comparable as between the sexes. This area of duality is very limited and would not seriously undermine the much more extensive areas where the unitary system prevails. But the courts should be aware of the danger.

*Id*.

It is clear that the Brown article was not advocating for courts to summarily determine that legislation making distinctions based on physical characteristics unique to one sex is excepted from judicial review. Instead, the authors were explaining that, faced with such laws, courts must be aware that equality of treatment necessarily rests upon considerations that are not strictly comparable as between the sexes, and courts must recognize that the duality could threaten an equal rights amendment. To achieve that

end, the authors proposed a searching review of any such distinctions to ensure that they do not run afoul of equal rights amendment protections. They advocated for courts to apply a multi-factor inquiry to determine whether the regulation or law at issue "is closely, directly and narrowly confined to the unique physical characteristic" to avoid laws that, in effect, seriously discriminate against one sex. *Id*. Thus, *The Equal Rights Amendment* article consistently argued that distinctions based on physical characteristics unique to one sex must be thoroughly reviewed under strict scrutiny, not that they be excepted from the purview of the equal rights amendment. *See id.* at 930 (arguing that regulations concerning conditions of employment for women for physical conditions unique to their sex "would be subject to careful judicial review").

Two of the authors of the Brown article subsequently published a separate text on the federal equal rights amendment efforts.[66] They reiterated that "[w]hen classifications based on characteristics unique to one sex are incorporated into legislation or public policy, Congress intended [the] constitutional standard known as strict scrutiny to be applied to insure that the basic premise of sex equality under the [federal equal rights amendment] is preserved." Brown et al., WOMEN'S RIGHTS AND THE LAW, supra, at 15-16. In their view, "[a]lmost no sex-based classifications can pass this rigorous test." *Id.* at 16.

Significantly, when the state courts cited specific passages of *The Equal Rights Amendment* article to justify adoption of this special exception for physical characteristics unique to one sex, they ignored the authors' starting point—that any federal equal rights amendment was to be applied comprehensively and without exception—and they ignored the authors' clear warnings regarding laws addressing physical characteristics unique to one sex. *Fischer* propagated this error and gave no reason for doing so aside from its

---

[66] Specifically, Barbara A. Brown & Ann E. Freedman–who were students when the original article was produced–authored the book, WOMEN'S RIGHTS AND THE LAW, along with Harriet N. Katz & Alice M. Price.

illusive assertion regarding the "immutable facts of life[.]" *Fischer*, 502 A.2d at 125. We note again that there is no ambiguity in the text of Section 28 and it certainly contains no exception for physical characteristics unique to one sex.

Since *Fischer*, courts in other jurisdictions have concluded that the phrases "on account of sex" and "because of sex" encompass reproductive capabilities as well as stereotypical gender norms when applying their equal rights amendments to comparable Medicaid coverage exclusions. In *Doe v. Maher*, 515 A.2d 134 (Conn. Super. 1986) (hereinafter, "*Doe* (Conn.)"), the Connecticut Superior Court addressed an equal rights amendment challenge to Connecticut's regulation prohibiting Medicaid payment for medically necessary abortions.[67] *Doe* (Conn.), 515 A.2d at 135. Similar to the present case, *Doe* (Conn.) promulgated a Medicaid carveout for abortions that were not essential to save the life of the mother. *Id*. According to the court, by adopting the equal rights amendment, CONN. CONST. art. I, § 20, the citizens of Connecticut and their legislators "unambiguously indicated an intent to abolish sex discrimination." *Doe* (Conn.), 515 A.2d at 159 (internal citation omitted).

The Connecticut court listed several reasons that the Medicaid exclusion discriminated "because of … sex" such that it triggered further inquiry under the equal rights amendment. First, Medicaid covered all medical expenses necessary to restore the male to health and likewise for the female "**except** for therapeutic abortions that are not life-threatening." *Id*. Second, Medicaid covered all medical expenses related to male and female reproductive health, including those conditions unique to their sex, "**except** for the medically necessary abortion that does not endanger [a woman's] life." *Id*.

---

[67] The court used this term and therapeutic abortions synonymously to mean "abortions necessary to ameliorate a condition that is deleterious to a women's physical and psychological health." *Doe v. Maher*, 515 A.2d at 135 n.4.

Third, the Connecticut court concluded that the failure to fund abortion is a form of pregnancy discrimination, which was plainly barred by passage of the equal rights amendment. *Id*. (citing, inter alia, *Mass. Elec. Co. v. Mass. Comm'n Against Discrimination*, 375 N.E.2d 1192 (Mass. 1978) (providing that "any classification which relies on pregnancy as a determinative criterion is a distinction based on sex")). According to the court, this brand of discrimination has a devastating effect upon women, and the framers of the Connecticut equal rights amendment provision undoubtedly intended the prohibitions to reach pregnancy discrimination. *Id*. at 160. "In sum, by adopting the [equal rights amendment], Connecticut determined that the state should no longer be permitted to disadvantage women **because of their sex including their reproductive capabilities**." *Id*. (emphasis added).

Twelve years later, in 1998, the Supreme Court of New Mexico addressed whether a state Medicaid plan rule ("Rule 766") violated New Mexico's equal rights amendment provision. Like the statute at issue here, Rule 766 excluded payment for any abortions except those that were the result of rape, incest, or necessary to save the life of the pregnant woman. *New Mexico Right to Choose/NARAL v. Johnson*, 975 P.2d 841, 851-52 (N.M. 1998). Adopted in 1973, New Mexico's equal rights amendment guarantees that "[e]quality of rights under the law shall not be denied on account of the sex of any person." N.M. CONST., art. II, § 18. The court viewed New Mexico's equal rights amendment "as the culmination of a series of state constitutional amendments that reflect an evolving concept of gender equality in [that] state." *Right to Choose*, 975 P.2d at 852.

Based on the history and text of the provision, the New Mexico court viewed the equal rights amendment as "a specific prohibition that provides a legal remedy for the invidious consequences of the gender-based discrimination that prevailed under the common law and civil law traditions that preceded it." *Id*. at 853. It requires a "searching

judicial inquiry" of state laws that employ gender-based classifications, an inquiry which begins from the premise that gender-based classifications are presumptively unconstitutional, and that it is the State's burden to rebut the presumption. *Id*.

The New Mexico court rejected arguments that Rule 766 did not warrant heightened judicial scrutiny because it was based on a condition unique to one sex. The court acknowledged that not all classifications based on characteristics unique to one sex offend the equal rights amendment, reiterating how the test operates: a gender-based classification is presumptively unconstitutional, and the state has the burden of rebutting that presumption. *Id*. at 854. It concluded "that classifications based on the unique ability of women to become pregnant and bear children are not exempt from searching judicial inquiry" under New Mexico's equal rights amendment. *Id*. As with Connecticut's *Doe* (Conn.) court, the *Right to Choose* court emphasized the fact that women's biology and ability to bear children historically have been used as a basis for discrimination. *Id*. (citing *Doe* (Conn.), 515 A.2d at 159). Further, the court noted that some physical characteristics, such as the ability to become pregnant, have profound health consequences. *Id*. at 855. Therefore, it concluded that "classifications based on the unique ability of women to become pregnant and bear children are not exempt from a searching judicial inquiry" under the equal rights amendment. *Id*.

Senate Intervenors call our attention to the Texas case of *Bell v. Low Income Women of Texas*, 95 S.W.3d 253 (Tex. 2002). Significantly, the Texas Court was faced with a unique statutory scheme created by the Texas Legislature which did not—unlike Section 3215 of the Abortion Control Act—contain a coverage exclusion for abortion. Instead, the Texas scheme provided that "no medical services may be included for which Federal matching funds are not available[,]" thereby tying all funding to the federal law. *Id*. at 261 (citing Medical Assistance Act of 1967, 60th Leg., R.S., ch. 151, § 5, 1967 Tex.

Gen. Laws 312).  As the court observed, "[t]his provision was plainly not directed at abortion funding, as abortion was illegal in Texas at the time it was enacted." *Id*.  Further, the scheme was in effect even before the Hyde Amendment, and at that time, Texas "funded all medically necessary abortions."  *Id*. at 261.  The court emphasized the uniqueness of its scheme in stating that no other state appeals court addressing the constitutionality of an abortion coverage exclusion (whether pursuant to an equal rights amendment challenge or equal protection challenge) "had before it a statute similarly authorizing the provision of services only to the extent federal matching funds are available."  *Id*. at 259 & n.5 (collecting cases).

Thus, the starting point for that court's analysis was a facially neutral statute.  *Id*. at 263.  It recounted its three-step equal rights amendment test: first identify whether equality under the law has been denied; second, determine "whether equality was denied **because** of a person's membership in a protected class of sex…[;]" and third, apply strict scrutiny.  *Id*. at 257 (internal citation omitted).  The court was focused on the second question, a question reminiscent, though not identical to that facing this Court in interpreting our Equal Rights Amendment.

In addressing that question, it observed that its prior case law "did not discuss how courts should decide the issue when the classification is not so overtly gender based and arises at least in part from a facially neutral law."  *Id*. at 259.  Further, though the Texas court recognized that the funding restrictions in that case impacted only women,[68] it found that the scheme did not explicitly create a suspect classification "because of sex."  *Id*. at

---

[68]  In that respect, the Texas court cited the reasoning from *Fischer*, wherein this Court indicated that the mere fact that a statute affects only women does not mean that it discriminates against women, given the "certain immutable facts of life which no amount of legislation may change[,]" and which may, as a consequence require "certain laws which necessarily … only affect one sex."  *Bell*, 95 S.W.3d at 260-61 (citing *Fischer*, 502 A.2d at 125).

261. The Texas court determined that its equal rights amendment, like the federal Equal Protection Clause, required a showing that the statute had a discriminatory purpose as established by consideration of multiple contextual factors.[69] Those factors included disproportionate impact, the context of the challenged action, the sequence of events leading up to it, departures from normal procedures and substantive course, and legislative or administrative history. *Id*. In addressing those factors, the court again emphasized the neutrality of Texas' statutory scheme, which, it pointed out, was not directed at abortion funding. *Id*. The court addressed the Hyde Amendment, too, and stated that it did "not believe that the discouragement of abortion through funding restrictions can, by itself, be considered purposeful discrimination against women as a class." *Id*. at 263. Thus, the court concluded that "[w]hatever one might think of the legislative policy choice that the [Texas] funding scheme embodies, plaintiffs have simply failed to demonstrate that it reflects a purpose to discriminate because of sex." *Id*. at 264. It therefore applied rational-basis review and determined that the statutory scheme was rationally related to legitimate governmental purposes and therefore did not violate the equal rights amendment. *Id.*

There are many distinctions which render that court's reasoning inapplicable in Pennsylvania, but most importantly, *Bell* addressed a unique statutory scheme that did not directly target abortion and, in fact, predated legalization of abortion in that state. Because the law was based on the requirement to follow the Hyde Amendment, the

---

[69] The court cited to *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), in which the United States Supreme Court considered an Equal Protection challenge to a zoning decision refusing to change a tract from single-family to multi-family classification that resulted in the exclusion of low-income housing serving minorities. The High Court stated that official action is not unconstitutional "solely because it results in a racially disproportionate impact[,]" and instead "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id*. at 264-65.

challenged scheme was, as the court stated, "a facially neutral statute." *Id*. at 259. By contrast, Connecticut and New Mexico's coverage exclusions were overtly based on abortion and sex, and they operated similarly to the one under review here. The reasoning of those courts — in determining that their abortion coverage exclusions were disadvantaging women because of their sex, including their reproductive capabilities – is more compelling. *See Doe v. Maher*, 515 A.2d at 120; *Right to Choose*, 975 P.2d at 854.

**d. Policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence**

*Edmunds* instructs that

> … in analyzing any state constitutional provision, it is necessary to go beyond the bare text and history of that provision as it was drafted … and consider its application within the modern scheme of Pennsylvania jurisprudence.

*Edmunds*, 586 A.2d at 901. These considerations support our conclusion that our Equal Rights Amendment does not contain an exception from the prohibition against denying or abridging an individual's rights based on characteristics unique to one sex.[70]

The vestiges of discrimination against women based on their reproductive function remain. What the *Fischer* Court referred to as "an immutable fact," the biological ability to bear children, persists as a defining characteristic that gives rise to stereotypes. The danger of allowing legislation that makes distinctions based on reproductive capabilities is that such laws further engrain the socio-economic disparities that continue to exist as a result of the historic subjugation of women in society. Pregnancies present medical

---

[70] While we focus on the reproductive functions of women, a law designed only to apply to the sperm production of men would likewise be implicated.

complications,[71] and pregnancy and childrearing, a task disproportionately undertaken by women, can determine employment and career opportunities.[72]

Setting aside the foregoing public policy concerns that undoubtedly animated the People to adopt the Equal Rights Amendment to our Charter, we must consider the Equal Right's Amendment in light of jurisprudential concerns. Here, the overarching jurisprudential policy is stare decisis. Having determined that the *Fischer* Court's analysis was inconsistent with the plain text of the constitutional provision at issue and jurisprudence of the Court that preceded it, we consider whether, despite this error, we should nonetheless continue to adhere to *Fischer*'s holding on the basis that it is precedential.

### Quality of reasoning

In *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), this Court stated that its "general faithfulness to precedent is not sufficient to buttress judicial decisions proven wrong in principle or 'which are unsuited to modern experience and which no longer adequately serve the interests of justice.'" *Id.* at 336 (quoting *In re Carney*, 79 A.3d at

---

[71] Declaration of Colleen M. Heflin, Ph.D., 1/10/2019 (Exhibit A) at 22 ("evidence suggests that self-reported physical effects of having an unwanted pregnancy are higher than those of having an abortion, including longer periods of limitations on physical activity, which likely interferes with the ability to work[]"); Declaration of Courtney Anne Schreiber, MD, MPH, 1/11/2019 (Exhibit D), at 9, ¶ 19 ("almost 13 women die within 42 days of the end of pregnancy for every 100,000 live births[;]"); *id.* at 10-18, ¶¶ 22-41 (describing how common conditions are exacerbated by pregnancy); Declaration of Sarah C. Noble, D.O., 1/10/2019 (Exhibit E), at 6, ¶ 15 ("up to 14.5 percent of pregnant women experience a new episode of major or minor depression during pregnancy").

[72] Declaration of Colleen M. Heflin, Ph.D., 1/10/2019 (Exhibit A) at 21-22, ¶ 25 (citing evidence that women who were unable to obtain an abortion were "less likely six months later to be employed full-time and more likely to be receiving public assistance benefits and to have lower household incomes and to be poor[;]" also, "the negative consequences to economic well-being were shown to be long-lasting and to persist four years later compared to similar women who were able to obtain an abortion[]") (internal citations omitted).

505). Similarly, the United States Supreme Court recognizes that prior decisions that are egregiously wrong as a matter of law must be overruled. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1414-15 (2020) (Kavanaugh, J., concurring in part) (citing numerous cases overturned due to egregious error) ("In conducting that inquiry, the Court may examine the quality of the precedent's reasoning, consistency and coherence with other decisions, changed law, changed facts, and workability, among other factors."). As such, the stare decisis doctrine cannot be used as an absolute shield to protect and perpetuate legal error regardless of whether the flaw existed at the time the decision was rendered or manifested itself through subsequent interpretations of the decision. *Id.* "The question thus arises as to whether we are bound to the [challenged] interpretation … when, by any rules of constitutional construction recognized at the time of those decisions or now, the interpretation is patently flawed. The answer is that we are not." *McLinko*, 279 A.3d at 573.

With respect to the Equal Rights Amendment, the *Fischer* Court's reasoning was patently flawed. The *Fischer* Court's creation of a judicial exception to the Equal Rights Amendment for "physical characteristics unique to only one sex" finds no support in the language of Section 28; it has no reasonable justification; and the cases it relied on for its conclusion were at least partially based on a flawed premise. *See Fischer*, 502 A.2d at 125 ("Although we have not previously addressed this situation, other [equal rights amendment] jurisdictions have; and the prevailing view amongst our sister state jurisdictions is that the [equal rights amendment] 'does not prohibit differential treatment among the sexes when, as here that treatment is reasonably and genuinely based on physical characteristics unique to one sex.'") (internal citations omitted)). This Court has no authority to judicially modify the constitutional text which prohibits denying or abridging equality of rights "because of the sex of the individual." PA. CONST. art. I, § 28. As such,

any state action which operates to deny or abridge equality of rights because of the person's sex, including when it is based on physical characteristics unique to one sex, is subject to searching inquiry under the Equal Rights Amendment.

The *Fischer* Court's only bases for adopting the exception were undeveloped assertions that the biological differences between men and women justify unique laws and that the "prevailing view" among other jurisdictions with constitutional equal rights amendments was that the Equal Rights Amendment does not prohibit distinctions based on physical characteristics unique to one sex. The *Fischer* Court's statement that there exist "certain immutable facts of life which no amount of legislation can change," calls to mind the notions that "nature herself has always recognized a wide difference in the respective spheres and destinies of man and woman"[73] and "that woman's physical structure and her performance of maternal functions place her at a disadvantage" especially "when the burdens of motherhood are upon her."[74] These rejected stereotypes cannot justify the *Fischer* Court's affirmative conclusion that "there are certain laws which necessarily will affect only one sex[.]" *Fischer*, 502 A.2d at 125. This statement ignores the question: Is it constitutional for the General Assembly to enact laws that deny or abridge rights of only one sex? Even if certain laws will make distinctions based on physical characteristics unique to one sex and that such laws cannot be neutralized so that they impact both sexes and that the laws are necessary to our functioning society, such laws would trigger the Equal Rights Amendment, then be scrutinized thereunder. We cannot simply ignore the Equal Rights Amendment for certain types of legislation.

Further, the *Fischer* Court's reasoning that the Coverage Exclusion uses abortion—a "voluntary choice made by the women" thus merely creating two classes of

---

[73] *Bradwell*, 83 U.S. at 141-42 (Bradley, J., concurring).

[74] *Muller*, 208 U.S. at 421.

women—as the basis for distinction and therefore does not use sex itself, is not "quality reasoning."[75]  Laws that create subclasses within one sex have been found violative of the Equal Rights Amendment.  For instance, in *Hartford*, this Court agreed with the Insurance Commissioner that an insurance company's calculation of motor vehicle insurance rates that took into account gender ran afoul of the non-discrimination principles of the Equal Rights Amendment.  *Hartford*, 482 A.2d 542.  The gender-based rates affected only a subset of men—those who made a voluntary choice to drive—but it triggered the Equal Rights Amendment nonetheless.

By way of further example, the discriminatory sentencing provisions at issue in *Butler*, 328 A.2d at 852-53, affected only the subset of men convicted of the relevant crimes (as opposed to a majority of men who chose not to commit crimes) subjecting themselves to such punishments.  Rather than delineating the affected classes to point out that the defendant was a member of a subset of men who voluntarily chose to commit crime, we focused on how the scheme "treats men less favorably than women[.]"  *Butler*, 328 A.2d at 856.  Heinous instances of discrimination often affect only a subset of women, and sometimes only individual women.  *See* Providers' Reply Brief at 7 (hypothesizing that this illogic could be used to justify a state law that barred women but not men from the practice of medicine because it differentiates between women who choose to be doctors and those who choose another path).  That a statute affects only a subset of women does not remove that statute from the protections of the Equal Rights

---

[75]  Relying on *Fischer*, DHS and Intervenors argue that the Coverage Exclusion creates a permissible classification within the female sex and not an impermissible distinction between men and women.  They argue that this intra-sex classification is based on the voluntary choice of women to carry a pregnancy to term or to terminate a pregnancy.  We reject this analysis because it is predicated on the false premise that the Coverage Exclusion is not a sex-based legislative provision in the first place.

Amendment, contrary to *Fischer*'s rationale.  To reiterate, the Equal Rights Amendment's breadth includes scenarios when sex is but one factor of many.

In light of *Fischer*, the arguments of the parties and Intervenors focused our inquiry on one question:   Does the Equal Rights Amendment prohibit differential treatment among the sexes based on physical characteristics unique to one sex?[76]

We conclude without hesitancy that there is no support in the text of Section 28 for the idea that differential treatment among the sexes based on physical characteristics unique to one sex is permissible.  Section 28 prohibits the denial or abridgment of rights because of the sex of an individual.  As developed, the first dictionary definition of sex establishes the first meaning as "either the male or female of a species, especially as differentiated with reference to the reproductive functions."[77]  A physical characteristic unique to a female is her childbearing capability—the precise characteristic targeted by the Coverage Exclusion at issue in this case.  We would have to conjure up a heretofore

---

[76]  As stated, our focus is driven by the arguments of the parties.  On the other hand, Justice Mundy posits that "equality of rights" necessarily involves a comparison. Concurring & Dissenting Op. at 9 n.7 (Mundy, J.).  This case presents such a comparison. Given that we are addressing this case at the preliminary objection stage, we consider as true Providers' allegation in their petition for review that women's reproductive healthcare is treated differently than men's reproductive healthcare under the Medical Assistance Program.  *See Robinson Township*, 83 A.3d at 917.  They further allege that there is no parallel Coverage Exclusion for men, as all reproductive health services are covered for men, including all sex-based healthcare consultations and procedures.   Petition for Review, 1/16/2019, ¶¶ 54, 90.  The only reproductive health service excluded from coverage is abortion when the pregnancy is not life-threatening and not the result of incest or rape.  *Id*.; *see* supra pp. 5-7.  Abortion is healthcare.  Thus, this Equal Rights Amendment challenge is, in part, based upon a comparison of men's and women's reproductive healthcare coverage under the Medical Assistance program in the same vein as all of our existing Equal Rights Amendment precedent.  *See* Providers' Brief at 35 (asserting that the Coverage Exclusion apportions benefits "unequally, excluding funding for an extremely common, sex-linked medical need of women while funding all reproductive medical needs for men[]").

[77]  *See* supra p. 85.

unimagined meaning of "sex" as used in Section 28 to validate an interpretation of its protection that excepts out physical characteristics unique to one sex.

DHS and Senate Intervenors, relying on *Fischer*,[78] argue that the Coverage Exclusion is not based on sex but on abortion. They state the relevant question "is not whether a law **affects** only one sex because that sex has a unique immutable characteristic, but whether the law **discriminates** on the basis of sex, which the Coverage Ban does not." Senator Intervenors' Brief at 24 n.7.

The distinction drawn by DHS and the Senate Intervenors emphasizes the medical procedure, abortion, as the basis for the challenged statutory exclusion. To accept that as the correct premise requires divorcing the analysis from the irrefutable fact that only women can use the medical procedure that is excluded from coverage. We recognize that the *Fischer* Court rejected the "rather simplistic argument that because only a woman can have an abortion then the statute necessarily utilizes 'sex as a basis for distinction[.]'" *Fischer*, 502 at 124 (citing *Henderson*, 327 A.2d at 62). With due respect to that Court, while the argument may be simple, it is not simplistic. As recognized in *Fischer*, the Appellants relied on *Henderson* for the proposition that "the thrust of the Equal Rights Amendment is to insure equality of rights under the law to eliminate sex as a basis for distinction." *Henderson*, 327 A.2d at 62. As previously discussed, *Henderson* invalidated the provisions of the divorce code that allowed, among other things, alimony pendente lite to women but not men. It was one of a long line of cases pre-dating *Fischer* that absolutely and without exception invalidated laws that conferred benefits or imposed burdens based on the sex of an individual. *See* supra pp. 94-98. The *Fischer* Appellants' argument was thus simple and correct: Based on the body of this Court's work examining the reach of the Equal Rights Amendment, no sex-based distinctions in the law were

---

[78] *Fischer*, 502 A.2d at 125.

tolerated and thus, the Coverage Exclusion, which only impacted women in making reproductive health care decisions, could also not stand.

We recognize that our Equal Rights Amendment jurisprudence prior to *Fischer* did not address a law that distinguished between the sexes based on a physical characteristic unique to one sex. However, based upon the unambiguous text of the Equal Rights Amendment, there is no room for a carve out for laws that differentiate between the sexes for any reason. The *Fischer* Court contorted a simple, longstanding principle of Section 28 law by declaring that the basis for the Coverage Exclusion was not a distinction based on sex but abortion. To support this logic, the *Fischer* Court cited to a dissenting opinion in a Massachusetts Supreme Court case addressing that Commonwealth's Medicaid coverage exclusion. *Moe v. Sec'y of Admin. and Fin.*, 417 N.E.2d 387 (Mass. 1981). In a robust opinion, the majority in *Moe* struck its analogous Medicaid exclusion as violative of Massachusetts' due process protections because it violated a woman's right to exercise autonomous decision-making protected by Massachusetts' constitutional privacy right. Given its disposition of that issue, the majority did not address the separate challenge under the state's equal rights amendment. Chief Justice Henessey, in a sole dissent, disagreed on all counts and separately addressed and rejected the equal rights amendment challenge:

> I do not believe that this case involves a gender based classification cognizable under the [e]qual [r]ight [a]mendment. Inescapably, the motive for the challenged legislation lies in opposition to abortion and is based on the State's valid interest in preserving life. The legislation is directed at abortion as a medical procedure, not at women as a class.

*Moe*, 417 N.E.2d at 407 (Hennesey, C.J., dissenting).

The declaration by the Massachusetts dissenting justice relied on in *Fischer* does not grapple with the fact that its coverage exclusion only applies to women and that it is,

thus, sex-based. The *Moe* dissent does however shed light on the basis for this line of thinking embraced by *Fischer* and the supporters of the Coverage Exclusion here. Instead of first recognizing the obvious sex-based discrimination as implicating the Equal Rights Amendment protection and then conducting a searching inquiry into the rationale supporting it, *Fischer*, following the *Moe* dissent, transposed and then collapsed these two independent inquiries: *Fischer* looked first and only to the motive of the Legislature (i.e., opposition to abortion, and the state interest in preserving life) and then stated its conclusion that the Coverage Exclusion is about preventing abortions, and women have no challenge under Section 28 based on an exclusion of Medical Assistance coverage that can only affect their sex. In other words, the *Fischer* Court's analysis started with the legislative policy when it should have first determined whether the legislative distinction was sex-based. It should have then scrutinized the legitimacy of distinction based on the Legislature's policy interests. Instead, *Fischer* considered the legislative policy, untethered from any scrutiny, to reach the conclusion that there was no sex-based distinction in the Coverage Exclusion.

*Fischer*'s analytical device is contrary to the manner in which we conduct judicial review and subverts constitutional protections. It requires that we ignore that the Coverage Exclusion is inherently sex-based. The failure of *Fischer*'s logic becomes apparent when applied to other sex-based distinctions. For example, in *Butler*, this Court held that mandatory minimum sentences applicable to men but not women violated the Equal Rights Amendment. If instead we applied *Fischer*'s transposed analysis in *Butler*, we would have to find that the sentencing scheme was not based on a distinction between men and women, but instead concerned protection of society, and the legislative policy recognized that women present a lesser danger. That would be the beginning and end of the analysis, because, following *Fischer*'s logic, as stated in the *Moe* dissent, we would

conclude that "the legislation is directed at [sentencing schemes as public safety measures], not at women as a class." *Moe*, 417 N.E.2d at 407 (Hennesy, C.J., dissenting).

*Fischer*'s analytical device that transposes the recognition of the legislative policy for a statute with the recognition of Section 28's constitutional protection guts the guarantee of the Equal Rights Amendment. The analytical device—by accepting legislative policy pronouncements in place of conducting any judicial scrutiny of sex-based classifications—avoids the difficult questions. While there may be a legitimate state interest in this Commonwealth for promoting potential life, the question remains whether that legislative determination trumps the constitutional guarantee expressed in the Equal Rights Amendment that individuals are to be treated equally under the law and that rights cannot be denied or abridged based on sex. It is for the courts, not the Legislature, to conduct a searching inquiry to determine whether the balance struck by the Legislature runs afoul of the constitutional promise that rights will not be denied or abridged based on sex.

Finally, and most fundamentally, the *Fischer* Court's adoption of an exception to the Equal Rights Amendment for "physical conditions unique to one sex" is so contrary to the text of the Equal Rights Amendment that contains no exceptions that it constitutes a special justification for overruling that analysis. Consequently, we will not perpetuate its error by considering the flawed framework when addressing Providers' claim.

### Stare Decisis and constitutional issues

In *Commonwealth v. Alexander*, this Court recognized that "stare decisis is at its weakest when we interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Alexander*, 243 A.3d at 197 (quoting *Agostini v. Felton*, 521 U.S. 203, 235 (1997)). Because the judiciary is

the sole branch vested with the power to interpret the Constitution, stare decisis is less strict in this area to ensure courts "balance the importance of having constitutional questions **decided** against the importance of having them **decided right**." *Ramos*, 140 S. Ct. at 1413 (Kavanaugh, J., concurring in part). In this case, given that we are faced with questions of state constitutional interpretations, stare decisis is at its weakest.

### Age and lineage

The likelihood that a court will apply stare decisis increases proportionally to the age of the decision. *Alexander*, 243 A.3d 177, 196 (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1969, (2019)). Typically, when discussing age and lineage as a factor, courts cite two main concerns: First, "[c]ases with a long lineage tend to have multiple precedents to overcome," making it challenging to overrule one decision without disrupting an entire area of law. *Id.* Second, courts are generally more hesitant to overturn longstanding decisions involving questions of statutory interpretation, reasoning that the longer the decision has been on the books, the longer the legislature had to step in if they felt something needed to be corrected. *See Hilton v. S.C. Pub. Rys. Comm'n*, 502 U.S. 197, 202 (1991) ("Congress has had almost 30 years in which it could have corrected our decision [] if it disagreed with it, and has not chosen to do so. We should accord weight to this continued acceptance of our earlier holding."). Again, with constitutional interpretation, the age and lineage of an opinion is accorded less weight.

*Fischer*'s Equal Rights Amendment analysis has not been approvingly cited or applied by this Court. If anything, *Fischer*'s analysis of the Equal Rights Amendment claim disrupted this area of the law. *Fischer* reached the opposite result of the established precedent providing that to treat women differently based on their pregnant status, a physical condition unique to their sex, is sex discrimination under the PHRA. *See Cerra*, 299 A.2d at 280. There is no reason to conclude that "sex" as used in the Equal Rights

Amendment has a meaning different than "sex" used in the PHRA that preceded it. Whereas *Cerra* established that "sex" encompasses, at least in part, the difference between individuals' reproductive biology, *Fischer* held that it did not. Therefore, for Equal Rights Amendment purposes, given its inconsistency with *Cerra*, the age and lineage of *Fischer* weighs against applying stare decisis.

### Reliance

Finally, where there has been substantial public or private reliance on precedent—and where overruling a decision would "dislodge settled rights and expectations or require an extensive legislative response[,]" stare decisis has added force. *Hilton*, 502 U.S. at 202 (emphasis omitted). In that respect, we have "recognize[d] the importance of reliance on settled jurisprudence when asked to overturn precedent," and found there was force to legislators' arguments that "they rely on this Court's interpretation of the law and precedent when crafting legislation, and that such reliance should not be undercut except for good reason." *Stilp*, 905 A.2d at 967.

Outside of repeated reenactment of the Coverage Exclusion, we have no indication of the Legislature's reliance on the *Fischer* Court's interpretation of the Equal Rights Amendment. Further, the Legislature's reliance interests cannot exceed a citizen's constitutional rights under the Equal Rights Amendment.

### 3. Enforcement and Conclusion

### a. Enforcement of the Equal Rights Amendment

Certainly, when this Court concluded that sex-based distinctions in statutes were based on traditional sex roles, social attitudes and questionable social stereotypes, we did not hesitate to invalidate the laws under the Equal Rights Amendment. To see the strength of the prohibition in Section 28, a case decided one year before *Fischer* is illustrative. In *Hartford*, a case involving the meaning of the phrase "unfairly

discriminatory" in the Insurance Rate Act, we upheld the Insurance Commissioner's interpretation of the term by relying on the Equal Rights Amendment and the strong public policy expressed in it against gender-based discrimination. This Court rejected the insurance company's argument that actuarially sound gender-based rates were not "unfairly discriminatory." We did so, among other reasons, because although a rate may be justified by actuarial data it could be unfair in its underlying assumptions and application to individuals. *Hartford*, 482 A.2d at 547. In making this assessment, without any balancing of policy concerns, we agreed with the insurance commissioner that a rate plan based upon gender is offensive to the spirit of Article I, Section 28—"unquestionably, sex discrimination in this Commonwealth is now unfair discrimination." *Id.* at 549.

Despite this Court's previous stringent enforcement of our Equal Rights Amendment,[79] no party or amicus argues for an absolutist approach in its enforcement. For example, Providers observe that there could exist constitutionally permissible state regulations that distinguish based on sex to ameliorate discrimination, to equalize the sexes, or to protect other constitutional rights. Providers' Reply Brief at 14-15; *see also* Senate Intervenors' Brief at 19-20 (stating that the Medical Assistance program affords preferential treatment of pregnant people through higher income eligibility thresholds). In our judicial review function, we consider the nuances of the scenarios implicating Article I rights and are rarely in a position to announce that a right is unfettered or a prohibition absolute. Moreover, in addressing Article I, Section 1 rights, this Court has acknowledged that "the General Assembly may, under its police power, limit those rights by enacting

---

[79] This Court's early jurisprudence applying the Equal Rights Amendment has been interpreted by some as an absolute bar against legislation making distinctions based solely on sex. Beck & Alfano Baker, supra, at 747 (citing, inter alia, *Henderson*, 327 A.2d at 62 (stating that the Equal Rights Amendment "eliminate[s] sex as a basis for distinction")); Paul Benjamin Linton, *State Equal Rights Amendments: Making a Difference or Making a Statement?*, 70 TEMP. L. REV. 907, 911 (1997); Krasik, supra, at 715-16.

laws to protect the public health, safety, and welfare," but that "any such laws are subject to judicial review and a constitutional analysis." *Nixon v. Commonwealth*, 839 A.2d 277, 286 (Pa. 2003) (internal citations omitted). In our enforcement of other Article I rights, we have conducted at least a two-step analysis of challenged legislation. First, we determine the nature of the right—is it fundamental or something less. Depending on the nature of the right, we conduct a means-ends analysis, i.e., scrutiny tailored to the nature of the right, to determine whether the articulated government purpose is advanced by the legislation. For example, faced with a violation of an individual's fundamental right to privacy under Article I, Section 1 of the Pennsylvania Constitution, we rejected the approach of applying varying degrees of scrutiny depending on the type of governmental intrusion. *Stenger v. Lehigh Valley Hosp. Ctr.*, 609 A.2d 796, 801 (Pa. 1992). We did so because "only a compelling state interest will override one's privacy rights" under the Pennsylvania Constitution. *Id*. at 802.

Our Equal Rights Amendment affords rights beyond those guaranteed by our equal protection provisions. Section 28 was adopted in 1971, four years after the adoption of Article I, Section 26, "No discrimination by Commonwealth and its political subdivisions" in 1967.[80] The mere chronology strongly evidences an intent to provide distinct protections for the denial or abridgement of rights based on the sex of the individual. Courts in our sister states have also interpreted their equal rights amendments in this manner, as affording greater protection than the other equal protection provisions of the federal and state constitutions.

We agree with our sister courts that "[w]e construe the intent of this amendment as providing something beyond that already afforded by the general language of the Equal Protection Clause." *Right to Choose*, 975 P.2d at 851-52. In *Right to Choose*, the

---

[80] *See* infra Part III.F. (discussion of Article I, Section 26).

New Mexico Supreme Court observed that prior to adoption of its equal rights amendment, its constitution contained an equal protection provision akin to that in the federal Constitution. It provided: "No person shall be deprived of life, liberty or property without due process of law; nor shall any person be denied equal protection of the laws." *Id*. at 851 (citing N.M. CONST. Art. II, § 18 (pre-1973)). Thereafter, a new sentence was added to New Mexico's constitution, i.e., the equal rights amendment providing that, "[e]quality of the rights under the law shall not be denied on account of the sex of any person." *Id*. The court relied on other states that interpreted their equal rights amendments as expanding the guarantees of their constitutions as well as its own rule of construction requiring that no part of the constitution may be rendered superfluous. *Id*. It therefore viewed the intent of the amendment as "providing something beyond that already afforded by the general language of the Equal Protection Clause." *Id*. at 851-52. The New Mexico court further noted that although federal courts apply an intermediate level of scrutiny to gender-based classifications, the New Mexico court's "rationale for conducting a searching judicial inquiry regarding such classifications under the New Mexico Constitution may accord with the criteria for invoking more stringent judicial scrutiny under federal law[.]" *Id*. at 853 (internal citations omitted). The criteria include that legislation on its face is within a specific prohibition of the constitution or that there is a history of purposeful unequal treatment. *Id*. The court reiterated its departure from the federal standards. *Id*. at 853-54 (providing that "our analysis is not inextricably tied to the standard of review employed by the federal courts").

Similarly, in *Doe* (Conn.), the Connecticut court rejected an argument by the state that federal Equal Protection Clause case law was applicable for reviewing a coverage exclusion, and that pursuant to federal jurisprudence, its coverage exclusion was subject to rational basis review. *Doe* (Conn.), 515 A.2d at 160-61. The court acknowledged that

the Connecticut Supreme Court had previously stated that the **equal protection provisions** of the Connecticut and United States constitutions share meanings and limitations, but it highlighted that "those pronouncements were made without reference to the [**equal rights amendment**]." *Id*. at 160 (emphasis added). Further, the "traditional language" was utilized in cases **not** involving gender classification. The court then stated: "To equate our [equal rights amendment] with the [E]qual [P]rotection [C]lause of the federal [C]onstitution would negate its meaning given that our state adopted an [equal rights amendment] while the federal government failed to do so. Such a construction is not reasonable." *Id*. at 160-61. Therefore, the court explained that at the very least, the standard of review of sex classifications must be strict scrutiny. It reiterated that "[s]urely the effect of the [equal rights amendment] was to raise the standard of review." *Id*. at 161.

Likewise, the Supreme Court of Illinois, reviewing a statute providing for treating as adults juvenile male offenders, but not juvenile female offenders, observed the canon of constitutional construction that "it is incumbent upon the court to give meaning to every section and clause of the instrument." *People v. Ellis*, 311 N.E.2d 98, 101 (Ill. 1974) (internal citation omitted). Giving meaning to its equal rights amendment, the court stated the following:

> In contrast to the Federal Constitution, which, thus far, does not contain the [e]qual [r]ights [a]mendment, the [Illinois] Constitution of 1970 contains section 18 of article I, and in view of its explicit language, and the debates, we find inescapable the conclusion that it was intended to supplement and expand the guaranties of the equal protection provision of the Bill of Rights and requires us to hold that a classification based on sex is a 'suspect classification' which, to be held valid, must withstand 'strict judicial scrutiny.'

*Id*.

While the United States Supreme Court applies an intermediate level of scrutiny to gender-based classifications (an approach cemented after 1971),[81] following the adoption of the Equal Rights Amendment, this Court, unsurprisingly, did not follow the High Court's lead in its enforcement of our Equal Rights Amendment. Instead, this Court took a near absolute view of the protections.

We take seriously the express recognition of the right to equality of the sexes under the law and the magnitude of this special protection against the denial or abridgment of rights under the law based on sex contained in our Equal Rights Amendment. We are persuaded that the approach to enforcement of this right taken by the Supreme Court of New Mexico[82] provides the appropriate framework. Thus, a challenge to a law as violative of Section 28 begins with the premise that a sex-based distinction is presumptively unconstitutional. It is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy. The judicial inquiry will be searching, and no deference will be given to legislative policy reasons for creating sex-based classifications. Given these parameters, we acknowledge that few, if any, sex-based conferrals of benefits or burdens will be sustainable.

---

[81] *See Reed v. Reed*, 404 U.S 71, 76 (1971) (finding an Idaho statute that provides a preference for female administrators of estates was unconstitutional and violated Equal Protection Clause of the Fourteenth Amendment; stating that the question in that case was whether a difference in sex "bears a rational relationship to a state objective that is sought to be advanced" by the challenged statutes); *Craig v. Boren*, 429 U.S. 190 (1976) (holding that statute distinguishing drinking ages of men and women was subject to intermediate scrutiny) (citing to *Reed*, the High Court stated the following: "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives.").

[82] *Right to Choose*, 975 P.2d at 854-56.

This approach we adopt is aligned with the overwhelming precedent of this Court that strictly enforces the Equal Rights Amendment against laws benefitting or burdening rights based on whether the individual was a man or woman. It also takes into account that there may be classifications within laws that are based on a characteristic that is unique to one sex that may not violate the Equal Rights Amendment. As with all laws making classifications based on sex, such an enactment will be presumed unconstitutional and the government will have the high burden of rebutting the presumption.

**b.      Conclusion**

Based on the foregoing interpretation of the Equal Rights Amendment, we overrule *Fischer*'s interpretation of the Equal Rights Amendment. We further conclude that when a statute is challenged as violative of Section 28, a sex-based distinction is presumptively unconstitutional, and it is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy.[83]

**E.      The Right to Reproductive Autonomy**[84]

In refusing to fund all medical care related to abortions while funding all medical care attendant to pregnancy, the Legislature evinces a partiality for pregnancy over

---

[83] Contrary to Justice Mundy's assertion, we have not ruled that the Coverage Exclusion is unconstitutional. Nor have we purposefully overridden legislative interests to the extent they represent taxpayers opposed to abortion. Concurring & Dissenting Op. at 19 (Mundy, J.). As a result of this decision, the Providers' claim that the Coverage Exclusion violates the Equal Rights Amendment will be adjudicated in the Commonwealth Court where we are confident there will be zealous advocacy supporting the state interests in the sex-based distinction. *See id*. at 7 (emphasizing the "state's important interest in promoting maternal health and protecting fetal life from destruction[]"); Concurring Op. at 8-20 (Wecht, J.) (discussing various state interests).

[84] For purposes of Part III.E., all uses of "we" and "our" refer only to this author and Justice Wecht, who are the two Justices reaching and deciding the question of whether (continued…)

abortion. Providers insist that this partiality violates the Pennsylvania Constitution because Article I, Section 1 of the Pennsylvania Constitution secures a fundamental right to reproductive autonomy, and Article I, Section 26 requires that legislative classifications that affect the exercise of fundamental rights do so neutrally and without discrimination.[85] The first contention requires us to address the source and scope of Pennsylvania's right to privacy to determine whether it encompasses the right to reproductive autonomy.

### 1. Parties' Arguments[86]

### Providers' Arguments

Providers' core argument is that "when states subsidize health care, they must do so in ways that do not place unequal burdens on the exercise of constitutionally-protected

---

the Pennsylvania Constitution secures the fundamental right to reproductive autonomy, which includes a right to decide whether to have an abortion or to carry a pregnancy to term.

[85] To be clear, Providers, in advancing their equal protection and non-discrimination argument, are not raising any claim based on race, gender, sex, or indigency. Their only claim is that the Coverage Exclusion violates Article I, Section 26 of the Pennsylvania Constitution because it discriminates against people in the exercise of their fundamental right to reproductive autonomy.

[86] We note that multiple amicus briefs have been filed in support of both parties. In support of Providers, the ACLU of Pennsylvania and Professors Seth Kreimer and Robert Williams provide a historical perspective of this Commonwealth's Constitution and the development of the equality guarantee, first set forth in Article 1, Section 1, and later augmented by, inter alia, Article 1, Section 26. They urge this Court to interpret the Commonwealth's Charter, and the rights secured thereunder, independently from federal law. They chronicle that Pennsylvania has long recognized that our Constitution provides a stronger right to privacy than does its federal counterpart.

A similar position is raised by a number of faith-based organizations that include the National Council of Jewish Women and Catholics for Choice, who argue that this Court has long held that Pennsylvania's Constitution guarantees a robust right to privacy that surpasses the right recognized by federal law. They detail the varied and nuanced positions held by, and within, the Jewish, Catholic and Islamic faiths regarding when life begins and contend that at least some segments of practitioners of those faiths, and others, believe that abortion is moral and permissible and can be reconciled with their religious beliefs. In addition to Article I, Section 1, they cite to Article I, Section 3's (continued…)

protection of religious freedom for reflecting "the importance of protecting the exercise of individual conscience and autonomy essential to personal liberty[.]" National Counsel of Jewish Women's Brief at 16. They assert that our Commonwealth has a continued interest in maintaining government neutrality toward religious differences among the Commonwealth's citizens. *Id*. at 18.

New Voices of Reproductive Justice and twenty-two additional organizations dedicated to reproductive justice and the health and wellbeing of Black women present heavily-sourced policy considerations surrounding the accessibility of healthcare generally, and abortion services specifically, to this segment of the population. These organizations contend that negative consequences that result from the abortion ban, such as the inability to control their reproductive lives, are disproportionally borne by Black women.

In contrast, the leaders of eight organizations active in the Black community filed an amicus brief in which they refute the notion that Black women have been denied access to healthcare and abortion services. To the contrary, they assert that Black women have been targeted by abortion providers in a concerted effort to control the Black community and to enrich abortion providers.

Similarly, a coalition of pro-life Jewish organizations and rabbis write in support of DHS, contending that abortion is abhorrent to their faith and that the use of their tax dollars (and the tax dollars of those who share their beliefs) causes them to violate their religious beliefs. These amici contend that *Fischer* controls and that the failure to adhere to stare decisis would amount to a usurpation by this Court of the General Assembly's prerogative to legislate and to declare public policy for the Commonwealth. The importance of stare decisis and this separation of powers concern are raised by the Life Legal Defense Fund and Judicial Watch, Inc., in their filings.

The American Association of Pro-Life Obstetricians and Gynecologists, together with the Pro-Life Union of Greater Philadelphia, the Charlotte Lozier Institute and the Human Coalition discuss physical and mental health risks attendant to abortion. These concerns are reiterated in a brief filed by Texas Right to Life and Stephen J. Hilgers, M.D., and echoed by Guiding Star Ministries. Guiding Star Ministries also advises the Court of various private entities that provide funds for women seeking abortions, claiming that Providers failed to substantiate their claim that low-income women are denied access to abortion because of financial constraints.

Members of the Republican Caucus of the Pennsylvania House of Representatives echo arguments made by Intervenors, explaining that it has long been the policy of the Commonwealth to protect unborn life and that the ban is a proper expression of that policy through the General Assembly's appropriation power. These amici point out that the General Assembly also appropriates significant funds for programs to support women through pregnancy and after birth.

Democrats for Life of America raises policy-based arguments, contending that the ban respects the conscience of the taxpayers who morally oppose abortion. Although it (continued…)

rights." Providers' Brief at 57. As to the right protected, they rely on our jurisprudence regarding Article I, Section 1, as well as Article I, Section 8 of the Pennsylvania Constitution, to argue that our Constitution protects a woman's fundamental right to make reproductive decisions. When *Fischer* was decided, a woman had a federally protected right to abortion, and thus, the Court was not asked to decide whether the Pennsylvania Constitution guaranteed the right of a woman to make such decisions. The Commonwealth Court did not expressly address the Providers' claim under our Charter but implicitly assumed that a right to abortion existed.[87] As a result of *Dobbs*, the federal right is no longer recognized. Thus, Providers assert that we must decide the question[88] and that an *Edmunds* analysis will confirm the right under our Charter. They generally provide such an analysis.[89]

---

acknowledges the General Assembly has no obligation to accommodate the moral convictions of taxpayers, this amicus contends that the General Assembly has the discretion to do so. Democrats for Life also illustrate how, in its view, the abortion ban serves as a bipartisan compromise that makes the passing of productive public welfare legislation possible.

Americans United for Life argues that Pennsylvania's equal protection guarantees are coextensive with federal equal protection guarantees, pointing out that Providers provide no authority in support of their claim to the contrary. It contends that availability of abortion services has no correlation to women's social or economic success, citing the steadily decreasing rate of abortion in Pennsylvania since 1990 and a concurrent rise in women's social and economic success during the same period.

[87] *See* supra note 11.

[88] We address this premise first because it may be dispositive of the claim, and its resolution could allow us to avoid reconsideration of *Fischer*'s Section 26 analysis. That is, in light of *Dobbs*, if we were to reject the existence of a constitutional right to abortion in Pennsylvania, there would be no constitutional right upon which to base consideration of the continued vitality of this aspect of *Fischer*.

[89] For reasons that are unclear, Providers combined their right to reproductive autonomy *Edmunds* analysis with their equal protection *Edmunds* analysis. Providers' Brief at 58-73. We have attempted to separate them to eliminate confusion.

In arguing that the Pennsylvania Constitution protects the right to decide whether to carry a pregnancy to term, Providers state that Article I, Section 1 of the Pennsylvania Constitution provides stronger protection for **individual autonomy** and **privacy** than the federal Constitution. They assert that our Constitution embodies "powerful protection for individual autonomy," citing *Nixon v. Department of Public Welfare*, 839 A.2d 277, 287 (Pa. 2003)*, Ladd v. Real Estate Commission*, 230 A.3d 1096, 1108 (Pa. 2020) and a concurring and dissenting opinion in *Yanakos v. UPMC*, 218 A.3d 1214, 1227 (Pa. 2019) (Donohue, J., concurring and dissenting) where members of this Court recognized the right to procreate and make child-rearing decisions as fundamental. Providers' Brief at 62-63.

Providers argue that Pennsylvania's enhanced privacy protections under Article I encompass "decisional autonomy and bodily integrity." *Id*. at 63 (citing *Commonwealth v. Murray*, 223 A.2d 102, 109 (Pa. 1966) (plurality); *Alexander*, 243 A.3d at 206). Decisional autonomy includes the "freedom to make certain important decisions[,]" including decisions over marriage, family formation and child rearing, *Denoncourt v. Commonwealth, State Ethics Commission*, 470 A.2d 945, 948 (Pa. 1983) (plurality), as well as the right to make decisions related to sex and sexuality "free from sanctions arising from the moral judgments of others," as established in, inter alia, *Commonwealth v. Bonadio*, 415 A.2d 47, 50-52 (Pa. 1980) (finding voluntary deviate sexual intercourse statute violated Pennsylvania's equal protections guarantees). Providers' Brief at 64. Given the paramount and life-altering importance of the decision whether to form a family, Providers state that the broad right to decisional autonomy in matters involving reproduction and sexuality encompasses "the right to choose to end or continue a pregnancy." *Id*. at 65.

According to Providers, the Court has treated the right to bodily integrity as a component of privacy, and bodily integrity "necessarily includes the right to decide whether or not to continue pregnancy because without it, a woman is no longer a 'master of her fate.'" Providers' Brief at 65 (citing *John M. v. Paula T.*, 571 A.2d 1380, 1386 (Pa. 1990) (referring to the constitutional guarantee of "clear privacy interests in preserving [] bodily integrity") (citing *Murray*, 223 A.2d at 110)). Providers reason that based on the enhanced protections of individual autonomy and privacy, this Court should specifically hold that the Pennsylvania Constitution protects a woman's right to decide whether to continue a pregnancy.[90] *Id*. at 65.

With regard to *Dobbs*, Providers assert that federal constitutional historical analysis of the right to abortion[91] is completely separate from any history relevant to this case because the pertinent Pennsylvania constitutional provisions were adopted at different times than the federal Equal Protection Clause. Providers' Supplemental Brief at 3. In fact, Providers submit that *Dobbs* bolsters their arguments that *Fischer* should be overruled. *Id*. at 1. Namely, they point out that in the wake of *Dobbs*, former Governor Tom Wolf highlighted distinctions between the Pennsylvania Constitution and the federal Constitution and issued an executive order recognizing that the Pennsylvania Constitution "has long provided a guarantee of reproductive health care rights independent of, and

---

[90] Providers' *Edmunds* analysis focuses on other states that have addressed the constitutionality of a Medicaid exclusion, i.e., the entire equal protection issue, without specifically delineating other states' decisions recognizing (or rejecting) the existence of a constitutional right to abortion. Providers' Brief at 49-51.

[91] *Dobbs* purported to trace the history of abortion generally in the United States, from the earliest days of the common law until 1973. *Dobbs*, 142 S. Ct. at 2249-54 (concluding that the right to abortion was not deeply rooted in the Nation's history and traditions because "an unbroken tradition of prohibiting abortion on pain of criminal punishment persisted from the earliest days of the common law until 1973"). The *Dobbs* Court concluded, however, that the relevant historical context was the time of the adoption of the Fourteenth Amendment, 1868.

more expansive than, any protection provided by the United States Constitution." *Id*. at 2 (citing Executive Order 2022-01-Reproductive Health Care, 7/12/2022, available at https://www.governor.pa.gov/wp-content/uploads/2022/07/20220712-EO-2022-01.pdf). Further, they implore: "[w]ithout federal constitutional protection of this basic human right, which had formed the backdrop of the law regarding abortion in Pennsylvania for half a century, *see Commonwealth v. Page*, 303 A.2d 215 (Pa. 1973),[92] this Court's role in protecting the right to abortion under our state constitution takes on new importance, providing the 'special justification' Respondents claim is needed[]" to overrule *Fischer*." *Id*. at 3-4.[93]

**DHS's Arguments**

With regard to Providers' arguments in favor of recognizing the right to abortion under our Constitution, DHS states the following:

> Although Department Appellees agree with [Providers] regarding the fundamental health care rights under the Pennsylvania Constitution and the current statutory authority to obtain an abortion under the Commonwealth's Abortion Control Act (18 Pa.C.S. §§ 3201-3220), [Providers] do not contend there is a fundamental right to have an abortion funded by the State. The fundamental right to abortion is distinct from whether there is a fundamental right to have the Commonwealth fund an abortion.

---

[92] In *Page*, this Court held that convictions under Pennsylvania's antiabortion statute could not be sustained because they violated the Due Process Clause of the Fourteenth Amendment by failing to comport with the permissible scope of state regulation of abortion as established in *Roe*. *Commonwealth v. Page*, 303 A.2d 215, 217-18 (Pa. 1973) (citing Act of June 24, 1939, P.L. 872, 18 P.S. §§ 4718-4719).

[93] Regardless of whether *Fischer* is overruled, under current Pennsylvania law, a woman may obtain an abortion, subject to statutory regulations, until the gestational age of the fetus is twenty-four weeks. 18 Pa.C.S. § 3211.

DHS's Supplemental Brief at 2-3. Thus, DHS argues that the recognition under our Charter of a woman's right to reproductive decisional autonomy would not undermine *Fischer*.

**Intervenors' Arguments**

House Intervenors dispute Providers' derivation of the right at issue, insisting that "abortion is not – and never has been – a fundamental right in Pennsylvania." House Intervenors' Brief at 44. In support, they cite *Mills v. Commonwealth*, 13 Pa. 631, 633 (1850), where this Court stated that intent to procure an abortion, i.e., the "destruction of gestation[,]" is criminal "at all periods after conception[,]" and not just after quickening.[94] House Intervenors' Brief at 61 n.10. They maintain that Pennsylvania's historical tolerance of abortion was only pursuant to federal mandate. With *Roe* and *Casey* overruled, "so is any underlying support … that abortion has historical roots in Pennsylvania." House Intervenors' Supplemental Brief at 2. Finally, House Intervenors declare: "Heretofore, Pennsylvania, through its elected representatives, has determined that abortion is neither a Pennsylvania Constitutional right nor an appropriate use of public funds." *Id*. at 4-5. They distinguish the various cases cited by Providers as establishing the broad right to privacy, the right to bodily integrity, and the right to decisional autonomy, on the grounds that none dealt with the right to abortion.

Senate Intervenors argue that, in the wake of *Dobbs* and the fact that the United States and Pennsylvania equal protection provisions are interpreted using the same standards, "there is plainly no support for [any right to terminate a pregnancy] under the Pennsylvania Constitution's equal protection provisions." Senate Intervenors'

---

[94] Quickening refers to "[t]he first motion felt in the womb by the mother of the fetus, usu. occurring near the middle of the pregnancy." *Quickening*, BLACK'S LAW DICTIONARY, 8 (11th ed. 2019).

Supplemental Brief at 4-5.[95]  They maintain that because *Roe* and its progeny have been overruled, "there **are no** U.S. Constitutional limits on a state's authority to regulate abortion[,]" and therefore, it is less necessary to revisit the issues presented in *Fischer* because the claims are "even less tenable than before."  *Id*. at 7.  Additionally, Senate Intervenors contend that *Fischer* acknowledged the "constitutionally protected right" to abortion.  Senate Intervenors' Brief at 50 (citing *Fischer*, 502 A.2d at 121).  However, they insist that the *Fischer* Court correctly determined that the Commonwealth's decision to fund the exercise of some rights and not others does not violate equal protection provisions "when the Commonwealth has a constitutionally valid reason to specify only a certain class as beneficiaries."  *Id*. at 50-51.

### 2.  *Edmunds* Analysis

The initial premise of Providers' argument is that Article I of the Pennsylvania Constitution secures the right to reproductive autonomy[96] against governmental encroachment, regardless of the *Dobbs* decision.  To answer this question, we use the framework established in *Edmunds* as an interpretive aid, which provides that we consider the text of Article I, Section 1; its history including relevant Pennsylvania case law involving the right to privacy; related case law from other states; and policy considerations including unique issues of state and local concern and applicability to modern jurisprudence.

### a.  Text of Article I, Section 1

The text of Article I, Section 1 provides:

---

[95]  Senate Intervenors do not distinguish between the equality guarantee in Section I and the guarantee of certain substantive rights contained in the provision.

[96]  Providers characterize the right at issue as the right to decide whether or not to carry a pregnancy to term.  The right at issue has multiple equally true iterations, each of which is encompassed within the woman's right to autonomy with regard to reproductive healthcare decisions.

**Art. I § 1. Inherent rights of mankind**

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. I, § 1.[97]  The text of Article I, Section 1 cannot be viewed in isolation from its placement in our Charter.  Article I of our Charter is titled Declaration of Rights.  It delineates the terms of the social contract between government and the people that are of such "general, great and essential" quality as to be ensconced as "inviolate." *Robinson Township*, 83 A.3d 947.  These are inherent, not created rights.  Article I, Section 25 encapsulates the solemnity of the social contract and the depth of the source of the rights contained in Article I:

**§ 25. Reservation of powers in the people**

To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is

---

[97]  The text of Article I, Section 1, when first promulgated in the Constitution of 1776 provided:

**Article I:** That all men are born equally free and independent, and have certain natural, inherent and inalienable rights, amongst which are the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety.

PA. CONST. ch. 1, art. 1 (1776).  In the 1790 Constitution, the language was altered to provide:

**Section 1.** That all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. CONST. art. IX, § 1 (1790).  It has remained in its current form since the 1838 Constitution.

> excepted out of the general powers of government and shall
> forever remain inviolate.

PA. CONST. art. I, § 25.

The Federal Constitution has no counterpart to Article I, Section 1. However, the United States Supreme Court has, in the past, settled on the Due Process Clause of the Fourteenth Amendment of the United States Constitution as the source of a right to privacy. *Roe*, 410 U.S. at 153; *Planned Parenthood v. Casey*, 505 U.S. 833, 846-51 (1992) (plurality); *Griswold v. Conn.*, 381 U.S. 479, 499-501 (1965) (Harlan, J. concurring). The Due Process Clause provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law… ." U.S. CONST. amend. XIV.

There is no similarity between the texts of these two provisions. Article I, Section 1 secures rights that are "inherent and indefeasible[,]" whereas the Fourteenth Amendment's scope is more circumscribed. According to the High Court, the Fourteenth Amendment's protections only extend to those rights explicitly mentioned by the text or those that are deeply rooted in the nation's history and tradition and implicit in the concept of ordered liberty. *Dobbs*, 142 S. Ct. at 2242 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

### b. History of Article I, Section 1, including Pennsylvania case law

We address the history of Article I, Section 1, to "draw meaning from the provision" and consider the existence of the right to reproductive autonomy in the Pennsylvania constitutional scheme. *Edmunds*, 586 A.2d at 896. The Pennsylvania Constitution, first adopted in 1776, predated the ratification of the United States Constitution. It constituted the "first overt expression of independence from the British Crown," and it was meant to "reduce to writing a deep history of unwritten legal and moral codes which had guided the colonists from the beginning of William Penn's charter in 1681." *Id*. Unlike the Bill of Rights, the Declaration of Rights was an organic part of the Pennsylvania Constitution,

appearing in the first iteration of the document.  *Id*.  Thus, the federal Bill of Rights was patterned off of the Declaration of Rights in many ways, such as in the establishment of freedom of speech and the press.  *Id*.[98]

Article I, Section 1 rights are inherent and indefeasible rights.  PA. CONST. art. 1, § 1.  That the rights are inherent, "secured rather than bestowed by the Constitution, has a long pedigree in Pennsylvania that goes back at least to the founding of the Republic." *Driscoll v. Corbett*, 69 A.3d 197, 208 (Pa. 2013) (citing *W. Pa. Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 515 A.2d 1331, 1334 (Pa. 1986) (stating that the drafters of our state charter adhered to theories of natural law philosophers)).  As explained by this Court in *Driscoll*, the "government established by the people is not the **source** of the individual liberties involved[.]"[99]  *Driscoll*, 69 A.3d at 208 n.9 (emphasis added).  Article I does not establish the rights but instead is "an enumeration of the fundamental human rights possessed by the people of this Commonwealth that are

---

[98]  Article I, Section 1's language can be traced to similar language in the Virginia Constitution, adopted on June 12, 1776, drafted by George Mason, as well as the writings of English political-philosopher Jeremy Bentham.  Elizabeth Wachsman & Ken Gormley, *Inherent Rights of Mankind: Article I, Section 1*, in THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, § 4.1, 92-93 (Ken Gormley & Joy G. McNally eds. 2nd ed. 2020).  Article I, Section 1 closely resembles the preface of the Declaration of Independence, which provides, "We hold these truths to be self-evident, that all men are created equal, that they are endowed by the Creator with certain and unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness. – That to secure these Rights, Governments are instituted among Men, deriving their just powers from the consent of the governed… ."  Declaration of Independence, July 4, 1776.  Unsurprisingly, many of the statesmen who participated in the drafting of the Pennsylvania Constitution – a convention chaired by Benjamin Franklin and convened from July 15 to September 28, 1776 – were also involved in drafting the Declaration of Independence just months earlier.  Wachsman & Gormley § 4.1 at 91-92 & n.1.

[99]  *Driscoll* considered and left open the question of whether the government or the people (by a majority vote) may remove an inherent right from constitutional protection through constitutional amendment, because it found that the right to hold office as a commissioned jurist beyond the age of seventy was not a fundamental or important right. *Driscoll*, 69 A.3d at 208 n.9, 213.

specifically exempted from the powers of Commonwealth government to diminish." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 803 (Pa. 2018).

We have been asked to determine as a matter of first impression[100] whether Article I guarantees a right to reproductive autonomy, e.g., the right of the woman to make decisions about whether to bring a child into the world free of government interference. Providers argue that the specific right is housed within the general right to privacy secured by our Constitution. Thus, we review the history of the recognition of the right to privacy in our Commonwealth and our case law defining its scope. We likewise review the history of abortion in the Commonwealth. While the procedure is only one of the potential outcomes of the exercise of a right to reproductive autonomy, it is most often the focus of discussion of the right. While the history of the practice of this procedure in our Commonwealth is not determinative of the inherency of a right to reproductive autonomy, it is helpful in highlighting the distinction between a constitutional right and moral judgments.

---

[100] Providers loosely argue that this Court has recognized the right to reproductive autonomy in previous cases, contending that this Court should expressly hold that Pennsylvania's Constitution protects women's right to decide whether or not to continue a pregnancy because "Article I, [S]ection 1's broad protections of individual rights include the fundamental rights to marry, procreate, and make child-rearing decisions, as well as a robust privacy right protecting decisional autonomy and bodily integrity in matters of reproduction[.]" Providers' Brief at 61-65. While we have enunciated the existence of a right to choose, we have done so in the context of recognizing the federal right announced in *Roe v. Wade*, not in terms of a Pennsylvania constitutional right.

Justice Mundy mischaracterizes our constitutional inquiry as an exercise in "social policy creation." Justice Mundy draws support for this hyperbole by noting that "reproductive autonomy" does not appear in the Pennsylvania Constitution. Concurring & Dissenting Op. at 8 & 8 n.6. (Mundy, J.). As discussed, the word privacy does not appear in the text of our Charter but yet it is one of our most recognized and bedrock constitutional rights. *See* infra pp. 137-40. In view of Justice Mundy's analytical construct, we hope that this cherished principle is not likewise being questioned. Our approach to determining the existence of a right is consistent with how this Court has approached such questions of constitutional interpretation for centuries.

**Right to privacy**

The most prominent of the inherent rights of Article I, Section 1 is the right to privacy. "Ironically, one of the rights most consistently afforded broad protection under Section 1 (besides property rights) relates to the area of privacy, a subject not even explicitly mentioned in the 'Inherent Rights of Mankind' provision." Wachsman & Gormley § 4.1 at 91-92. Although not enumerated,[101] its repeated recognition as an inherent right is not surprising. The importance of privacy in Pennsylvania was recognized long before the iteration of a formal Constitution. In a short poem penned in the 1690s, William Penn wrote that "Princes" and "their Grandees, of all Men, are the Unhappiest[,]" for, as he describes it, "they live least alone." Ken Gormley, *One Hundred Years of Privacy*, 1992 WISC. L. REV. 1335, 1344 n.42 (citing William Penn, *Some Fruits of Solitude* 96-97 (8th ed. 1749) (quoted in David H. Flaherty, PRIVACY IN COLONIAL NEW ENGLAND (1972)). The "[a]dvantage," according to Penn was to other men who "can be private, and have leisure for Family Comforts, which are the greatest Worldly Contents Men can enjoy." *Id*.

It has been observed that the right to privacy is rooted in a person's inherent and indefeasible right to liberty and the pursuit of happiness. *Commonwealth v. Murray*, 223 A.2d 102, 109-10 (Pa. 1966) (plurality).[102] Mirroring Penn's poetic description of privacy as the greatest worldly content, Justice Musmanno wrote:

> The greatest joy that can be experienced by mortal man is to
> feel himself master of his fate,—this in small as well as in big

---

[101] The rights specifically mentioned in Article I, Section 1 are not exclusive. Section 1 signals the inclusion of other inherent rights by use of the phrase "among others" before the specific references. PA. CONST. art. I, § 1.

[102] Though Justice Musmanno's 1966 opinion was one of the first developed discussions of Pennsylvania's right to privacy, as early as 1938, this Court recognized the significance of the right. *See Annenberg v. Roberts*, 2 A.2d 612, 617-18 (Pa. 1938) (holding that subpoenas issued by a government legislative commission contemplated an unreasonable search and seizure because the legislative body was not invested with general powers to inquire into personal affairs and compel disclosures).

things. Of all the precious privileges and prerogatives in the crown of happiness which every American citizen has the right to wear, none shines with greater luster and imparts more innate satisfaction and soulful contentment to the wearer than the golden, diamond-studded right to be let alone. Everything else in comparison is dross and sawdust.

*Murray*, 223 A.2d at 110.[103] In so writing, Justice Musmanno was speaking to the meaning of privacy as "protected by the organic law of the land[,]" and he noted that there were two relevant provisions of the Pennsylvania Constitution "dedicated to this right to be let alone[,]" Sections 1 and 8 of Article I. *Id.* at 109-10.[104]

As *Murray* itself illustrates, this Court's jurisprudence regarding the right to privacy is predicated on the relationship of Article I rights. For instance, in *Denoncourt v. Commonwealth, State Ethics Commission*, 470 A.2d 945 (Pa. 1983) (plurality), a plurality of this Court affirmed that the right of privacy encompassing the freedom from disclosure of personal matters finds explicit protection in Article I, Section 1. The Court referred to Article I, Section 8 case law as well as Article I, Section 1 case law when it stated that "[i]n all these cases there is implicit a balancing of an individual's right to privacy against

---

[103] In *Murray*, the Court held that a private detective's conduct in listening in on a conversation using a telephone extension violated the proscriptions of the anti-wiretapping statute. *Murray*, 223 A.2d at 110-11.

[104] Section 8 is typically but not exclusively implicated in criminal cases. *See Pa. State Educ. Ass'n v. Commonwealth*, 148 A.3d 142, 149 (Pa. 2016) ("*PSEA*") (stating that the right to privacy "most frequently discussed under our Constitution" is the protection against unreasonable searches and seizures). Section 8 provides the following:

### § 8. Security from searches and seizures

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.

a counterveiling state interest which may or may not justify, in the circumstances, an intrusion on privacy." *Id*. at 948. In *Commonwealth v. Shaw*, 770 A.2d 295, 296 (Pa. 2001), in holding that Article I, Section 8 protects the results of a blood alcohol test performed by a hospital for medical purposes, the Court looked to precedent applying Article I, Section 1. More recently, in *Commonwealth v. Alexander*, 243 A.3d 177, 206 (Pa. 2020), we drew from privacy jurisprudence under both sections to determine whether Article I, Section 8 provided broader protections than the Fourth Amendment vis-à-vis automobile searches.

*Alexander* cemented the conclusion that "[w]e must consider our charter as a whole in terms of establishing a set of normative values that limits the government's authority[.]" *Id*. Like Article I, Section 8, Article I, Section 1's protection of privacy "must be read in conjunction with more abstract considerations of how far the government may encroach on the rights of citizens[.]" *Id*.[105] One such consideration that permeates our privacy rights jurisprudence is the right to be let alone. In 1991, in *Edmunds*, a landmark Article I, Section 8 privacy rights case,[106] the Court cited to the plurality opinion in *Denoncourt* (an Article I, Section 1 case) to focus on that principle:

---

[105] Although Providers primarily focus on Article I, Section 1 as the source of the alleged right to abortion, they also draw from Article I, Section 8 case law. *See* Providers' Brief at 65 (citing *John M. v. Paula T.*, 571 A.2d 1380 (Pa. 1990)). *John M. v. Paula T.* arose out of a paternity dispute in which John M., a paramour of the biological mother, sought to compel the husband of the biological mother (and presumed father of the child) to submit to blood tests to establish paternity. In addressing the privacy interests at play, the Court stated that the person whose blood is sought "has clear privacy interest in preserving his or her bodily integrity, and the constitutional right to be free from unreasonable searches and seizures[,]" thus clearly invoking the language of Article I, Section 8. *Id*. at 1386.

[106] *Edmunds* rejected the good faith exception to the exclusionary rule refusing to follow *United States v. Leon*, 468 U.S. 897 (1984), because the strong notion of privacy embodied in Article I, Section 8 required adherence to the warrant requirement. *Edmunds*, 586 A.2d at 905-06.

> As Mr. Justice Flaherty noted in *Denoncourt*, supra, in echoing the wisdom of Justice Brandeis over 60 years ago: "The makers of our Constitution overtook to secure conditions favorable to the pursuit of happiness … They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men." *Id.* [] 470 A.2d at 948-49, quoting *Olmstead v. United States*, 277 U.S. 438, 478 … (1928) (Brandeis, J., dissenting).

*Edmunds*, 586 A.2d at 98-99; *see also*, *Murray*, 223 A.2d at 110.

In advancing this comprehensive right to be left alone, this Court has interpreted the right to privacy under Article I, Section 1 to contain at least two often overlapping interests: the interest in avoiding disclosure of personal matters and the interest in having independence to make certain kinds of important decisions. In doing so, we adopted the view espoused by the United States Supreme Court in *Whalen v. Roe*, 429 U.S. 589 (1977).[107]

At issue in *Whalen* was a claim that a New York statute requiring the state government to maintain a database of prescriptions of Schedule II controlled substances invaded patients' privacy not only because the statute required disclosure of private information, but also because it interfered with their interest in making important decisions independently because the required disclosure made the patients and physicians reluctant to use and prescribe the drugs. Though it ultimately rejected these arguments as being too attenuated under the facts to constitute infringement of privacy rights, the High Court observed that its cases protecting privacy have "in fact involved at least two kinds of interests[,]" i.e., "the individual interest in avoiding disclosure of personal matters"

---

[107] For a detailed discussion of the interplay between the constitutional privacy interests identified in *Whalen* and the development of tort law in the privacy arena, see *Commonwealth v. Hayes*, 414 A.2d 318, 324-27 (Pa. 1980)

and "the interest in independence in making certain kinds of important decisions." *Id*. at 599-600 (internal footnotes omitted).[108]

Following *Whalen*, in *Bellotti v. Baird*, 443 U.S. 622 (1979) (plurality), the High Court determined that a Massachusetts statute requiring either a judicial order or parental consent before an abortion could be performed on an unmarried woman under the age of eighteen was unconstitutional. Writing for four Justices, Justice Stevens' concurrence addressed the connection between the two interests protected by the right to privacy, observing that "[t]he constitutional right to make the abortion decision affords protection to both of the privacy interests recognized in" *Whalen*. *Id*. at 655-56 (Stevens, J., concurring). He wrote that it was "inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties." *Id*.[109]

As illustrated by *Whalen* and Justice Stevens' concurrence in *Bellotti*, these two privacy interests are not mutually exclusive, and instead, often involve overlapping concerns for an individual's right to live free from disclosure of personal information and free from intrusion into her decision-making. We repeated *Whalen*'s description of the privacy paradigm first in *In re June 1979 Allegheny County Investigating Grand Jury*, 415

---

[108] The Court rejected plaintiffs' arguments, holding that the program "[did] not, on its face, pose a sufficiently grievous threat to either interest to establish a constitutional violation." *Whalen*, 429 U.S. at 600.

[109] Justice Stevens expressed concern that "the need to commence judicial proceedings in order to obtain a legal abortion would impose a burden at least as great as, and probably greater than, that imposed on the minor child by the need to obtain the consent of a parent[.]" *Bellotti*, 443 U.S. at 655-56 (Stevens, J., concurring). Further, it opens the door for the judge to impose his judgment—a reflection of "personal and societal values and mores whose enforcement upon the minor—particularly when contrary to her own informed and reasonable decision—is fundamentally at odds with privacy interests underlying the constitutional protection afforded to her decision." *Id*.

A.2d 73 (Pa. 1980) (plurality).[110]  The two interests were subsequently restated in *Denoncourt v. Commonwealth, State Ethics Commission*, 470 A.2d 945, 948 (Pa. 1983) (plurality)[111] and thereafter in majority opinions in *Stenger v. Lehigh Valley Hospital Center*, 609 A.2d 796, 800 (Pa. 1992) and *Pennsylvania State Education Association v. Commonwealth*, 148 A.3d 142, 150 (Pa. 2016) ("*PSEA*").

Although we have recognized that the privacy right secured by Article I, Section 1 encompasses two interests—avoiding disclosure of personal information and making certain important decisions—much of our Article I, Section 1 case law has addressed the first interest.  Some of those cases addressed a subset of that interest which has come to be referred to as informational privacy.  For example, relying on *Denoncourt*, this Court decided a trilogy of cases,[112] recognizing the constitutional right to informational privacy including protection for, among other things, names, addresses, social security numbers,

---

[110] *In re June 1979 Allegheny County Investigating Grand Jury* considered the subpoena of certain patient medical reports of tissue specimens to a grand jury investigating the County Coroner's Office.  The Court, in a splintered decision, issued on non-constitutional grounds, enforced the subpoena.

[111] *Denoncourt* addressed the constitutionality of the Public Officials Ethics Act, which required the filing of a statement by every public official disclosing the financial affairs of the public official as well as those of her immediate family members; further, the Act provided for criminal penalties for non-disclosure.  Rather than resolve the matter on privacy grounds, a majority of the Justices agreed that imposition of the criminal liability offends due process because "it is axiomatic that criminal liability may not be imposed for a failure to perform acts which a person has no power to perform."  *Denoncourt*, 470 A.2d at 947.

[112] *Sapp Roofing Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 12*, 713 A.2d 627 (Pa. 1998) (plurality); *Pa. State Univ. v. State Emps.' Ret. Bd.*, 935 A.2d 530 (Pa. 2007); *Tribune-Review Pub. Co. v. Bodack*, 961 A.2d 110 (Pa. 2008).  As we explained in *PSEA*, the trilogy of cases establish a constitutional balancing test weighing an individual's privacy interest against the public benefit or interest in disclosure of the records.  *PSEA*, 148 A.3d at 157-58.

and telephone numbers. We reaffirmed this recognition of the informational privacy right in *PSEA* relative to the Right to Know Law.[113]  *PSEA*, 148 A.3d at 158.

In a broader context, in *Commonwealth v. Shaw*, 770 A.2d 295 (Pa. 2001), this Court found greater protection under Article I, Section 8 than the Fourth Amendment related to an investigatory procedure used in connection with driving under the influence ("DUI") charges. The Court concluded that the results of a blood draw test performed for treatment purposes could not be used in the patient's DUI prosecution because the warrantless acquisition of the test result violated Article I, Section 8, which extends to areas where an individual has a reasonable expectation of privacy. The Court held that the right to privacy extends to medical records of patients. The *Shaw* court relied on *In re June 1979 Allegheny County Investigating Grand Jury* and *Denoncourt* in so concluding. *Shaw*, 770 A.2d at 299.

We likewise recognized the right to privacy in medical records and, more saliently, the right of an individual to be let alone, in *Stenger v. Lehigh Valley Hospital Center*, 609 A.2d 796 (Pa. 1992). This civil case involved a discovery order allowing the release of anonymized blood donor records to a plaintiff who contracted Acquired Immune Deficiency Syndrome (AIDS) allegedly as a result of a contaminated blood transfusion. In reviewing the discovery order, this Court engaged in an analysis of the privacy issues under both the federal and Pennsylvania Constitutions. Recognizing that we adopted the dual privacy interests articulated in *Whalen*, the Court observed that the discovery order implicated the interest in avoiding disclosure of personal matters that could impugn his character and subject him to ridicule and persecution. *Id*. at 800. However, it noted that this privacy interest also subsumes the right to be let alone, a right recognized under our Charter. *Id*. It was the infringement of this right that was argued in opposition to the post-

---

[113]  Act of February 14, 2008, P.L. 6, as amended 65 P.S. §§ 67.101-67.3104.

donation questioning of donors. The blood center feared that in the future, people would not donate blood if the questioning were allowed.[114] *Id*. at 801.

Although the Court recognized that the discovery order implicated the privacy interests asserted, it concluded that there was a compelling government interest in protecting blood transfusions and the anonymized discovery was the least intrusive means to protect that interest. *Id*. at 802-03. In performing its analysis, the *Stenger* Court recognized that unlike in federal jurisprudence, which uses a flexible, sliding scale approach in assessing alleged infringement of privacy rights,[115] under the law of this Commonwealth, only a compelling state interest will override one's privacy rights. *Id*. at 802 (citing *Fabio v. Civil Service Commission*, 414 A.2d 82 (Pa. 1980)). We affirmed that privacy rights are fundamental and that a law may only be deemed constitutional if it is narrowly tailored to a compelling state interest in *Nixon*, 839 A.2d at 287 and *John M. v. Paula T.*, 571 A.2d at 1385-86.

As previously discussed, the scope of the privacy protections afforded under our Charter cannot be neatly packaged into either Article I, Section 1 or Section 8, and the right to be let alone is an overriding principle found in all of our right to privacy jurisprudence — it is embedded in the Article I, Section 1 interest in avoiding disclosure of personal matters and the interest in making certain kinds of important decisions. It is likewise embedded in Article I, Section 8 as evidenced by *Edmunds*' reliance on Justice

---

[114] This argument was similar to that advanced by the Petitioners in *Whalen* that the data collection at issue in that case would interfere with the decision to prescribe and take the drugs being monitored. In *Whalen*, the argument was made in the context of the interest in making certain important decisions.

[115] The *Stenger* Court cited *Nixon v Administrator of General Services*, 433 U.S. 425, 458 (1977) and Second, Third and Ninth Circuit jurisprudence which used a sliding scale to weigh the privacy intrusion against the public interest asserted. The *Stenger* Court concluded that most circuits appear to apply an "intermediate standard of review." *Stenger*, 609 A.2d at 801 (citing, inter alia, *Fraternal Ord. of Police, Lodge 5 v. Phila.*, 812 F.2d 105, 110 (3d Cir. 1987)).

Brandeis' dissent in *Olmstead* invoking, as against the government, the right to be let alone as the most comprehensive of rights. *Edmunds*, 586 A.2d at 888-89.[116] In keeping with this principle, freedom from government intrusion into an individual's bodily integrity is a clearly recognized privacy right under our jurisprudence. In *John M. v. Paula T.*, we held that a person whose blood is sought (there for paternity testing) has a clear privacy interest in preserving his bodily integrity. *John M. v. Paula T.*, 571 A.2d at 1386 (citing *Koleski v. Park*, 525 A.2d 405 (Pa. 1987) (Fourth Amendment and Article I, Section 8 protect right to be free from unreasonable searches and seizures, and blood test falls within the constitutional scope)).

Further, in *Coleman v. WCAB*, 842 A.2d 349 (Pa. 2004),[117] we linked the constitutional privacy interest of individuals in preserving their bodily integrity recognized in *John M. v. Paula T.* to the common law right to be free of bodily invasion and to refuse medical treatment as applied in *In re Fiori*, 673 A.2d 905, 910 (Pa. 1996). *Coleman*, 842 A.2d at 354. The line drawn by *Coleman* between the constitutional right to bodily integrity

---

[116] Further, as recognized by this Court, "Article I, Section 8 of the Pennsylvania Constitution, as consistently interpreted by this Court, mandates greater recognition of the need for protections from illegal government conduct offensive to the right to privacy." *Commonwealth v. Sell*, 470 A.2d 457, 459 (Pa. 1983) (rejecting elimination of automatic standing to challenge evidence in pretrial proceedings involving possessory crimes). *See, e.g.*, *Alexander*, 243 A.3d at 177 (holding that warrantless search of vehicle required both probable cause and exigent circumstances pursuant to Article I, Section 8); *Commonwealth v. Matos*, 672 A.2d 769 (Pa. 1996) (holding that pursuit by a police officer without probable cause or reasonable suspicion constitutes a seizure and there required suppression of contraband discarded during the chase); *Edmunds*, 586 A.2d at 887 (rejecting federal good faith exception to the exclusionary rule); *Commonwealth v. DeJohn*, 403 A.2d 1283 (Pa. 1979) (holding that defendant had a legitimate expectation of privacy in his bank record under Article I, Section 8, despite not having such an interest under the Fourth Amendment); *Commonwealth v. Melilli*, 555 A.2d 1254 (Pa. 1989) (providing that Article I, Section 8 of the Pennsylvania Constitution was violated by the installation of a pen register device without probable cause whereas such conduct was not considered a search for Fourth Amendment purposes).

[117] *Coleman* involved a challenge on multiple grounds to conducting certain diagnostic testing pursuant to the Workers Compensation Act, 77 P.S. §§ 1-1041.4, 2501-2710.

and the common law right to refuse medical treatment was apt. In *Fiori*, this Court held that under the common law, an individual has a right to self-determination in regard to the acceptance or rejection of life-sustaining medical treatment for a patient in a persistent vegetative state.[118] In the *Whalen* categorization of privacy rights which we have adopted in our Article I, Section 1 jurisprudence, this self-determination question falls squarely into the privacy category of making certain important decisions and, as implied in *Coleman*, it involves a right to protect one's bodily integrity, i.e., the right to be free from intrusion into the person. *Fiori* made this point by noting that the concept of informed consent derives from the right to self-determination. *In re Fiori,* 673 A.2d at 910. Thus, while *Fiori* was not decided based on the constitutional right to privacy, *Coleman*'s reference to it in relation to the constitutional right to bodily integrity illustrates the interwoven texture and fabric of our constitutional privacy jurisprudence.[119]

The right to reproductive autonomy calls into play the most rudimentary of the privacy interests interwoven throughout Article I and recognized in our case law. The private life situations, economic and relational, surrounding pregnant women; the obvious, overt and consequential effects on the physical being of a woman carrying a pregnancy,

---

[118] The *Fiori* Court chose to avoid a constitutional decision based on the privacy right of the patient to make a decision regarding the cessation of treatment. *In re Fiori*, 673 A.2d 909 and n.9. The Court noted that it was preferable to avoid constitutional questions where possible. *Id*. We note that the case had complicating factors in that the adult patient left no advance directives, and consequently, the request was based on the substituted judgment of a close relative with the consent of two physicians.

[119] In terms of activities protected by the right to privacy, we have held that individuals in Pennsylvania have the right to engage in extramarital sexual relationships free of government interference. We did so based on: (1) an amalgamation of federal privacy right jurisprudence; (2) the recognition that the crimes code eliminated the crime of adultery in 1972; and (3) the court's abolition of the civil cause of action for criminal conversion. *Fabio v. Civil Service Commission*, 414 A.2d 82, 89 (Pa. 1980). Implicit in the right to engage in the private activity is the right to make the decision to engage in the activity.

giving birth or aborting; and the consequences of the reproductive choice decision, one way or the other, on the course of the rest of a woman's life. These specific factors impact private information, bodily integrity and the right to self-determination implicit in making important decisions. The body of work that is our privacy jurisprudence not only supports, but also dictates explicit recognition of the right to make decisions about reproductive autonomy.

There is longstanding precedent from the United States Supreme Court delineating the right to make certain bedrock decisions. *Meyer v. Nebraska*, 262 U.S. 390, 399-401 (Pa. 1923) (stating that the right to liberty in the Fourteenth Amendment denotes, inter alia, the right "to marry, establish a home and bring up children, to worship God according to the dictates of [one's] own conscience" and the right of parents "to control the education of their own[]"); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534 (1925) (recognizing the "liberty of parents and guardians to direct the upbringing and education of children under their control"); *Skinner v. State of Okl.*, 316 U.S. 535, 541 (1942) (referring to marriage and procreation as the basic civil rights of man); *Griswold v. Connecticut*, 381 U.S. 479, 482, 485-86 (1965) (recognizing right to privacy in the intimacies of marriage which extends to decisions related to the use of contraceptives); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (stating that the "freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men"). As a result, we have repeatedly enforced those rights. As a further result, we have not been asked to enforce these rights to make the important decisions based on our own Charter's privacy guarantees. Complacency with the status quo established by the United States Supreme Court jurisprudence applying the federal Constitution stalled development of our Charter's protections in this arena.

So too, the constitutional right to make decisions involving reproductive autonomy was recognized in 1973 in *Roe v. Wade*. Over the past fifty years, given that the right was firmly ensconced in the federal Constitution, there has been no opportunity to address the question of whether our Constitution protects the right to make decisions involving reproductive autonomy until *Dobbs*, when the federal right was retracted.

As illustrated, our privacy jurisprudence is strong and deep, and founded in the basic notion that it is the inherent right of an individual to be let alone — to live a private life, to have security in one's bodily integrity and to make important decisions free of government intrusion. These rights are embedded in the inherent Article I, Section 1 rights to pursue happiness and enjoy liberty and the interrelated Article I, Section 8 right to bodily integrity. The right to make healthcare decisions related to reproduction is a core important right encompassed by the enmeshed privacy interest protected by our Charter. Whether or not to give birth is likely the most personal and consequential decision imaginable in the human experience. Any self-determination is dependent on the right to make that decision.

Because our Article I rights are inherent, we are not constrained, as the *Dobbs* Court believed it was, to determine whether abortion is "deeply rooted" in the "history or traditions" of the Commonwealth. *See Dobbs*, 142 S. Ct. at 2242 (under the Due Process Clause of the Fourteenth Amendment, "any such right must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty[]'"). That is not our Constitution's analytical framework since our Article I rights are inherent. As important, this reproductive decision is not one dimensional. It is a decision, and like all decisions, it involves choices, one of which is to terminate a pregnancy, and another is to give birth. These choices deeply impact a woman's life. It is, however, helpful to clarify

the status of abortion in Pennsylvania, which was selectively referenced in *Dobbs*.[120] Thus, we review the history of abortion around the time when the Pennsylvania Constitution was adopted which highlights the contrast between varying moral judgments and inherent constitutional rights.

**Abortion in Pennsylvania**

For context, in Pennsylvania, under the common law, women had few rights. As detailed in our discussion of the history of women's rights relative to the adoption of our Equal Rights Amendment, *see* supra pp. 86-94, women were either an extension of their husbands and had no independent rights or, if not married, had only undefined rights. Consequently, the common law addressing abortion developed in a society where any rule elevating the continuation of the growth of a fetus was largely untempered by consideration of the impact on the woman who bore the brunt of the rule.

Although we have not uncovered any Pennsylvania specific discussion of the common law from the late eighteenth or early nineteenth century, scholars on both sides of the abortion debate have asserted that the quickening doctrine was a settled part of the common law at the opening of the seventeenth century.[121] One such scholar summarized the state of abortion in America in the early nineteenth century as follows:

---

[120] For instance, *Dobbs* relied on an 1850 Pennsylvania case to disprove arguments that a right to abortion was deeply rooted in the nation's history. *Dobbs*, 142 S. Ct. at 2252 & n.32, 2255 (citing *Mills v. Commonwealth*, 13 Pa. 631 (1850) as evidence that abortions were criminalized at all points of pregnancy in Pennsylvania and that, in other areas of the law, a fetus was regarded as a "person in being")). The *Dobbs* opinion also discussed the generic common law in the colonies and United States over the decades but ultimately settled on the time frame for the adoption of the Fourteenth Amendment as the appropriate marker. *Id*. at 2252-53.

[121] *Compare* Cyril C. Means Jr., *The Law of New York Concerning Abortion and the Status of the Foetus, 1664-1968: A Case of Cessation of Constitutionality*, 14 N.Y.L.F. 411 (1968), Cyril C. Means Jr., *The Phoenix of Abortional Freedom: Is a Penumbral or Ninth-Amendment Right About to Arise from the Nineteenth-Century Legislative Ashes of a Fourteenth-Century Common-Law Liberty*, 17 N.Y.L.F. 335 (1971), JAMES C. MOHR, (continued…)

> In the absence of any legislation whatsoever on the subject of abortion in the United State in 1800, the legal status of the practice was governed by the traditional British common law as interpreted by the local courts of the new American states. For centuries prior to 1800 the key to the common law's attitude toward abortion had been a phenomenon associated with normal gestation known as quickening. Quickening was the first perception of a fetal movement by a pregnant woman herself. Quickening generally occurred near the midpoint of gestation, late in the fourth or early in the fifth month, though it could and still does vary a good deal from one woman to another. The common law did not formally recognize the existence of a fetus in criminal cases until it had quickened. After quickening, the expulsion and destruction of a fetus without due cause was considered a crime, because the fetus itself had manifested some semblance of a separate existence: the ability to move.

JAMES C. MOHR, ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY 3 (1978). The author further notes that our Commonwealth imported the common law traditions that criminalized abortion after quickening and that though there is some dispute, there is no definitive evidence that any common law criminal prohibition against abortion itself and prior to quickening was enforced until the mid-nineteenth century. *Id*. at 6 & n.5.

This status of the common law is confirmed by an unpublished decision of this Court in 1846, *Commonwealth v. Demain*, 6 Penn. Law Jour. 29 (Pa. 1846). The case

---

ABORTION IN AMERICA: THE ORIGINS AND EVOLUTION OF NATIONAL POLICY 3 (1978) and James S. Witherspoon, *Reexamining Roe: Nineteenth-Century Abortion Statutes and the Fourteenth Amendment*, 17 ST. MARY'S L.J. 29, 31-32 (1985).These authors draw on the writings of Coke, Hawkins, Hale and Blackstone. 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN: OR, A SYSTEM OF THE PRINCIPAL MATTERS RELATING TO THAT SUBJECT, DIGESTED UNDER PROPER HEADS 188 (7th ed.) (1795); 1 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 129-130 (1765); 3 EDWARD COKE, THE INSTITUTES OF THE LAWS OF ENGLAND 50 (1644); 1 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 433 (1736). The *Dobbs*' Court acknowledged that "a pre-quickening abortion was not itself considered a homicide" but a woman's death during an attempted abortion was, and therefore, it downgraded the significance of the quickening rule. *Dobbs*, 142 S. Ct. at 2250.

involved the sufficiency of an indictment for assault on a woman based on an abortion resulting in a miscarriage. The first count averred that the woman was "big, quick and pregnant." *Id*. at 29-30. The subsequent counts did not aver quickness. The prosecuting attorney general responded that quickness was not a necessary allegation because "at every period of gestation, the rights of an infant en ventre sa mere, are equally respected." *Id*. at 31. The Supreme Court ruled: "2. The indictment is in proper form, and sufficiently avers that she (the party injured) was pregnant and quick with child, which was destroyed and killed, &c." *Demain*, 6 Penn. Law Jour. at 32. The holding established that quickness was a necessary averment and thus, the indictment was sufficient because it pled that the woman was "quick" in the first count.[122]

This understanding of the *Demain* holding was contemporaneously expressed by the New Jersey Supreme Court in *State v. Cooper*, 22 N.J.L. 52 (N.J. 1849) (procuring of an abortion by the mother or by another with her assent, unless the mother be quick with child, is not an indictable offence at common law). The New Jersey Supreme Court cited to treatises of Francis Wharton, the deputy attorney general for Philadelphia who drafted the indictment in the *Demain* case, who ultimately became one of the most influential advocates for the broader criminalization of abortion as well as a lecturer and rector in the Protestant Episcopal Church. Stephen A. Siegel, *Francis Wharton's Orthodoxy: God, Historical Jurisprudence, and Classical Legal Thought*, 46 AM. J. OF L. HIST. 422, 423-24

---

[122] Amicus Pennsylvania Pro-Life Federation and the Thomas More Society argue that *Demain* establishes that abortion, pre-quickening, was illegal. Pennsylvania Pro-Life Federation and the Thomas More Society Brief at 22 (asserting that the Court in *Demain*, "recognized that abortion was a common law crime throughout pregnancy[,]" and cited *Demain* as holding that it was not necessary "to aver quickness on the part of the mother"). Amicus apparently relies on the reporter's note that precedes the actual opinion in the Pennsylvania Law Journal. The commentary states: "(3) It is not necessary, **it seems**, in an indictment for the production of an abortion, to aver **quickness** on the part of the mother; it is sufficient to set forth that she was "big and pregnant." *Demain*, 6 Penn. Law Journal at 29 (emphasis in original). The actual holding belies the commentary.

(2004); FRANCIS WHARTON, A TREATISE ON THE CRIMINAL LAW OF THE UNITED STATES § 1220 (4th rev. ed. 1857). The New Jersey Supreme Court dismissed Wharton's position as follows:

> In a recent American treatise upon criminal law, the proposition, that the procuring of an abortion was indictable at the common law, had been stated, and advocated with much learning. WHARTON'S CRIM. LAW 308; WHARTON'S PREC. 108. The only direct authority cited in support of the doctrine, is the case of *The Commonwealth v. Demain*, decided by the Supreme Court of Pennsylvania, at January term, 1846, and reported in 6 Penn. Law Journal 29. Although in that case the point appears to have been elaborately argued by counsel, it does not appear to have been decided by the court. On the contrary, the court are reported as declaring the indictment before them sufficiently averred that the party injured was pregnant and quick with child, which was destroyed and killed. The obvious inference would seem to be, that the court regarded the fact, that the child was quick (either by direct averment or necessary implication), as essential to the validity of the indictment.

*State v. Cooper*, 22 N.J.L. at 58.[123]

As repeatedly referenced in *Dobbs*, 142 S. Ct. at 2252 & n.32, 2255, in *Mills v. Commonwealth*, 13 Pa. 631 (1850), this Court concluded that it was not necessary to aver quickening in the woman to establish a crime associated with abortion: "The moment

---

[123] Contemporaneous medical writings demonstrate that the Pennsylvania medical community considered abortion legal until quickening. For instance, in his lecture at University of Pennsylvania medical school, Hugh L. Hodge, though he advocated for abrogation of the quickening rule, wrote that "[t]he English law, which governs generally in this country, as laid down by the celebrated Blackstone, does not even notice the crime of abortion before quickening, and even after this process, affirms that it is not murder, but a serious misdemeanor." Hugh L. Hodge, M.D., *An introductory lecture to the course on obstetrics, and diseases of women and children: delivered in the University of Pennsylvania, November 6, 1839*, at 14. He acknowledged also that the English had, by 1803, revised their laws to criminalize pre-quickening abortion, but that "[i]n our own country there has been but little legislation on this subject[,]" and we continue to be governed by the common law. *Id*. at 15. *See similarly*, Charles D. Meigs, M.D., *Females and their Diseases; A series of letters to his class* 479 (1848) (criticizing lawyers for not criminalizing conduct antecedent to quickening).

the womb is instinct with embryo life, the gestation has begun, the crime may be perpetrated." *Id*. at 633. However, as developed, the common law as recent as four years prior to *Mills* did not recognize abortion as a crime until after quickening.[124]

Thus, at the time our Charter was adopted, abortions were available and performed and the government did not interfere in a woman's pregnancy until quickening. As discussed, that history is not determinative in the resolution of the issue presented in this case, i.e., whether under our Charter, an individual has the inherent right to make autonomous decisions about reproductive matters. To focus the issue on the abortion procedure itself denigrates the monumental impact on a woman making the decision to carry a pregnancy to birth or not. The constitutional question is whether that decision is the type of important decision that the privacy right protects. Put simply, if the Article I rights that this Court has recognized do not encompass this decision, it is hard to imagine a decision that would be encompassed.

What the history of the common law in Pennsylvania establishes is that views of morality may change regarding abortion and other practices. For example, adultery was a crime at common law and, for a period of time, under our crimes code, but then it was not. It was once a tort at common law but no longer. *Fadgen v. Lekner*, 365 A.2d 147 (Pa. 1976). The recognition of the right to engage in private sexual relationships removes the conduct from the winds of prevailing views on morality. When the crime of voluntary deviate sexual intercourse was put to the constitutional test, Justice Flaherty wrote that the statute had only one purpose: to regulate the private conduct of consenting adults

---

[124] Finally, we note that abortion was openly available during the first half of women's pregnancies during the early to mid-nineteenth century. Its availability was widely advertised in newspapers. Philadelphia (along with Boston) was the location of one of the most prominent nationally known abortion providers' clinics. MOHR, supra, at 48-64.

and thus, could not stand, *Commonwealth v. Bonadio*, 415 A.2d 47 (Pa. 1980) (plurality).

On the issue of morality and its place in government, Justice Flaherty wrote:

> Many issues that are considered to be matters of morals are subject to debate, and no sufficient state interest justifies legislation of norms simply because a particular belief is followed by a number of people, or even a majority. Indeed, what is considered to be 'moral' changes with the times and is dependent upon societal background. Spiritual leadership, not the government, has the responsibility for striving to improve the morality of individuals.

*Id*. at 50.

We are cognizant of the deeply held views on both sides of the abortion issue. The interpretation of our Charter and the inherent rights of individuals protected by it are not part of the debate. The breadth and strength of our Article I rights is that they are inherent and thus, timeless. It is our task to interpret our Charter based on its text and history to discern the intent of the people adopting it. As shown by our prior case law, the privacy rights guaranteed by Article I, Sections 1 and 8 have long been found to protect private matters, decision making on certain important issue and security in one's bodily integrity. The right to make decisions about reproductive health falls squarely within the parameters of our existing jurisprudence.

Justice Dougherty dissents from this Court's resolution of the question of whether the Pennsylvania Constitution guarantees the right to reproductive autonomy to the citizens of this Commonwealth. Concurring & Dissenting Op. at 2-3 (Dougherty, J.). Procedurally and substantively, this is the appropriate time to address the issue.

The petition for review in this case was filed on April 16, 2019 and included, inter alia, a request for a declaration that our Charter guarantees the right to reproductive autonomy. Petition for Review, 1/16/2019, at 30. The Providers' equal protection claim under Article I, Section 26 was predicated solely on the anticipated recognition of the right to reproductive autonomy. After two years of litigation, in March 2021, the

Commonwealth Court adjudicated the preliminary objections to the petition for review and dismissed it, in part, because it found that Providers lacked standing. Having so concluded, the trial court could have stopped there; the decision could have been appealed and, if reversed, the case would have been remanded for consideration of the remaining preliminary objection — a demurrer to the petition for review based on the Providers' inability to prevail in light of *Fischer*. The Commonwealth Court acted prudently by not taking this path. Instead, it granted the demurrer, allowing a direct appeal to this Court of the dismissal of Providers' claims for relief as opposed to a piecemeal appeal and prolonged litigation, delaying a case involving pure questions of law that could only be finally decided by this Court.

Two and three-quarter years after the commencement of this appeal, there is no reason to punt the question of our Charter's guarantee of reproductive autonomy back to the trial court. In order to grant the demurrer, it was perfectly appropriate for the trial court to assume that the Pennsylvania Constitution embodied a right coterminous with the right recognized in *Roe v. Wade* or that the existing federal right was a baseline protection. *See* supra note 11. Nowhere is that approach more appropriate than when presented with an issue involving the existence of a fundamental right, given that "matters concerning the proper interpretation and application of our Commonwealth's organic charter are at the end of the day for this Court — and this Court only." *League of Women Voters v. Commonwealth*, 178 A.3d 737, 822 (Pa. 2018) (citing *Pap's A.M. v. City of Erie*, 812 A.2d 591, 611 (Pa. 2022) (recognizing that this Court has "the final word on the meaning of our own charter")). Justice Dougherty's reliance on *Commonwealth v. Koger*, 295 A.3d 699, 711 n.12 (Pa. 2023) for the proposition that "this Court's preferred course in this type of situation is ordinarily a remand …, not to seize the opportunity to decide the [unresolved] question ourselves[,]" is totally inapt. Concurring & Dissenting Op. at 2

(Dougherty, J.). We remanded in *Koger* for the Superior Court to address a fact-bound sufficiency question, **not** for a lower court to announce new law interpreting our Charter.

Justice Dougherty states that this issue regarding the right to reproductive autonomy deserves reconsideration by the trial court so that the bench, bar and public have full notice that such a decision will be made. Concurring & Dissenting Op. at 3. (Dougherty, J.). The suggestion that the consideration of the current appeal and this issue has gone under the radar, precluding public and professional community knowledge is belied by reality: the public was given notice of this case in 2019 when the Pennsylvania Courts' website listed the case as of one of "public interest" before the Commonwealth Court and publicly posted the complaint;[125] twenty-seven state legislators attempted to intervene and participate in the proceedings before the Commonwealth Court and this Court;[126] twenty-eight amici participated in the proceedings before the Commonwealth Court,[127] for which oral argument was broadcast and available online; no fewer than

---

[125] AOPC, *Cases of Public Interest,* http://web.archive.org.web.20190130224838/http://www.pacourts.us/news-and-statistics/cases-of-public-interest (Jan. 30, 2019).

[126] *See* supra note 8.

[127] The amici that participated in the Commonwealth Court were as follows: Alliance for Police Accountability; Black Women for Wellness; Black Women's Health Imperative; Center for Women's Health Research & Innovation; Democratic Caucus of Pennsylvania Senate and House of Representatives; Gwen's Girls; Healthy Start Inc.; In Our Own Voice: National Black Women's Reproductive Justice Agenda; Let's Get Free: The Women & Trans Prisoner Defense Committee; Mary's Daughter for the Formerly Incarcerated; National Asian Pacific American Women's Forum; National Health Law Program; New Voices for Reproductive Justice; Oshun Family Center; Pennsylvania Religious Coalition for Reproductive Justice; Pittsburgh Action Against Rape; SPARK Reproductive Justice NOW!, Inc.; SisterLove Inc.; SisterReach; SisterSong Women of Color Reproductive Justice Collective; The Afiya Center; The Midwife Center for Birth & Women's Health; The Opportunity Fund; The Pennsylvania Immigration & Citizenship Coalition; The Womanist Working Collective; Women with a Vision, Inc.; Women & Girls' Foundation; The Women's Center & Shelter of Greater Pittsburgh.

twenty-one amici[128] — not including the Intervenors who we have held to be amici in this matter, *see* supra Part II.B. — participated in the proceedings before this Court, which was also televised and remains available for public viewing on this Court's website; and, moreover, the case has been the subject of numerous published articles detailing Providers' arguments and highlighting that the Providers specifically sought a declaration that the Pennsylvania Constitution recognized a fundamental right to reproductive autonomy.[129]  It is safe to say that the public and the legal profession have had more

[128] ACLU of Pennsylvania and Law Professors Seth Kreimer and Robert Williams; American Center for Law and Justice; Americans United for Life; Democrats for Life in America; Guiding Star Ministries; Equal Rights Amendment Project at the Center for Gender and Sexuality Law at Columbia Law School; Jewish Pro-Life Foundation, Institute for Judaism and Civilization, Inc., Beit Emunah, LLC, Rabbi Menashe Bovit and Rabbi Yakov David Cohen; Judicial Watch, Inc.; Life Legal Defense Foundation; Members of the Democratic Caucuses of the Pennsylvania Senate and House of Representatives; Members of the Republican Caucus of the Pennsylvania House of Representatives; National Council of Jewish Women, Catholics for Choice, and other faith-based organizations; Nationally Recognized Organizations and Leaders in the Black Community; National Women's Law Center; National Health Law Program; New Voices for Reproductive Justice and Pennsylvania and National Organizations Advocating for Black Women and Girls; New Wave Feminists and Feminists Choosing Life of New York; Obstetrical Society of Philadelphia, Philadelphia County Medical Society, the Midwife Center for Birth and Women's Health, Physician for Reproductive Health, Medical Students for Choice, and Individual Healthcare Providers; Pennsylvania Pro-Life Federation and the Thomas More Society; Pro-Life Obstetricians and Gynecologists, the Pro-Life Union of Greater Philadelphia, the Charlotte Lozier Institute, and Human Coalition; and Texas Right to Life, Stephen J. Hilgers, MD.

[129] *See, e.g.*, Tara Murtha, *Say No to the Status Quo: It's Time to Fight for a Better Post-Roe Pennsylvania*, PA. CAPITAL STAR (June 29, 2023) ("Critically, [the Providers] also requested that [the Pennsylvania Supreme Court] declare that abortion is a fundamental right under the Pennsylvania Constitution. We are currently awaiting a ruling."); Hannah Albarazai, *Abortion Litigation To Watch as Dobbs Decision Turns 1*, LAW 360 (June 22, 2023) ("[The Providers] seek a court declaration that abortion is a fundamental right under the Pennsylvania Constitution. The case, launched in 2019, remains pending in the Pennsylvania Supreme Court."); Jonathan Lai and Jeremy Roebuck, *The Latest Battle Over Abortion Rights in Pa. is All About the State Constitution*, PHILADELPHIA INQUIRER (Jul. 22, 2022) (recognizing that "underlying the [Providers'] arguments is the idea that abortion access is a right inherent in the state constitution."); Greer Donley, *A Different Abortion Case is Pending in Pennsylvania*, PITTSBURGH POST GAZETTE (Dec. 9, 2021) (continued…)

awareness of this case, this appeal and the pendency of a decision on the right to reproductive autonomy than any other in recent memory.

Finally, the principle of constitutional avoidance has no application here. *See* Concurring & Dissenting Op. at 3 n.2 (Dougherty, J.) (finding it "proper to address *Fischer*'s continued vitality without weighing in on the constitutional issue at this time[]") (citing *In re B*, 394 A.2d 419, 422 (Pa. 1978) (explaining courts should "avoid" "constitutional question[s] if possible")). Where we are faced with two issues concerning constitutional rights, "the doctrine of constitutional avoidance does not provide any meaningful guidance in determining which issue we should deem dispositive." *J.S. by M.S. v. Manheim Twp. Sch. Dist.*, 263 A.3d 295, 326 (Pa. 2021) (Dougherty, J., dissenting). Here, where Providers base every claim on the Pennsylvania Constitution, there is no room to resolve this matter on anything but constitutional grounds. Only this Court would be avoiding the issue. Moreover, to postpone a decision on this issue and the Providers' Article I, Section 26 equal protection claim by remanding to the trial court that will be adjudicating the merits of the Providers' Equal Rights Amendment claim kicks the determination of the Pennsylvania Constitution's guarantee of reproductive autonomy into a procedural morass. The constitutional question will not be avoided by the proposed remand. The critical recognition of the right to reproductive autonomy will only be avoided by this Court after four and one-half years of litigation and fulsome advocacy while the Providers, Medical Assistance recipients, the Legislature and the public are deprived of a determination by this Court on the existence of a right to reproductive autonomy under the Commonwealth's Charter.

--------

("Importantly, the litigants are asking [the Pennsylvania Supreme Court] to recognize the right to abortion under the Pennsylvania Constitution."); Carrie N. Baker, *Pennsylvania Medicaid Abortion Coverage Ban Challenged Under State ERA: "Sex Discrimination, Pure and Simple*, Ms. Magazine (Oct. 19, 2021) ("[The Providers] seek a court order recognizing abortion as a fundamental right[.]").

### c.  Related case law from other states

Pennsylvania's strong embrace of the privacy rights of individuals is not unique in the nation. The Kansas Supreme Court explained that the heart of its natural rights philosophy (a tradition shared with our Commonwealth) is a principle that "individuals should be free to make choices about how to conduct their own lives, or, in other words, to exercise personal autonomy." *Hodes & Nauser v. Schmidt*, 440 P.3d 461, 483 (Kan. 2019). It explained that "[f]ew decisions impact our lives more than those about issues that affect one's physical health, family formation, and family life." *Id*. It viewed this as the right to "personal autonomy" and stated that it is "firmly embedded" with their natural rights guarantee and its concepts of liberty and happiness. *Id*. The Kansas Court explained:

> At the core of the natural rights of liberty and the pursuit of happiness is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This ability enables decision-making about issues that affect one's physical health, family formation, and family life. Each of us has the right to make self-defining and self-governing decisions about these matters.

*Id*. at 484.

The Montana Supreme Court has also been loyal to a strong tradition of privacy. In fact, the Montana Constitution explicitly provides for a right of privacy. In a discussion reminiscent of this Court's analysis of inherent rights in *Driscoll*, the Montana Supreme Court explained that the legal notions of privacy trace their roots to philosophies of John Locke, who maintained that "each individual has an inherent property interest in his own person and has the capacity for and the right of rational self-determination which must be promoted and protected by civil society and political institutions." *Armstrong v. State*, 989 P.2d 364, 372-73 (Mont. 1999). The Montana court also relied on Mill's articulation of the

fundamental right of self-determination and personal autonomy from ON LIBERTY, as well as Mill's view that an individual's right to self-determination encompasses her own body. *Id*. at 373-75. As in our Commonwealth, in Montana, the right to privacy is expansive and includes protecting citizens from disclosure of information and interference with an individual's autonomy to make personal decisions. *Id*. From that tradition, the court easily concluded that "the right of each individual to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government" is "protected under the personal autonomy component of the fundamental right of individual privacy set out in" the Montana Constitution. *Id*. at 376. It then found that "a woman's right to seek and obtain pre-viability abortion services[,]" what it termed procreative autonomy, "is a protected form of personal autonomy." *Id*.[130]

---

[130] These are just two examples where state courts interpret inherent rights secured by their state constitutions to encompass the right to abortion. The New Jersey Constitution which likewise enshrines "natural and unalienable rights," N.J. CONST. Art. I, ¶ 1, "incorporates within its terms the right of privacy and its concomitant rights, including a woman's right to make certain fundamental choices." *Planned Parenthood of Cen. New Jersey v. Farmer*, 762 A.2d 620, 629 (N.J. 2000). The court, keenly aware of the principle of individual autonomy embodied in its constitution as well as the woman's right to make reproductive decisions, explained that a woman's "right to control her body and future" is a right "fundamental to individual liberty." *Id*. at 632.

Other state courts have reached the same conclusion focusing on the strength of their commitments to privacy. In 1981, the Massachusetts Supreme Judicial Court recognized the right to abortion embedded amongst the protected guarantees of privacy. *Moe*, 417 N.E.2d at 399. The Massachusetts court stated that Massachusetts cases dealing specifically with a woman's right to make the abortion decision privately "express but one aspect of a far broader constitutional guarantee of privacy. These cognate cases are linked by their recognition that '[t]he existence of a private realm of family life which the state cannot enter,' is a cardinal precept of our jurisprudence." *Id*. at 398-99 (internal citations omitted). However, the decision interwove principles of privacy laid in federal constitutional law (i.e., *Roe*) whereas we are interpreting the Pennsylvania Constitution independent from federal precedent. *See also Valley Hosp. Ass'n, Inc. v. Mat-Su Coal. for Choice*, 948 P.2d 963, 968 (Alaska 1997) (holding that "'few things are more personal' than a woman's control of her body, including the choice of whether and when to have (continued…)

Since *Dobbs*, various state courts have been called upon to address whether specific laws restricting access to abortion violate their state constitutions. In some, the courts announced for the first time that their constitutions provided some protection of reproductive choice, although many of these decisions are most notable for precisely addressing only the challenged statutes before them. Those courts addressed challenges that emanated from legislative attempts to limit access to abortion in specific ways; for instance, by providing circumstantial or temporal restrictions. *See, e.g.*, *Okla. Call for Reprod. Just. v. Drummond*, 526 P.3d 1123, 1130-31 (Okla. Mar. 21, 2023) (striking down a statute prohibiting abortion "except to save the life of a pregnant woman in a medical emergency[,]" given its constitutionally-based fundamental right to abortion to preserve the life of the mother, and stating twice that it made no ruling regarding elective termination of a pregnancy); *Wrigley v. Romanick*, 988 N.W.2d 231 (N.D. Mar. 16, 2023) (upholding preliminary injunction of total abortion ban, N.D. Cent. Code § 12.1-31-12, that went into effect shortly after *Dobbs*, because the protections of its constitution "implicitly include the right to obtain an abortion to preserve the woman's life or health").

The South Carolina Supreme Court struck down a law prohibiting abortion after six weeks gestation, holding that it violated the state constitution's prohibition against unreasonable invasions of privacy. *Planned Parenthood S.A. v. State*, 882 S.E.2d 770, 776 (S.C. 2023) (plurality) ("*Planned Parenthood S.A. I*"). Subsequently, the same court upheld a new iteration of the law prohibiting abortion "after the detection of a fetal heartbeat." *Planned Parenthood S.A. v. State*, 892 S.E.2d 121, 126 (S.C. Aug. 23, 2023) (citing S.C. Code §§ 44-41-610–660) ("*Planned Parenthood S.A. II*"). In finding the earlier

---

children[,]" and therefore, reproductive rights are fundamental and encompassed within the privacy rights of Article I, Section 22 of the Alaska Constitution); *Gainesville Woman Care, LLC v. State*, 210 So.3d 1243, 1254 (Fla. 2017) ("Florida's constitutional right of privacy encompasses a woman's right to choose to end her pregnancy.").

law unconstitutional, the plurality emphasized that unlike *Dobbs*, it was not bound solely by an historical analysis of the intention of the drafters to ascertain the existence of a constitutional right. *Planned Parenthood S.A. I*, 882 S.E.2d. at 778-79 ("We cannot relegate our role of declaring whether a legislative act is constitutional by blinding ourselves to everything that has transpired since the amendment was adopted."). In reaching its determination that the privacy right was implicated by that law prohibiting abortion, the plurality provided the following analysis:

> [W]e are persuaded by the logic replete in the opinions we have surveyed that few decisions in life are more private than the decision whether to terminate a pregnancy. Our privacy right must be implicated by restrictions on that decision. As stated by the Supreme Court in *Eisenstadt*, "[i]f the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." [*Eisenstadt*,] 405 U.S. at 453, 92 S. Ct. 1029.

*Id*. at 782. The court did not address the "right to abortion" per se, and in fact stated that the fundamental question before it was whether the challenged law "constitutes an 'unreasonable invasion of privacy.'" *Id*. at 776.[131] Taking a similar tact in addressing the newer legislation, the court again avoided the question of abortion per se—this time by assuming that Article I, Section 1 of the South Carolina Constitution "reaches beyond the

---

[131] The relevant South Carolina constitutional provision states:

**Searches and seizures; invasions of privacy**

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures and unreasonable invasions of privacy shall not be violated and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, the person or thing to be seized, and the information to be obtained.

S.C. CONST. art. I, § 10.

search and seizure context to include bodily autonomy." *Planned Parenthood S.A. II*, 892 S.E.2d at 130. Whereas the court deemed the earlier iteration of the law unreasonable, it viewed the latter, which largely addressed the court's earlier critiques, as adequately weighing competing interests and within the range of possible, reasonable choices available to the legislature in promoting the government's "compelling interest in protecting the lives of unborn children." *Id*. at 132. Thus, both holdings—and the court's silence on the right to abortion per se—are a function of, at least partly, the question before it.

However, at least one state supreme court, that of Idaho, flatly rejected that its constitution protects a right to abortion, interpreting its constitution in a manner nearly identical to that utilized by the *Dobbs* Court. The Idaho court stated that, "to read a fundamental right into the Idaho Constitution, we must examine whether the alleged right is so 'deeply rooted' in the traditions and history of Idaho at the time of statehood that we can fairly conclude that the framers and adopters of the Inalienable Rights Clause intended to implicitly protect that right." *Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (Idaho 2023). Once it identified 1889 as the pertinent point in time for its analysis, it found that its constitution contained no protections for the right to an abortion. *Id*. at 1148-52.

In many other states, post-*Dobbs* challenges to statutes prohibiting abortion are pending, some having been temporarily restrained[132] and others not,[133] while the courts resolve the challenges before them.

From the consideration of related case law from other states, we observe that a pivotal factor in determining whether a right exists in a given state is the genesis of the constitutional right. Those states with inherent rights, like Montana and Kansas, consider the contours of privacy and conclude that a right to reproductive choice exists. By

---

[132] In states which had already recognized a fundamental constitutional right to abortion under their state constitution such as Minnesota and Montana, trial courts enjoined laws restricting abortion access, which were subsequently affirmed by the appellate courts in those states. *See, Doe v. State*, 2022 WL 2662998 (Minn. Dist. Ct. July 11, 2022); *Planned Parenthood of Montana v. State by and through Knudsen*, 515 P.3d 301, 317 (Mont. 2022).

In Ohio, a state that had not previously recognized a constitutionally-based right to abortion, a six-week abortion ban is currently enjoined, pending resolution of the appeal on the merits. *See Preterm-Cleveland v. Yost*, 2022 WL 16137799, at *21 (Ohio Com.Pl.) (granting temporary restraining order); *Preterm-Cleveland v. Yost*, 2022 WL 17744345, slip op. ¶ 29 (Ohio Ct. App. Dec. 16, 2022) (denying review of TRO), *appeal accepted*, *Preterm-Cleveland v. Yost*, 204 N.E.3d 564 (Ohio 2023) (granting appeal and leaving TRO unaffected). *See similarly Johnson v. State*, 2023 WL 2711603, at *2 (Wyo. Dist. Ct. Mar. 22, 2023) (TRO of abortion prohibition granted in view of the Wyoming Constitution's protection of the right for "competent adults … to make his or her own health care decisions[,]" WYO. CONST. art. 1, § 38). Presumably, the adoption of Article I, Section 22 "The Right to Reproductive Freedom with Protections for Health and Safety" of the Ohio Constitution fundamentally impacts the court's decision.

[133] In Florida, a preliminary injunction on a partial abortion ban, Fla. Stat. §§ 390.011, 390.0111 (eff. 2022) (prohibiting abortions after gestational age of fifteen weeks, with few exceptions), granted by a trial court was subsequently reversed because the challengers were abortion providers who complained of economic harm only, i.e., the type of harm that is inadequate to constitute irreparable injury as required for a temporary injunction. *State v. Planned Parenthood of S.W. & C. Florida*, 342 So.3d 863, 867-68 (Fla. 1st Dist. App. 2022). The trial court relied on *Gainesville Woman Care, LLC v. State*, 210 So.3d 1243 (2017) (holding that the right of privacy under the state constitution encompasses a woman's right to choose to end her pregnancy). The Florida Supreme Court accepted jurisdiction over the case without reinstating the preliminary injunction, and without any discussion of the right to abortion. *Planned Parenthood of S.W. and C. Fla.*, 2023 WL 356196 (Fla. Jan. 23, 2023).

contrast, those states with static rights—rights determined by a point-in-time analysis of society at the time of adoption of their constitution—have been disinclined to recognize the right of a woman to choose to have an abortion.

**d.  Policy considerations including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence**

We consider, as *Edmunds* requires, the policy issues associated with recognizing (or rejecting) a right to reproductive decision-making.[134]  Given our Commonwealth's strong historical tradition of privacy, and this Court's repeated recognition of the strength of the right to privacy, excluding from those protections the autonomy of women to decide whether to carry a pregnancy and give birth would require a radical departure from the recognized force of the right to privacy.

Moreover, the right we address transcends the privacy rights embedded in Sections 1 and 8 of Article I of our Constitution.  In 1971, the People amended our Constitution and Article I by adopting the Equal Rights Amendment.  As discussed,[135] the Amendment was intended to enshrine equality of the sexes in our Commonwealth and to rectify centuries of subjugation of the rights of women.  This would be a hollow promise if women did not possess the ability to control their destiny.  Whether or not to carry a pregnancy, whether or not to give birth, whether or when to expand the size of their families, whether or when to make career, employment or other changes in the course of their lives are all decisions central to self-determination and ultimately, to equality in society.

---

[134]  Providers focus on policy concerns related to the ultimate question of how the Coverage Exclusion affects Pennsylvanians.  We, however, view the appropriate focus of the *Edmunds* policy consideration factor to be jurisprudential.  The public policy is the realm of the other branches of government.

[135]  *See* supra pp. 86-94.

The right to reproductive autonomy is the right to self-determination. While the right has been presented to us in terms of making the decision "to choose to end or continue a pregnancy,"[136] it implicates the broader proposition that individuals have the right to make important reproductive healthcare decisions—a gender neutral right to make decisions without governmental intrusion into those private matters that play a defining role in the course of a lifetime. Our Constitution guarantees equality in the exercise of this right. The right of all individuals to be left alone to pursue happiness and enjoy liberty is central to our compact with the government.

While the right to reproductive decision-making is fundamental, like our other privacy rights, it is not absolute. As discussed in relation to the rights secured by our Equal Rights Amendment,[137] our jurisprudence has not, to date, identified an absolute Article I right. Consequently, in keeping with this precedent, the legislative policy here, the governmental interest in "attempting to preserve a potential life" argued by the Intervenors and recognized by the *Fischer* Court,[138] is not eliminated from the General Assembly's consideration in enacting laws. However, the fundamental right of a woman to decide whether to give birth is not subordinate to policy considerations favored by transient legislatures. Thus, the enforcement of the right to make reproductive decisions as a fundamental right is firmly planted in the existing analytical framework of our privacy jurisprudence.

---

[136] Providers' Brief at 65.

[137] *See* supra pp. 119-20.

[138] *Fischer*, 502 A.2d at 122.

### 3. Conclusion

For the foregoing reasons, we conclude that the Pennsylvania Constitution secures the fundamental right to reproductive autonomy, which includes a right to decide whether to have an abortion or to carry a pregnancy to term.

### F. Equal Protection under Article I, Section 26

The next question is whether the state's Medical Assistance scheme discriminates against the exercise of a woman's reproductive choice. Providers broadly allege that this discrimination violates what they refer to as the "equal protection provisions" of the Pennsylvania Constitution: Article I, Sections 1 and 26 and Article III, Section 32. Some scholars refer to these as the "equality provisions" of the Pennsylvania Constitution, while the *Fischer* Court referred to Article I, Section 1 and Article III, Section 32 as the "equal protection provisions" and Article I, Section 26 as the "non-discrimination" provision of the Pennsylvania Constitution.[139] Despite identifying three provisions that collectively guarantee equal protection of the law and prohibit discrimination, Providers' argument hinges on whether Article I, Section 26 requires that the Legislature treat the exercise of the asserted fundamental right neutrally.[140]

---

[139] *See* Providers' Brief at 59 (describing Article I, Sections 1 and 26, and Article III, Section 32, as collectively "guarantee[ing] equal protection of the law and prohibit[ing] discrimination based on the exercise of a civil right"); Robert F. Williams, *A "Row of Shadows": Pennsylvania's Misguided Lockstep Approach to its State Constitutional Equality Doctrine*, 3 WIDENER J. PUB. L. 343, 346 (1993) (referring to various provisions of the Pennsylvania Constitution, including the three mentioned by Providers, as the "state constitutional equality provisions"); *Fischer*, 502 A.2d at 120, 123 (stating that Article I, Section 1 and Article III, Section 32 "have generally been considered to guarantee the citizens of this Commonwealth equal protection under the law" whereas Article I, Section 26 is "known as the Commonwealth's non-discrimination clause"); *but see Love*, 597 A.2d at 1139 (referring to Article I, Sections 1 and 26 as "the equal protection provisions of the Pennsylvania Constitution").

[140] We agree with Justice Mundy that the primary focus of the Article I, Section 26 challenge to the Coverage Exclusion is not on "**who women are,** but on **what they do**." Concurring & Dissenting Op. at 22 (Mundy, J.); *see similarly id*. at 11 (emphasizing that the classification at issue is not about indigency but about the choice between childbirth (continued…)

In answering that question, we identify the applicable framework to assess an Article I, Section 26 challenge. To date, our jurisprudence has operated from the premise that the federal framework used to assess an Equal Protection Clause challenge applies to an Article I, Section 26 challenge. *See, e.g.*, *Love*, 597 A.2d at 1139; *Fischer*, 502 A.2d at 121.

In *James*, this Court summarized the federal framework to assess an Equal Protection Clause challenge:

> Under a typical [F]ourteenth [A]mendment analysis of governmental classifications, there are three different types of classifications calling for three different standards of judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. *Singer v. Sheppard*, [346 A.2d 897, 904-05 (Pa. 1975)]. In the second type of cases, where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. *San Antonio School District v. Rodriguez*, 411 U.S. 1 … (1973). Finally, in the third type of cases, if "important," though not fundamental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review, or a heightened standard of review. *U.S. Dept. of Agriculture v. Murry*, 413 U.S. 508[, 517] … (1973) [(Marshall, J., concurring)], citing *Stanley v. Illinois*, 405 U.S. 645 … (1972). There are, in summary, three standards of review applicable to an equal protection case, and the applicability of one rather than another will depend upon the type of right which is affected by the classification.
>
> At the outset, then, we must determine what type of right the present classification affects ("fundamental rights," "important rights," or rights which are neither "fundamental" nor

---

and abortion). To address the Section 26 challenge before us, we need not consider that the law primarily impacts women, indigent women, and minority women. For Providers' argument does not hinge on the existence of any suspect classification. Instead, we are addressing the Commonwealth's non-neutral treatment of a person's exercise of a purported fundamental right.

> "important"); whether the classification is suspect or involves a sensitive area; the state purpose in making the classification; and what type of relationship there is between the classification and the purpose of the classification.

*James*, 477 A.2d at 1305-06.

While the framework's applicability in Pennsylvania is generally undisputed in this case, the question before us is whether the *Fischer* Court strayed from the language and intent of Article I, Section 26 by following federal precedent and applying a penalty analysis to the legislation's classification to determine whether the legislation burdens or impinges a fundamental right. *Fischer*, 502 A.2d at 123-24 (stating test as "whether a person has been somehow penalized for the exercise of a constitutional freedom"). Requiring a penalty may be appropriate under the federal Equal Protection Clause, but the question before this Court is whether a penalty analysis is reflective of Article I, Section 26's prohibition against "discrimination" in the exercise of a right.

### 1.    Parties' Arguments

**Providers' Argument**

Providers assert that the Coverage Exclusion violates the equal protection guarantees under our Charter because the exclusion operates to favor one exercise of the right to reproductive autonomy (deciding to carry a pregnancy to term) over another (deciding to terminate a pregnancy). Citing to Article I, Section 26 and Article III, Section 32, Providers argue that legislation placing unequal burdens on the exercise of a fundamental right – here, the right to decide whether to continue a pregnancy – is subject to strict scrutiny. They assert that it fails this constitutional means-ends test.

Arguing for this Court to overrule *Fischer*'s equal protection provisions analysis, Providers assert that the *Fischer* Court mischaracterized the protected equality interest at stake as the "right to have the state subsidize the individual exercise of a constitutionally protected right." *Fischer*, 502 A.2d at 121. Instead, Providers emphasize

that they are arguing that once the Commonwealth undertakes to provide Medical Assistance for those who are indigent, "**if** pregnancy and childbirth are covered, abortion must be **as well**." Providers' Brief at 57. They analogize this circumstance to a government-run voter transportation service that would refuse to convey Republicans to the polls. This action would violate equal protections not because there is a right to be driven to the polls but because, if the government undertakes to provide such a service, it must do so evenhandedly. *Id*. at 57 n.30.

Providers also fault the *Fischer* Court for addressing the issue solely based on federal precedent. They urge this Court to apply the *Edmunds* factors, insisting that an *Edmunds* analysis will show that (1) the Pennsylvania Constitution protects the right to decide whether to carry a pregnancy to term;[141] and (2) the Pennsylvania Constitution prohibits the state from discriminating against people in the exercise of their civil rights.

Providers state that once the right is recognized, the other equal protection provisions—Article I, Section 26, and Article III, Section 32—require that "the government cannot favor one exercise of the right over another." *Id*. at 66. They argue that these two provisions are interpreted more broadly than the federal Equal Protection Clause as "prohibiting discrimination against people exercising their civil rights." *Id*. Further, Providers contend that most state courts that have reviewed similar coverage bans have declined to follow the federal Equal Protection Clause doctrine and instead have concluded that denying coverage for abortion while fully funding childbirth "is coercive and violates their right to reproductive choice under their respective state constitutions." *Id*. at 70 (citing *Dep't of Health and Soc. Servs. v. Planned Parenthood of Alaska*, 28 P.3d

---

[141] The *Fischer* Court did not address this issue because, at the time of that decision, the right was recognized as a federal constitutional right, *Roe v. Wade*, 410 U.S. 113 (1973), and Appellants in that case grounded their claims on the federal right. *Fischer* Appellants' Brief at 38.

904, 909 (Alaska 2001); *Doe* (Conn.), 515 A.2d 134; *Right to Choose v. Byrne*, 450 A.2d 925, 935 (N.J. 1982); *Comm. to Def. Reprod. Rts. v. Myers*, 625 P.2d 779, 798 (Cal. 1981)). Thus, Providers fault the *Fischer* Court for applying our state constitutional provisions in accordance with the federal Equal Protection Clause doctrine and failing to recognize that our Constitution provides a different threshold prohibiting the Commonwealth from "us[ing] criteria which discriminatorily burden[] the exercise of a fundamental right." *Id*. at 67 (citing *Planned Parenthood of Alaska*, 28 P.3d at 909 (quoting *Moe*, 417 N.E.2d at 401)).

Providers further assert that *Fischer* "ignores the practical realities of its calamitous impact." *Id*. at 71. Women enrolled in Medical Assistance are by definition poor and lack the resources to afford medical services absent the Medical Assistance program. *Id*. An abortion is one such medical service. Citing the legislative history of the Coverage Exclusion, Providers point out that it is designed to impact the women least able to overcome the financial coercion and force them to choose between paying for an abortion or using money for daily necessities. *Id*. (citing H. Pa. Legis. Journal No. 164-62, at 2244-45 (1980)).[142] On this basis, Providers urge this Court to overturn *Fischer* and hold that "the coverage ban impinges on the fundamental right to choose abortion by discriminating against women for seeking to exercise their right to reproductive choice." *Id*.

Having concluded that the Coverage Exclusion impinges on a fundamental right, consistent with Pennsylvania jurisprudence involving fundamental rights, Providers analyze the exclusion under strict scrutiny and find that it fails both parts of the test. *Id*.

---

[142] "The coverage ban forces women with low incomes seeking abortion to choose between continuing an unwanted pregnancy and using money that they would have otherwise used for daily necessities, such as shelter, food, clothing, electricity or diapers, to pay for the procedure." Providers' Brief at 72 (citing Petition for Review, 1/16/2019, ¶ 79).

at 73. Providers cite Section 3202(a) of the Abortion Control Act as establishing the compelling government interest in "preserving the life and health of fetuses and women[.]" 18 Pa.C.S. § 3202(a). They assert that the state's interest does not justify overriding a woman's right to make choices about her life's course, health, and well-being. *Id*. at 73-74. They highlight that their petition for review alleged numerous risks associated with pregnancy that wreak profound harm on a woman's health and well-being. *Id*. at 74 (citing Petition for Review, 1/16/2019, ¶¶ 65-75). Providers claim that the majority of courts that have addressed similar funding restrictions under heightened standards of review support their view that a woman's decisional autonomy regarding her health and well-being come first. *Id*.

Next, Providers state that the Coverage Exclusion is not narrowly tailored to achieve the state's interest in preserving the life and health of fetuses or women. They assert that the Coverage Exclusion harms women's health and compromises women's future ability to have healthy pregnancies. *Id*. at 75 (citing Petition for Review, 1/16/2019, ¶¶ 54, 65-83). They also claim that there are less restrictive means to advance the state's professed interest, providing, by way of example, that the state could implement policies and programs that increase early and adequate prenatal care. *Id*. at 75-76 n.34.

**DHS's Argument**

DHS rests its equal protection argument on stare decisis, describing *Fischer* in detail, then citing the Attorney General's opinion letter indicating that *Fischer* is "directly on point here and … still good law[,]" then asserting that Providers have offered no basis to overturn *Fischer*. DHS's Brief at 26-27 (citing OAG letter).[143]

---

[143] In summarizing *Fischer*, DHS reiterates many points, including the Court's adoption of federal constitutional law principles that "there is no limit on a state's authority to favor childbirth over abortion and implement that determination through the allocation of public funds." DHS's Brief at 23 (citing *Fischer*, 502 A.2d at 118 (citing *Maher*, 432 U.S. at 473)). DHS emphasizes that the *Fischer* Court determined that rational basis was the proper (continued…)

DHS highlights that the doctrine of stare decisis requires "'a special justification, over and above the belief that the precedent was wrongly decided,' to reverse a decision." *Id*. at 26 (citing *Alexander*, 243 A.3d at 196) (internal citation omitted). According to DHS, Providers do not present any special justification to overrule *Fischer*. Further, DHS contends that the *Fischer* Court was correct to state that this Court "often turn[s] to federal constitutional analysis as an interpretational aid." *Id*. at 27-28 (citing *Fischer*, 502 A.2d at 121). DHS insists that *Dobbs* does not impact this case because it does not address the public funding issue. DHS's Supplemental Brief at 2.

**House Intervenors' Argument**

In advancing the *Fischer* Court's construction of Pennsylvania's equal protection provisions, House Intervenors submit that Pennsylvania courts analyze Pennsylvania equal protection provisions (Article I, Sections 1 and 26) in the same way as the Fourteenth Amendment Equal Protection Clause. House Intervenors' Brief at 56-58 (citing *Love*, 597 A.2d at 1139, for the proposition the state and federal provisions are analyzed under the same standard). They distinguish the cases cited by Providers, arguing that few of them addressed Article I, Section 1 and Article I, Section 26 of the Pennsylvania Constitution. *Id*. at 65-67. Therefore, House Intervenors insist that the Coverage Exclusion is subject to rational basis review and that it passes muster. *Id*. at 52-54.

---

standard to evaluate the constitutionality of the Coverage Exclusion. *Id*. at 24 (citing *Fischer*, 502 A.2d at 123). Also, DHS highlights that the *Fischer* Court interpreted Article I, Section 26, as protecting against harassment or punishment for the exercise of constitutional rights. *Id*. at 24-25 (citing *Fischer*, 502 A.2d at 122). Thus, the question, according to DHS's summary of the *Fischer* Court opinion, is whether a person has been penalized for exercising a constitutional right. *Id*. at 25 (citing *Fischer*, 502 A.2d at 124). The *Fischer* Court explained that the state is merely encouraging behavior "by offering incentives[,]" and it is not penalizing individuals for exercising their right to choose. Consequently, DHS contends that the statute did not violate Article I, Section 26. *Id*.

**Senate Intervenors' Argument**

With regard to the analysis of equal protections, Senate Intervenors assert that consideration of the *Edmunds* factors is not a valid reason for this Court to depart "from decades of equal protection jurisprudence." Senate Intervenors' Brief at 40-45. They emphasize that Providers have not cited a single decision that applied the *Edmunds* factors to conclude that the factors changed the standard applicable to Pennsylvania equal protection challenges. *Id.* Rather, Senate Intervenors cite to various post-*Edmunds* decisions that they interpret as tying the construction of our state equality provisions to that of the federal Equal Protection Clause. *Id.* at 46-47. They also make the point that this Court has relied upon *Fischer*'s equal protection analysis repeatedly since *Edmunds* was decided. *Id.* at 48 (citing *Love*, 597 A.2d at 1139-40; *Commonwealth v. Wolf*, 632 A.2d 864, 868 n.8 (Pa. 1993); *McCusker v. WCAB*, 639 A.2d 776, 781 (Pa. 1994); *Probst v. Commonwealth, Dep't of Transp.*, 849 A.2d 1135, 1143-44 (Pa. 2004); *Kramer v. WCAB*, 883 A.2d 518, 531 n.12 (Pa. 2005); *Driscoll v. Corbett*, 69 A.3d 197, 212 (Pa. 2013)). While not suggesting that the Court was asked to do so, Senate Intervenors contend that if this Court believed that *Edmunds* required an overhaul of equal protection jurisprudence, we would have done so in one of those cases. *Id.* at 48.

Senate Intervenors argue that Providers have not drawn any meaningful connections between the Pennsylvania Constitution and those of the other states to justify departing from this Court's "long-standing practice of relying on federal precedent in favor of precedent from these other states." *Id.* at 51. Senate Intervenors find it significant that only two states have rendered holdings contrary to *Fischer* since *Fischer* was decided; in contrast, they highlight six states that have addressed this issue after *Fischer* and decided that their state constitutions do not prohibit abortion exclusions. *Id.* at 52.

According to Senate Intervenors, Providers' argument is truly premised on an assumption that indigency should be treated as a protected class, an argument that this Court rejected in both *Fischer* and *Probst*. *Id*. at 53 (citing *Probst*, 849 A.2d at 1144). Having established that the Coverage Exclusion does not **burden** a fundamental right, Senate Intervenors urge this Court to reject Providers' arguments for strict scrutiny. *Id*. at 54. In the alternative, Senate Intervenors argue that the Coverage Exclusion would still survive strict scrutiny. *Id*. at 54-56.

**Providers' Reply**

Though Providers recognize that this Court has adopted the three-tiered means-end framework developed under federal equal protection case law,[144] they nonetheless maintain that the textual differences between the federal and Pennsylvania provisions, as well as our precedent, establish that this Court "does not walk in lockstep with federal law" in applying this framework under the state Constitution. Providers' Reply Brief at 16. According to Providers, in *League of Women Voters*, the Court clarified that we apply the same jurisprudential framework that federal courts apply to federal Equal Protection Clause challenges, but **not** the same interpretations of the law. *See League of Women Voters*, 178 A.3d at 784 n.54 (clarifying that *Love*, 597 A.2d 1137 "merely remarked" that the federal and Pennsylvania standards "involve the same jurisprudential framework"). They argue that the advent of the *Edmunds* framework for addressing claims that the Pennsylvania Constitution provides greater protection than its federal counterpart is "yet another reason for this Court to revisit" *Fischer*. Providers' Reply Brief at 18.

---

[144] Under the federal Equal Protection Clause, the test takes into account a law's use of a suspect classification, its burdening of fundamental rights, and its justification in light of its objectives. *League of Women Voters*, 178 A.3d at 784 n.54. The restriction is balanced against its rationale on a sliding scale.

Providers continue to advance the argument that under the correct formulation of the issue, the Coverage Exclusion burdens the fundamental right to decide whether to carry a pregnancy to term. *Id*. at 18-19. Alternatively, Providers argue, even if this Court determines that the Coverage Exclusion does not trigger heightened scrutiny, it will still fail rational basis review. *Id*. at 22. They insist that the Commonwealth cannot focus on promoting childbirth alone because it also must recognize the state's interest in protecting the health and lives of women. *Id*. They allege that the Coverage Exclusion "prevents women from receiving timely abortion care, if not from accessing abortion care altogether." *Id*.

Providers reiterate their argument that the weight of authority from other state courts supports invalidating the Coverage Exclusion on constitutional grounds. Whereas fourteen state courts have struck down coverage exclusions on constitutional grounds, only six other state courts have upheld bans on funding for abortion. *Id*. at 23. They criticize those cases for committing the same errors as the *Fischer* Court, i.e., following the federal equal protection doctrine, identifying the right at issue as the right to have the state pay for abortions, and ignoring the state's interest in the lives and health of women. Providers' Reply Brief at 23-24.[145] Finally, they distinguish *Bell v. Low Income Women of Texas*, 95 S.W.3d 253, 255-56 (Tex. 2002), based on the unique nature of the Texas statutory scheme which is tied to federal funding and not animated by a preference for potential fetal life.

---

[145] In particular, Florida and Michigan courts have followed *Harris* and *Maher*, a path which Providers attribute to the fact that their state equal protection provisions do not provide greater protections than the federal counterpart. *See, e.g.*, Providers' Brief at 71; Providers' Reply Brief at 23-24 (citing, inter alia, *Renee B. v. Fla. Agency for Health Care Admin.*, 790 So.2d 1036, 1041 (Fla. 2001); *Doe v. Dep't of Soc. Servs.*, 487 N.W.2d 166, 174-76 (Mich. 1992)).

## 2. *Edmunds* Analysis

We reiterate that Providers argue that, "[o]nce the right is recognized, Article I, [S]ection 26 and Article III, [S]ection 32 require that the government cannot favor one exercise of the right over another." Providers' Brief at 66. Thus, although Providers observe that Article I, Sections 1 and 26 and Article III, Section 32 "collectively guarantee equal protection of the law and prohibit discrimination based on the exercise of a civil right[,]" *id.* at 59, their argument relative to Section 1 concerns the recognition of the inherent right to reproductive autonomy, *id*. at 62, and not its equal protection under the law. As for Article III, Section 32, Providers' advocacy does not demonstrate that it applies in the instant matter.[146] We focus instead on Section 26.

---

[146] Providers argue that Article I, Section 26 and Article III, Section 32 work in conjunction to render the coverage exclusion unconstitutional.

Article III, Section 32 prohibits local and special laws, providing as follows:

> The General Assembly shall pass no local or special law in any case which has been or can be provided for by general law and specifically the General Assembly shall not pass any local or special law:
>
> 1. Regulating the affairs of counties, cities, townships, wards, boroughs or school districts:
>
> 2. Vacating roads, town plats, streets or alleys:
>
> 3. Locating or changing county seats, erecting new counties or changing county lines:
>
> 4. Erecting new townships or boroughs, changing township lines, borough limits or school districts:
>
> 5. Remitting fines, penalties and forfeitures, or refunding moneys legally paid into the treasury:
>
> 6. Exempting property from taxation:
>
> 7. Regulating labor, trade, mining or manufacturing:

(continued…)

This Court has reviewed Section 26 and the federal Equal Protection Clause under the same standards.[147]  However, in more recent years, we have acknowledged that there

---

8. Creating corporations, or amending, renewing or extending the charters thereof:

Nor shall the General Assembly indirectly enact any special or local law by the partial repeal of a general law; but laws repealing local or special acts may be passed.

PA. CONST. art. III, § 32.  This provision dates to 1874, at a time when there were concerns that "[t]he concentration of money held by private, powerful corporations exerted a disproportionate, if not all-consuming, influence on the [Pennsylvania] legislature." Donald Marritz, *Making Equality Matter (Again): The Prohibition Against Special Laws in the Pennsylvania Constitution*, 3 WIDENER J. PUB. L. 161, 186 (1993).  At that time, general legislation was given little attention as compared to "special legislation," which concerned "one person, one company, one county, or even one horse-protective association." *Id.* at 187 n.124 (quoting William A. Russ, Jr., *The Origin of the Ban on Special Legislation in the Constitution of 1873*, in 11 PENNSYLVANIA HISTORY 260, 263-64 (1944)).  In fact, "[i]n the seven years preceding the constitutional convention of 1873[, when the predecessor to Section 32 was drafted,] 475 general laws had been passed and 8,755 private acts," or "special laws" had been passed.  Thomas Raeburn White, COMMENTARIES ON THE CONSTITUTION OF PENNSYLVANIA, xxvi (1907).  In other words, special laws outnumbered general laws about twenty-one to one.  Marritz, supra, at 187 n.124.  It was in the face of such legislative abuses that the constitutional convention set forth the first prohibition against special laws.

While we agree that Section 32 was adopted in a much different historical context than the federal Equal Protection Clause, both provisions generally "embod[y] the principle that 'like persons in like circumstances should be treated similarly by the sovereign.' " *William Penn Sch. Dist.*, 170 A.3d at 458 (citing *Robinson Township*, 83 A.3d at 987).  Based on the brief discussion above, we do not foreclose the notion that Section 32 has the potential to secure broader protection of our citizens' rights than the federal Equal Protection Clause. *See generally* Marritz, supra.  The mere fact of its adoption may be evidence that the people of this Commonwealth did not believe that the Equal Protection Clause was broad enough to address all other concerns regarding equality under the law.  However, the advocacy with respect to Section 32 has not sufficiently demonstrated that its specific protections apply here.  Thus, we do not further explore Section 32.

[147] *See, e.g.*, *James*, 477 A.2d at 1305 ("James' challenge ... is also grounded on the equal protection clause of the Fourteenth Amendment to the United States Constitution and Art. I, § 26 of the Pennsylvania Constitution ... The claims made under these separate constitutional provisions are in essence the same."); *Kramer*, 883 A.2d at 532 ("In evaluating equal protection claims under the Pennsylvania Constitution, this Court has (continued…)

may be an occasion to revisit Section 26 in the context of an *Edmunds* analysis should the parties raise such an issue. *League of Women Voters*, 178 A.3d at 784 n. 54; *Lohr v. Saratoga Partners, L.P.*, 238 A.3d 1198, 1209 n.16 (Pa. 2020); *Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1117 n.10 (Pa. 2014). Providers have raised the issue.

We will address the relevant question by conducting an *Edmunds* analysis of Article I, Section 26 of our Constitution, beginning with an examination of the text.

**a.     The text of the Pennsylvania constitutional provision**

Article I, Section 26 provides as follows:

> **Art. I § 26. No discrimination by Commonwealth and its political subdivisions**
>
> Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.

PA. CONST. art I, § 26. Section 26 is notably different from the standalone federal Equal Protection Clause: "No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV, § 1. While the federal Equal Protection Clause prohibits "deny[ing]" equal protection of the laws, Section 26, more specifically, secures two protections. It prohibits the Commonwealth from "deny[ing] any person the enjoyment of any civil right" and "discriminating against any person in the exercise of any civil right." U.S. CONST. amend XIV, § 1; PA. CONST. art. I, § 26. Thus, Section 26 protects

---

employed the same standards applicable to federal equal protection claims."); *Commonwealth v. Albert*, 758 A.2d 1149, 1151 (Pa. 2000) ("This Court has held that 'the equal protection provisions of the Pennsylvania Constitution are analyzed … under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution.'"); *McCusker v. WCAB (Rushton Min. Co.)*, 639 A.2d 776, 777 (Pa. 1994) ("The equal protection provisions of the Pennsylvania Constitution are analyzed by this Court under the same standards used by the United States Supreme Court when reviewing equal protection claims under the Fourteenth Amendment to the United States Constitution.").

against not only the denial of civil rights but also discrimination by the government when a person exercises a civil right.

In one respect, Article I, Section 26 and the Equal Protection Clause share a similar general purpose, i.e., equal treatment under the laws. However, to stop there in the analysis does not account for Section 26's language and the importance of the two separately recognized protections in our Charter. Accordingly, we must give meaning to the unique language employed in Section 26, which is distinct from what is explicitly contained within the federal Equal Protection Clause. In interpreting this provision, we acknowledge that its language has an ordinary meaning that voters would have been familiar with when they ratified the amendment.[148]

Both the federal Equal Protection Clause and Section 26 use the word "deny," which means to "withhold … the enjoyment." *Deny*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION, 356 (Laurence Urdang ed. 1968). However, Section 26 also expressly declares that the government shall not "discriminate" against any person in the exercise of any civil right. PA. CONST. art. I, § 26. "Discriminate" means "to make a distinction in favor of or against a person or thing on a categorical basis rather than according actual merit … to make or constitute a distinction in or between; differentiate[.]" *Discriminate*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, COLLEGE EDITION, 379 (Laurence Urdang ed. 1968).

---

[148] It is accepted that dictionaries are a source of the common meaning. *Greenwood Gaming & Ent., Inc. v. Commonwealth*, 263 A.3d 611, 620 (Pa. 2021) (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 75 (Pa. 2014)). For this purpose, we rely on dictionaries in use around the time of the adoption of Section 26.

While the prohibitions against denial of "any civil right"[149] or "equal protection of the laws"[150] indicate that the government may not withhold the enjoyment of a right from any person, Section 26's explicit protection against discrimination signals something broader: the government is prohibited from treating any person differently in the exercise of their civil rights. In other words, the Commonwealth may not demonstrate partiality for how a person exercises any civil right. This constitutional language clearly demonstrates that Section 26 mandates that the Commonwealth maintain neutrality with respect to how individuals exercise their civil rights.

We have previously considered the meaning of "civil rights," and found that the term is generally understood to mean "constitutional freedoms" or "constitutional rights." *See Driscoll v. Corbett*, 69 A.3d 197, 212 (Pa. 2013); *Fischer*, 502 A.2d at 123. Pennsylvania courts have also previously "[a]ssum[ed]" that statutorily created civil rights fall under the protections of Section 26, as well. *McIlvaine v. Pa. State Police*, 296 A.2d 630, 633 (Pa. Commw. 1972). While we continue to assume that certain statutory rights are encompassed by the notion of "civil rights," for the purposes of addressing Providers' claim based on the assertion of a fundamental right to reproductive autonomy,[151] we need only affirm that "civil rights," as used in Section 26, includes constitutional rights and freedoms.

Thus, based on the text alone, Section 26 is implicated when the Commonwealth applies differential treatment to persons based on their exercise of a constitutional right.

---

[149] PA. CONST. art. I, § 26.

[150] U.S. CONST. amend XIV, § 1.

[151] *See* Providers' Brief at 68 (asserting that the Pennsylvania Constitution "protects the abortion right as a fundamental right, and the [Coverage Exclusion] is a discriminatory funding scheme that impinges on that fundamental right in violation of the Constitution's equal protection provisions[]").

Section 26's broad protection becomes even more apparent upon examination of the history of the provision.

b.      The history of Article I, Section 26, including Pennsylvania case law

Section 26, adopted in 1967, would seem, as some scholars suggest, to go farther than the federal Equal Protection Clause by design.  *See generally* Robert F. Williams, *A "Row of Shadows": Pennsylvania's Misguided Lockstep Approach to its State Constitutional Equality Doctrine*, 3 WIDENER J. PUB. L. 343 (1993).  The predecessor to Section 26 emerged as a proposal by the Committee on the Bill of Rights of the Pennsylvania Bar Association's "Project Constitution."[152, 153]   *Id.* at 362.   The bill

---

[152]  Specifically, the following language was proposed by the Committee:

> Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right, because of race, color, or national origin.

Constitutional Report, *A Revised Constitution for Pennsylvania*, 34 PA. BAR. ASS'N Q. 147, 247, 249 (1963).  From the Committee's report and its proposed language, it is clear that its concern was primarily directed towards raced-based discrimination; however, the language that the People ultimately adopted in Section 26 suggests that the scope of the anti-discrimination principles of Section 26 addresses all forms of discrimination.

[153]  At the same time that the Committee proposed the initial version of Section 26, it also recommended a redrafting of Article I, Section 10 to include a separate clause "with the addition of an 'equal protection' clause, from the Federal Constitution."  Williams, supra, at 362.  At that time, Article I, Section 10 provided:

> No person shall, for any indictable offense, be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger, or by leave of the court for oppression or misdemeanor in office. No person shall for the same offense, be twice put in jeopardy of life or limb; nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.

(continued…)

introduced in the state Senate proposed the same language as that recommended by the Committee, which prohibited discrimination on the grounds of "race, color, or national origin." Williams, supra, at 363 (citing S.B. 530, printer no. 551, at 2, 149th Gen. Ass. (1965)). The bill was later amended in the House to prohibit discrimination based on "race, creed, color, sex, or national origin." *Id.* (citing S.B. 530, printer no. 1281, at 2, 149th Gen. Ass. (1965)). This language was ultimately rejected in favor of more expansive language prohibiting discrimination "against any person in the exercise of any civil right." *Id.* (citing 149 PA. LEGIS. J., HOUSE, 2771-72 (1965)). It was this version of

---

Constitutional Report, *A Revised Constitution for Pennsylvania*, 34 PA. BAR. ASS'N Q. 147, 247, 248 (1963) (quoting PA. CONST. art. I, § 10)). The Committee proposed that Section 10 be amended to instead provide the following:

> No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws; nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured.

*Id.* at 248-49.

While the Committee recommended that the "double jeopardy" language be removed from Section 10 and instead added to Article I, Section 9, it viewed grand juries as no longer serving as "an essential or even always a desirable part of the initiation of criminal proceedings," and thus it wanted the language from the beginning of the provision to be cut. *Id.* at 248. Instead, the Committee wanted the Legislature to be left free to determine how to charge persons with criminal violations. *Id.*

Ultimately, the proposed redrafting of Article I, Section 10 containing the federal type of equal protection guarantees was not successful. *Id.* at 363. Perhaps this was because the proposed Section 10 language was considered duplicative of the equal protections already guaranteed by the federal Equal Protection Clause, *see id.*, or perhaps it was a rejection of the Committee's view on grand juries. Regardless, we can infer that the Committee, at least, viewed the proposed language of what became Article I, Section 26 to contain something separate and distinct from the federal Equal Protection Clause. Williams, supra, at 363. Otherwise, the Committee would not have attempted to include nearly identical language from the federal Equal Protection Clause as an amendment to Section 10 at the same time it was proposing what became Section 26.

Section 26 that was ratified by the people in 1967 and adopted into our Constitution.[154] *Id.*; *see also* PA. CONST. art. I, § 26.

We cannot ignore that this provision was adopted in the midst of the Civil Rights Movement. This helps to inform us of the spirit with which the amendment was drafted, proposed, and adopted. In fact, as previously discussed, the Committee that initially drafted this provision expressly referenced preventing the Commonwealth from discriminating "on the basis of race" in its report. Constitutional Report, *A Revised Constitution for Pennsylvania*, 34 PA. BAR. ASS'N Q. 147, 247, 249 (1963). However, while some versions of the proposed constitutional amendment attempted to identify specific classes of people against whom discrimination was prohibited, the language ultimately adopted by the people was far broader, as it prevented the denial or discrimination against the enjoyment of the exercise of any civil right by any person. We cannot discount that this deliberate decision broadens the circumstances in which Section 26 may be implicated.

While the text and the history of Section 26 signal that the drafters and the citizens of Pennsylvania intended to afford broader protection than what already existed at that time, our underdeveloped case law has not acknowledged Section 26's breadth. One of the first occasions Section 26 was construed at the appellate level was in 1972 by the Commonwealth Court. *McIlvanie,* 296 A.2d at 630. In that case, after thirty-seven years of service, a Pennsylvania State Police officer was involuntarily retired by the Commissioner of Police pursuant to Section 205(d) of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, 71 P.S. § 65(d) (providing for a mandatory retirement at sixty years of age). Ultimately, the Commonwealth Court addressed the officer's

---

[154] Notably, Section 26 was voted on separately by the citizens in May of 1967. It was not part of the broad package of amendments to the state Constitution that emerged from the Constitutional Convention at that time.

challenge to Section 205(d) based upon his claim, among others, that it violated Article I, Section 26 of the Pennsylvania Constitution and the PHRA. In rejecting that challenge, President Judge James S. Bowman recalled a 1940 case in which this Court upheld a Philadelphia ordinance providing a mandatory retirement age (set at sixty-five years old) for certain firemen and policemen against a statutory challenge, *Boyle v. City of Philadelphia*, 12 A.2d 43 (Pa. 1940), as well as a similar case in which this Court upheld a mandatory retirement age (sixty-five) applied to policemen in the City of Duquesne, as against a challenge that it was an unauthorized act by council, *Soltis Appeal*, 135 A.2d 744 (Pa. 1957). Judge Bowman relied on this Court's statement in *Boyle* that "in the absence of express statutory prohibition, the power is inherent in a municipality to prescribe reasonable and nondiscriminatory superannuation classifications, similar to those here set up, with respect to its firemen and policemen." *McIlvanie*, 296 A.2d at 632 (citing *Boyle*, 12 A.2d at 44-45).

Judge Bowman interpreted Article I, Section 26 to serve not as a provision of substantive rights but rather as a declaration that "neither the State government nor local governments shall deny to any person the enjoyment of such rights nor discriminate against them in the exercise thereof." *Id*. at 633. Then, combining his analysis of Article I, Section 26 with his discussion of the Pennsylvania Human Relations Act, Judge Bowman stated the following:

> Assuming but not deciding that statutorily created 'civil rights' are within the protection of Article I, Section 26, of our Constitution, plaintiff's argument is, nevertheless, without merit, as it ignores the very essence of the statute and its provisions which he says protects him. The Pennsylvania Human Relations Act does not absolutely protect one against discharge from employment by reason of age; it does not guarantee retention of employment until death or proof of the employee's inability to perform. Rather, it is designed to protect against Discrimination in discharge from employment by reason of age and in doing so recognizes a 'bona fide

occupational qualification' as nondiscriminatory, as are terminations of employment by reason of retirement and pension plans and other like programs. In essence, with respect to termination of employment by reason of age, it proscribes such terminations on a discriminatory basis. To reach the conclusion plaintiff would have us reach as to this contention, we would have to hold that the Pennsylvania Human Relations Act prohibits discharge from employment by reason of age without exception, a conclusion which the statute does not permit us to reach. Alternately, plaintiff appears to assert, without any supporting proof in the record, that a mandatory retirement age for State police officers as a class is not a bona fide occupational qualification. To merely say so is not enough, particularly in light of the *Soltis* and *Boyle* cases, *Supra*. The fact that a particular police officer is physically fit and able to perform his duties or that minds may differ upon the particular mandatory retirement age selected by the legislature is not proof of want of bona fides as to the qualification otherwise applied uniformly and nondiscriminatorily to the selected class.

*Id*.

Thereafter, we "affirm[ed] the order of the Commonwealth Court on the opinion of President Judge Bowman." *McIlvaine v. Pa. State Police*, 309 A.2d 801, 803 (Pa. 1973). Justice Eagan concurred in the result. Justice Roberts, joined by Justice Nix, filed a dissenting opinion, expressing the view that the mandatory retirement provision violated Article I, Section 26 of the Pennsylvania Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Justice Roberts faulted the Majority and the Commonwealth Court for relying on decisions approving of the constitutionality of a mandatory retirement age for police officers that predated Section 26, such as *Boyle*. He wrote that while this "may have at one time represented the prevailing view," the adoption of Article I, Section 26 "denuded those cases of all precedential value." *Id*. at 807 (Roberts, J., dissenting).

When claims under Section 26 later came before this Court, we considered the protections under Section 26 to be "in essence the same" as those afforded by the federal

Equal Protection Clause, without acknowledging the difference in language or history of our provision. *James*, 477 A.2d at 1305; *see also Astemborski v. Susmarski*, 466 A.2d 1018 (Pa. 1983).[155] Accordingly, we reasoned that Section 26 is subject to the same equal protection framework for analyzing government classifications as employed by the High Court under the Fourteenth Amendment. *James*, 477 A.2d at 1305-06. In other

---

[155] In *James*, a pedestrian filed suit for injuries he suffered when he fell on stairs owned and maintained by SEPTA. The trial court granted SEPTA's motion for summary judgment pursuant to a former provision of the Metropolitan Transportation Authorities Act requiring that notice of a claim be served on SEPTA within six months of injury or accrual of the cause of action. On appeal, the pedestrian asserted, inter alia, that the notice requirement violated the Fourteenth Amendment's Equal Protection Clause and the Pennsylvania Constitution's Article I, Section 26 because it treated those injured by government tortfeasors in one way while treating those injured by non-government tortfeasors in another way. *James*, 477 A.2d at 1305. The pedestrian did not present an argument that Section 26 is broader than the Fourteenth Amendment. Thus, the Court characterized the two constitutional provisions as essentially the same, and it treated the claims identically, citing exclusively to jurisprudence addressing Equal Protection Clause claims raised under the Fourteenth Amendment. *Id*. (citing *Singer v. Sheppard*, 346 A.2d 897 (Pa. 1975) (rejecting claim that Pennsylvania's No-Fault Motor Vehicle Insurance Act violated Equal Protection Clause of the Fourteenth Amendment)). The *James* Court applied the Fourteenth Amendment Equal Protection Clause framework to the claim, determining that the notice provision restricted pedestrian's important right. i.e., access to the courts to sue the Commonwealth in cases where the Commonwealth has consented to suit. The Court applied intermediate scrutiny, and it determined that the notice requirement passed constitutional muster. In sum, the *James* Court, faced with a Fourteenth Amendment Equal Protection Clause claim, addressed the claim pursuant to the federal test. The Court's opinion does not address the meaning of Article I, Section 26 of the Pennsylvania Constitution because the claim grounded in that provision was merely tacked on to a federal claim without any development. Therefore, *James* does not support the conclusion, much less stand for the proposition that Article I, Section 26 and the Fourteenth Amendment Equal Protection Clause are coterminous.

Similarly, *Astemborski* merely highlighted that a statute of limitations was being challenged under both the Fourteenth Amendment and Article I, Section 26. *Astemborski*, 466 A.2d at 1019. The *Astemborski* Court relied exclusively on equal protection case law from the United States Supreme Court, holding that the challenged statute of limitations was constitutional "consistent with the recent decision of the Supreme Court of the United States[.]" *Id.* at 1022.

words, legislative classifications challenged under Section 26 are reviewed pursuant to the means-end test, i.e., the varying levels of scrutiny. *Id.*

The *Fischer* Court subsequently endorsed *McIlvanie*'s conclusion that Section 26 does not itself define a substantive right, stating that Section 26 did no more than "make more explicit the citizenry's constitutional safeguards not to be harassed or punished for the exercise of their constitutional rights." *Fischer*, 502 A.2d at 123. As previously discussed in the context of the other equality provisions, the right on which *Fischer* was focused was not one of a fundamental nature, such as the purported right to reproductive autonomy, but rather whether a woman was entitled to a subsidized abortion. *Id.*

After the *Fischer* Court stated that the Court had "not previously embraced a mode of analyzing claims under Article I, Section 26," for purposes of determining when a government action offends Section 26, it adopted a penalty analysis derived from federal Equal Protection Clause jurisprudence[156] to assess whether government action implicates a fundamental right. *Fischer*, 502 A.2d at 123. Although the *Fischer* Court did not articulate its analysis with precision, to apply a penalty analysis, the *Fischer* Court had to first accept the *James* Court's Fourteenth Amendment Equal Protection Clause framework, which required, as the first inquiry, whether a fundamental right was implicated; more particularly, whether the government is penalizing the exercise of a

---

[156] The *Fischer* Court relied on *Shapiro* and *Maricopa County* as establishing the penalty test. In *Shapiro v. Thompson*, 394 U.S. 618 (1969), the High Court applied strict scrutiny to statutory prohibitions denying welfare assistance based on applicants' length of residency in the jurisdiction because the statutes operated "to chill the assertion of constitutional rights by penalizing those who choose to exercise them[.]" *Id*. at 631. *See* supra note 42 (detailed discussion of *Shapiro*). In *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 261-62 (1974), the High Court held that an Arizona statute requiring a year's residence in a county as a condition of receiving nonemergency hospitalization or medical care at the county's expense "penalize[d] indigents for exercising their right to migrate to and settle in that State[,]" and therefore was subject to strict scrutiny. *See* supra note 43 (detailed discussion of *Maricopa County*).

fundamental right. *Shapiro*, 394 U.S. at 634 ("[A]ny classification which serves to penalize the exercise of [a constitutional] right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional.").

In line with this assumption that Section 26's prohibition operated like its federal counterpart to protect only against "harassment" or "punishment," the *Fischer* Court employed a "penalty analysis." To *Fischer*, the "penalty analysis" focused on whether a law somehow penalized a person for the exercise of a constitutional freedom. *Fischer*, 502 A.2d at 123-24. Based on this and its adoption of the High Court's rationale in *Maher*, the *Fischer* Court reasoned that the Commonwealth's express partiality for encouraging childbirth over abortion does not constitute a penalty and is therefore not offensive to the protections of Section 26. *Id*. at 124. The *Fischer* Court offered no context as to when a "penalty" analysis applies in the larger equal protections framework, but based on its language, it seemed that *Fischer* intended for this "penalty" analysis to operate as the primary "mode" for analyzing Section 26 claims.

However, shortly after *Fischer*, this Court signaled that it would not **solely** review alleged violations of Section 26 pursuant to a "penalty analysis." *See Commonwealth v. Parker White Metal Co.*, 515 A.2d 1358 (Pa. 1986) (plurality). Instead, in keeping with the notion that our equal protection analysis mirrors that of the federal courts, this Court applied the standard federal equal protection framework to Section 26 by first addressing "whether the State has created a classification for the unequal distribution of benefits or imposition of burdens." *Id.* at 1363. This Court restated the standard federal Equal Protection Clause framework, without mention of *Fischer*'s penalty analysis.

Following *Fischer*, this Court cited *Fischer*'s general recitation of the principle that the analysis of Article I, Section 26 is the same as that conducted under the Equal Protection Clause, without questioning that proposition until *League of Women Voters*.

We have identified only one instance in which this Court applied an analysis that bore some resemblance to *Fischer*'s penalty analysis, and it did so when addressing, without distinguishing, a challenge made under the federal Equal Protection Clause and Article I, Section 26 together. That is, like the vast majority of cases, the Court in *McCusker v. WCAB*, 639 A.2d 776, 779 (Pa. 1994) addressed the two challenges together because there was no argument for interpreting Article I, Section 26 differently than its federal counterpart.

In *McCusker*, this Court rejected a claim that a provision of the Worker's Compensation Act – providing for termination of benefits when a dependent of a deceased worker either remarried or was living in meretricious relationship – violated "the equal protection guarantees of both the U.S. Constitution and the Pennsylvania Constitution[,]" i.e., the Fourteenth Amendment and Article I, Sections 1 and 26 of the Pennsylvania Constitution. *Id*. at 777-78. Applying the federal equal protection framework, the Court determined that the relevant classification encompassed "dependent spouses of deceased employees who remarry or are living with another in a meretricious relationship[.]" *Id*. at 778. The Court explained that the law did not "prohibit or criminalize" McCusker's choice of living or family arrangements but merely set forth eligibility requirements, and therefore, it held that the law did not violate McCusker's right to privacy in his intimate affairs. *Id*. at 779 (citing *Bowen v. Gilliard*, 483 U.S. 587, 601-02 (1987) and *Zablocki v. Redhail*, 434 U.S. 374, 368-78 (1978) for the premise that eligibility requirements which do not "directly and substantially" interfere with family living arrangements do not burden a fundamental right, and therefore, are subject to rational basis review). Having determined that no fundamental right was penalized, the Court

identified "rational relationship" as the proper standard of review.[157]  The Court found that the scheme rationally promoted the governmental interest of judicious distribution of worker's compensation benefits, and therefore, did not violate the equal protection provisions of the Pennsylvania and federal Constitutions.  *Id*. at 780-81.

In sum, *McCusker* fits within a line of cases that followed *James*, *Love* and *Fischer*, which assumed, without question, that the federal Equal Protection Clause analysis applied to claims brought under Article I, Section 26 of the Pennsylvania Constitution. *McCusker* asked whether the statute prohibited or criminalized the exercise of a fundamental right – in essence conducting a "penalty" analysis – in observance of federal precedent interpreting the Fourteenth Amendment, but it did not cite to *Fischer* for such a premise.

Subsequently, in *Driscoll v. Corbett*, 69 A.3d 197 (Pa. 2013), the most recent Section 26 case from this Court to cite *Fischer*, this Court addressed Section 26 without conducting a penalty analysis.  This Court reviewed constitutional challenges to the mandatory retirement provision of the Pennsylvania Constitution applicable to judicial officers.  Petitioners argued, inter alia, that any governmental action requiring them to retire at a certain age violated the guarantee of equal protection derived from Article I, Section 1, as well as the nondiscrimination provision of Article I, Section 26 of the Pennsylvania Constitution.  *Id*. at 212.  In rejecting the petitioners' argument regarding Article I, Section 1, the Court explained that "judicial review for compliance internal to the foundational document must be highly deferential."  *Id*. at 210.  In view of that deference, it rejected petitioners' contention that the age-related basis for classification implicated a

---

[157]  The single proposition for which *McCusker* relied on *Fischer* (as cited by *Love*) was the recitation of the rational basis test.  *McCusker*, 639 A.2d at 781 (citing *Love*, 597 A.2d at 1139 (citing *Fischer*, 502 A.2d at 114)).

heightened level of scrutiny and found that the provision survived rational basis review. *Id*. at 210-11.

The *Driscoll* Court next addressed petitioners' arguments that the forced retirement age violated Article I, Section 26 of the Pennsylvania Constitution. The Court highlighted that the adoption of Section 26 coincided with the adoption of the judicial retirement provision. The fact that Section 26 was of recent vintage weakened the force of petitioners' argument regarding age-related classifications "insofar as they [sought] to characterize the provision as enshrining rights that are 'so fundamental to human beings' (as they expressed it at oral argument), that they have been recognized as pre-existing the Constitution." *Id*. The Court noted as well that in *Fischer*, this Court "determined that Section 26 does not define any new substantive civil rights, but clarifies that an individual may not be harassed or penalized for the exercise of his or her constitutional freedoms." *Driscoll*, 69 A.3d at 212 (citing *Fischer*, 502 A.2d at 123-24). The Court then stated:

> Petitioners have not provided grounds to suggest that our reasoning relative to Article I, Section 1 should have any less force in the context of the anti-discrimination clause. Thus, as we have concluded that Petitioners' constitutional right to equal protection is not otherwise injured by the retirement mandate, Article I, Section 26, as construed in *Fischer*, does not provide a separate basis for relief, either independently or in combination with Article I, Section 1.

*Driscoll*, 69 A.3d at 212-13. As with the many Section 26 cases that came before and after *Fischer*, the Court was merely reciting the proposition that the equal protection provisions of the Pennsylvania Constitution operated conterminously with the federal Equal Protection Clause, and therefore, Article I, Section 26, did not provide a different basis for a claim. The Court did not apply the penalty test, nor did it consider the possibility that Article I, Section 26 affords greater protections than the federal equal protection framework.

Like *Driscoll*, multiple cases cited *Fischer*'s general recitation of Article I, Section 26 as being coterminous with the Equal Protection Clause, without questioning that proposition.[158] However, until *League of Women Voters*, such a request for a broader interpretation of Section 26 had not been properly raised before this Court. *See, e.g.*, *Lohr*, 238 A.3d at 1209 n.16 (recognizing that the parties did not argue that the equal protection analysis differs under the state and federal constitutions, and thus, this Court would continue to apply the same analytical tests to both texts); *Zauflik*, 104 A.3d at 1117 n.10 (observing that Section 26's federal counterpart is the federal Equal Protection Clause, but declining to conduct an *Edmunds* analysis because there was "no suggestion that the Pennsylvania provision is other than coextensive, and the parties have not engaged in a formal *Edmunds* analysis").

In *League of Women Voters*, this Court overruled the proposition set forth in *Erfer v. Commonwealth*, 794 A.2d 325 (Pa. 2002), that we are required to utilize the same standard to adjudicate a claim for a violation of the Free and Equal Elections Clause, PA. CONST. art. I, § 5, as we would under the federal Equal Protection Clause. *League of Women Voters*, 178 A.3d at 812-13. The *Erfer* Court arrived at this holding because, in its view, any claim predicated on equal protections of our Charter, such as the right to

---

[158] *See Kramer*, 883 A.2d 518 (refusing to consider separate Article I, Section 26 claims for lack of developed argument, holding instead that challenged provision in the Workers' Compensation Act did not violate federal equal protection guarantee because classification regarding receipt of severance benefits did not implicate fundamental property right or create a suspect classification); *Probst*, 849 A.2d at 1142 n.14 (citing *Fischer*'s articulation of the legal framework for evaluating an equal protection challenge and for the general proposition that claims made under the Pennsylvania Constitution are analyzed under the Fourteenth Amendment's Equal Protection Clause. This Court declined to address the Section 26 question for lack of a developed argument.); *Love*, 597 A.2d 1137 (citing to *Fischer* as additional basis after citing *James* for utilization of federal equal protection standards in analyzing Article I, Section 26 claims); *Klein v. Commonwealth, State Employees' Ret. Sys.*, 555 A.2d 1216 (Pa. 1989) (Opinion Announcing Judgment of the Court) (Larsen, J.) (citing to *Fischer* for applying the federal Equal Protection Clause framework).

vote, could not be afforded broader protections than those guaranteed under the federal Equal Protection Clause. *Erfer*, 794 A.2d 332. To *Erfer*, our equal protection jurisprudence stood for the proposition that Pennsylvania's equal protection guarantees under Article I, Section 26 as well as those under Article I, Sections 1 and 5 were coterminous with the protections of the federal Equal Protection Clause. *Id.* Relying on *Erfer* and other equal protections analyses from this Court, the Commonwealth Court in *League of Women Voters* held similarly.

Addressing the appeal in *League of Women Voters*, this Court corrected course. Aside from decoupling the analysis of an Article I, Section 5 challenge from our equal protection analysis, this Court in *League of Women Voters* also distinguished and clarified the problematic assumption that utilizing the same standards for analysis is equivalent to saying that Section 26 and the federal Equal Protection Clause are coterminous.

> Notably, in *Erfer*, our determination that the Equal Protection Guarantee was to be adjudicated as coterminous with the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution was predicated on *Love*, in which we merely remarked that the Equal Protection Guarantee and Equal Protection Clause involve the same jurisprudential framework—i.e., a means-ends test taking into account a law's use of suspect classification, burdening of fundamental rights, and its justification in light of its objectives. *See Erfer*, 794 A.2d at 331–32; *Love*, 597 A.2d at 1139. The same was true in *Kramer*, where we remarked that we had previously employed "the same standards applicable to federal equal protection claims" and that the parties therein did not dispute "that the protections [were] coterminous[.]" *Kramer*, 883 A.2d at 532. Moreover, our affirmance in *Zauflik* was rooted in the parties' failure to conduct an analysis under *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991). *See Zauflik*, 104 A.3d at 1117 n.10; …. Finally, concerning [*Doe v. Miller*, 886 A.2d 310 (Pa. Commw. 2005), *affirmed by Doe v. Miller*, 901 A.2d 495 (Pa. 2006) (per curiam)], the issue was not meaningfully litigated before the Commonwealth Court, and, in any event, this Court affirmed its decision per curiam, rendering it of no salient precedential value in the instant case. *See Commonwealth v. Tilghman*, 673 A.2d 898, 903–05 (Pa.

1996) (noting that orders affirming a lower court's decision, as opposed to its opinion, per curiam should not be construed as endorsing its reasoning).

*League of Women Voters*, 178 A.3d at 784 n.54.

A conclusion that our Constitution's equal protection provisions are to be read in lockstep with the federal Equal Protection Clause runs the risk of rendering our own constitutional text, history, traditions, and jurisprudence "a mere row of shadows." *See generally* Robert F. Williams, *A "Row of Shadows": Pennsylvania's Misguided Lockstep Approach to its State Constitutional Equality Doctrine*, 3 WIDENER J. PUB. L. 343 (1993). That we generally apply the same means-ends test to state equal protection claims as articulated by federal courts for Equal Protection Clause cases does not mean that we are bound by federal interpretations of the test, nor does it mean that we defer to or are bound by Equal Protection Clause analyses of similar claims. Certainly we are not bound by interpretations of the scope of the protections of the Equal Protection Clause when interpreting provisions of our Charter that speak, as Article I, Section 26 does, to prohibiting discrimination in the exercise of a civil right.

In *League of Women Voters*, we clarified that our past references to this coterminous analysis were merely this Court's recognition that Section 26's "Equal Protection Guarantee and Equal Protection Clause involve the same jurisprudential framework—*i.e.*, a means-ends test taking into account a law's use of suspect classification, burdening of fundamental rights, and its justification in light of its objectives." *League of Women Voters*, 178 A.3d at 784 n.54. We recognized, as confirmed by our analysis in this case, that our more recent references to the coterminous nature of Section 26 and the federal Equal Protection Clause stem from a failure of the parties to properly develop an argument that Section 26 affords broader protection than its federal counterpart. *Id.*

We continue to recognize, as we did in *League of Women Voters*, that we apply the same jurisprudential framework to equal protections challenges under the Pennsylvania Constitution as is applied under the federal Equal Protection Clause, i.e., the means-ends test, and Providers do not argue that we should apply a different analytical framework. We further continue to recognize the unremarkable proposition that Section 26 does not itself create new substantive rights. As it falls under Article I's Declaration of Rights, it is a recognition of inherent rights that are preserved by our Charter, not created. *Robinson Township*, 83 A.3d at 948. More specifically, Section 26 guarantees that no person shall be denied the enjoyment of rights and that the government will not discriminate against a person based on the manner in which a right is exercised. We conclude that this prohibition against discrimination requires that the government act neutrally to the manner in which a right is exercised. Although *Fischer* maintained that Section 26 made our constitutional safeguards "more explicit," *Fischer*, 502 A.2d at 311, any suggestion that Section 26–ratified more than one-hundred years after the adoption of the federal Equal Protection Clause–amounts to mere surplusage of the federal Equal Protection Clause ignores the unique text of Section 26, the historical context, and *League of Women Voters*.

### c.    Related case law from other states

Adhering to federal jurisprudence without reference to the text or history of Article I, Section 26, the *Fischer* Court blindly followed *Harris v. McRae*, 448 U.S. 297 (1980),[159] holding that the rights of women eligible for public medical assistance are not violated by the Coverage Exclusion. However, other states have found themselves not so bound. As illustrated by our consideration of the third *Edmunds* factor (related case law from

---

[159]  *See* supra pp. 58-67 (discussion of *Fischer* and its reliance on *Harris*)

other states), various other states have interpreted their respective constitutions as requiring the government to act neutrally when allocating health care benefits.

For instance, the Supreme Court of Alaska read its equal protection provision, which mandated the "equal treatment of those similarly situated," as providing a more robust protection for Alaskans' right to non-discriminatory treatment as compared to the federal Equal Protection Clause.[160]  *Dep't of Health and Soc. Servs. v. Planned Parenthood of Alaska*, 28 P.3d 904, 909 (Alaska 2001).  It found that the logic to extending equal protection to their abortion coverage exclusion was "straightforward:"

> [W]hen state government seeks to act for the common benefit, protection, and security of the people in providing medical care for the poor, it has an obligation to do so in a neutral manner so as not to infringe upon the constitutional rights of our citizens.

*Id.* at 908 (quoting *Women's Health Ctr. of W.Va. v. Panepinto*, 446 S.E.2d 658, 660 (W. Va. 1993)).  To the court, the coverage exclusion "affect[ed] the exercise of a constitutional right, the right to reproductive freedom."  *Id.* at 909.

Alaska's Supreme Court recognized that the challenged statute "did not forbid the individual exercise of constitutional rights; rather, it limited the government benefits distributed to the class of individuals who exercised that right."  *Id.* at 910. However, the court highlighted that it would look to "the real-world effects of the government action to

---

[160]  Article I, Section 1 of Alaska's Constitution provided as follows:

> This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

ALASKA CONST. art. I, § 1.

determine the appropriate level of scrutiny." *Id.* The court observed that pursuant to Alaska's equal protections, its government was not required to provide limitless health care services, but it was "constitutionally bound to apply neutral criteria in allocating health care benefits, even if considerations of expense, medical feasibility, or the necessity of particular services otherwise limit the health care it provides to poor Alaskans." *Id.* Viewing the "right to reproductive freedom" as a "fundamental right," the Alaska Supreme Court applied strict scrutiny. *Id.* at 909-10.

In a case contemporary to *Fischer*, the Supreme Court of New Jersey also responded directly to the High Court's decision in *Harris*. *Right to Choose v. Byrne*, 450 A.2d 925 (N.J. 1982). In highlighting the "more expansive language" in its Charter and comparing it to the language of the federal Equal Protection Clause, the New Jersey Supreme Court concluded that its Constitution afforded stronger protections than the federal Constitution.[161] *Id.* at 933-34. Although the New Jersey Supreme Court recognized that neither "poverty nor pregnancy gives rise to membership in a suspect class[,]" and that there does not exist a "fundamental right to funding for an abortion[,]" the court still applied a balancing test akin to strict scrutiny because "individual states may accord greater respect than the federal government to certain fundamental rights." *Id.* at 931, 934. According to that court, the right to choose whether to have an abortion "is a fundamental right of all pregnant women[.]" *Id.* The exclusion, it found, impinged on the

---

[161] New Jersey derives its state equal protections from the following constitutional provision:

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

N.J. CONST. art. I, ¶ 1.

"fundamental right of a woman to control her body and destiny." *Id.* According to the court, the exclusion, per the government's admission, sought to influence the decision between abortion and childbirth. *Id.* The court reasoned that "[o]nce [the state government] undertakes to fund medically necessary care attendant upon pregnancy … [it] must proceed in a neutral manner." *Id.* at 935.

In *Doe* (Conn.), the Superior Court of Connecticut concluded that its courts had recognized, as an aspect of privacy, "procreative choice" as a fundamental right. *Doe* (Conn.), 515 A.2d at 150. It further determined that the High Court's equal protection analysis in *Harris* was "difficult to accept," suggesting that it viewed its own equal protections as affording greater protections than the federal Equal Protection Clause.[162] *Id.* at 158. In reviewing its abortion coverage exclusion, the Superior Court of Connecticut reasoned that its equal protection provisions "require the state when extending benefits to keep them free of unreasoned distinctions that can only impede [the] open and equal exercise of fundamental rights." *Id.* (internal quotations citations omitted). According to the court, "the selective funding of medically necessary abortions and the willingness of the state to fund all necessary medical procedures to bring the fetus to term at least

---

[162] The Connecticut court reached its conclusion by relying upon two equal protections provisions, one of which was its equal rights amendment.

> All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.

CONN. CONST. art. I, § 1.

> No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.

CONN. CONST. art. I, § 20.

implicitly impinges on the fundamental right of privacy guaranteed to all pregnant women—rich and poor alike—and that is, the right to choose whether to have an abortion." *Id.* at 159. As this "impinge[d]" on a fundamental right, the court determined that the coverage exclusion was subject to strict scrutiny. *Id.*

In *Committee to Defend Reproductive Rights v. Myers*, 625 P.2d 779 (Cal. 1981), the Supreme Court of California, in examining a similar abortion coverage exclusion, determined that its Constitution expressly extended more protections to its citizens than the federal Charter.[163] *Id.* at 783-84. Among these protections, the California court observed that all women in California, "rich and poor alike possess a fundamental constitutional right to choose whether or not to bear a child." *Id.* at 784 (citing *People v. Belous*, 458 P.2d 194 (Cal. 1969)). Applying the unconstitutional conditions doctrine[164] and its own test of constitutional scrutiny, the court held that "[o]nce the state furnishes medical care to poor women in general, it cannot withdraw part of that care solely because a woman exercises her constitutional right to choose to have an abortion." *Id.* at 798.

Faced with another similar coverage exclusion, in *Moe v. Secretary of Administration and Finance*, 417 N.E.2d 387 (Mass. 1981), the Massachusetts Supreme Court reviewed its privacy jurisprudence and announced that its Declaration of Rights[165]

---

[163] California's Constitution provided as follows:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

CAL. CONST. art. I, § 1.

[164] The unconstitutional conditions doctrine is the notion that the government extends a benefit or privilege upon the surrender of constitutional rights. *Unconstitutional Conditions*, 73 HARV. L. REV. 1595, 1595 (1960).

[165] The Massachusetts constitutional provisions were, in relevant part, as follows:

(continued…)

protected women's right to abortions. *Id.* at 398-99 (citing, inter alia, *Superintendent of Belchertown State Sch. v. Saikewicz*, 370 N.E.2d 417 (Mass. 1977); *In re Spring*, 405 N.E.2d 115 (Mass. 1980)). While recognizing that the enactments at issue were "substantially identical to those challenged" and upheld by the United States Supreme Court in *Harris*, the *Moe* court explained that it was "not bound by Federal decisions, which in some respects are less restrictive than our Declaration of Rights." *Id.* at 399, 400 (internal quotations and citations omitted). Indeed, with respect to the challenge to the coverage exclusion, it determined that its Declaration of Rights afforded "a greater degree of protection to the right asserted … than does the Federal Constitution as interpreted" in *Harris*. *Id.* at 400.

According to its examination of its own constitutional protections and *Roe v. Wade*, the *Moe* court found that "the limitation on State action which is imposed by the fundamental right of privacy declared in *Roe v. Wade*, supra,[166] is one of neutrality." *Id.* Thus, it found that while the government may retain "wide latitude" to determine how to allocate benefits, it could not use criteria which would "discriminatorily burden the exercise

---

> All people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness. Equality under the law shall not be denied or abridged because of sex, race, color, creed or national origin.

MASS. GEN. L. CONST. art. I.

> Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws.

MASS. GEN. L. CONST. art. X.

166 *Roe v. Wade*, 410 U.S. 113 (1973), overruled by *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).

of a fundamental right." *Id.* at 401 (citing, inter alia, *Mass. Pub. Int. Rsch. Grp. v. Sec'y of the Commonwealth*, 375 N.E.2d 1175 (Mass. 1978)). The *Moe* court determined that it was irrelevant whether a selective grant of benefits imposed a direct or indirect burden, because once the government "chooses to enter the constitutionally protected area of choice, it must do so with genuine indifference" and "may not weigh the options open to the pregnant woman by its allocation of public funds[.]" *Id.* at 402. The court found the funding scheme to be a means for the government to inject "coercive financial incentives favoring childbirth into a decision that is constitutionally guaranteed to be free from government intrusion … depriv[ing] the indigent woman of her freedom to choose abortion over maternity, thereby impinging on the due process liberty right recognized in *Roe v. Wade*." *Id.*

After concluding that the funding scheme was not neutral to the protected area of choice, the *Moe* court conducted an interest balancing, akin to strict scrutiny but less rigid, pursuant to principles it had developed in Massachusetts case law. *Id.* at 403. In so doing, the court found that the balance was "decisively in favor of the individual right involved[,]" and thus concluded that the coverage exclusion at issue was invalid. *Id.* at 403-04.

We acknowledge Senate Intervenors' claim that other state courts have upheld bans on abortion funding against constitutional challenges. Senate Intervenors' Brief at 52. Indeed, there are cases in which state (trial level) courts have tracked *Fischer*'s logic, applied federal principles and reached the same conclusion as the *Fischer* Court. *See, e.g.*, *Planned Parenthood of Idaho v. Kurtz*, 2002 WL 32156983 (Id. Dist. 2002). And we observe that the Supreme Court of Michigan, in *Doe v. Department of Social Services*, 487 N.W.2d 166 (Mich. 1992), did the same, despite the fact that its constitution contains

a non-discrimination clause.[167]  However, we are convinced beyond doubt that the text of Article I, Section 26 along with its history demands a distinct interpretation and application.[168]  The provision commands that the government will not "discriminate against any person in the exercise of any civil right."  If the government is not neutral in its treatment of the exercise of a right, Section 26 is implicated.  If the right is one that is fundamental, then only evidence of a compelling government interest and a finding that there are no less intrusive means to advance the interest will save the government action.

Providers' sole argument in this respect is that the privacy protections in our Charter protect the right to reproductive autonomy, a right that, like other privacy rights, is fundamental.  This asserted right is clearly implicated by the partiality towards carrying a pregnancy to term embedded in the Coverage Exclusion.

---

[167]  The Michigan Constitution's equal protection and non-discrimination clause provides:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

MICH. CONST. art. I, § 2.

The Michigan Supreme Court viewed the passage of the non-discrimination provision as evidence of a "deliberate effort to duplicate the protection secured by the federal clause." *Doe v. Dep't of Soc. Servs.*, 487 N.W.2d at 175.  For the reasons expressed herein, this was not the effort undertaken with Section 26.  *See* supra Part III.F.2.b. ("the history of Article I, Section 26, including Pennsylvania case law").

[168]  The Michigan court discounted the textual differences between its equal protection provision and the federal Equal Protection Clause as insignificant, and it viewed the timing of the Civil Rights Movement as proof that its provision was merely emblematic.  *Doe*, 487 N.W.2d at 175.  We find the textual differences between Section 26 and the Equal Protection Clause significant and the context of its adoption indicative of its unique purpose.  In fact, we find these factors dispositive in determining the intent behind Section 26 to do more than the federal Equal Protection Clause.

Addressing the argument with regard to the then-constitutionally recognized right to abortion under *Roe v. Wade*, the *Fischer* Court eschewed the argument that the Coverage Exclusion implicated *Roe v. Wade*'s right to choose an abortion over carrying a pregnancy to term. Instead, the Court flipped the table: the case was not about abortion—it was about the right to a government-funded abortion. *Fischer*, 502 A.2d at 121.[169] In so doing, it followed the lead of the United States Supreme Court in *Maher* and *Harris*, where the focus was likewise upended from consideration of the substantive right impacted by the unequal treatment created by the coverage exclusions to the mechanism for unequal treatment.

While we express no opinion on the legitimacy of the inventive analytical phrasing under the federal Equal Protection Clause, it makes no sense under Article I, Section 26. This recasting of the issue requires us to ignore that funding by the General Assembly is government action subject to constitutional review.[170] This is an untenable proposition. One of the principal purposes of the government is to provide for the health and safety of its citizens. *Pa. Env't Def. Found. v. Commonwealth*, 161 A.3d 911, 930 (Pa. 2017) (recognizing that the Constitution grants the General Assembly "broad and flexible police

---

[169] Senate Intervenors advance this same argument, insisting that the challenge does not implicate the right to abortion, but rather, "concerns whether there exists a right to have the Commonwealth fund an abortion when it is unnecessary to protect the life of the woman, or when the pregnancy does not result from rape or incest[.]" Senate Intervenors' Brief, at 40-41.

[170] Justice Mundy predicts a deluge of litigation as a result of this decision. *See* Concurring & Dissenting Op. at 20 n.13 (Mundy, J.). Given the experience in other jurisdictions adopting a similar approach, this is unlikely. In any event, this Court is duty-bound to apply the Constitution to each challenge before it. *Marbury v. Madison*, 5 U.S. 137, 178 (1803) ("Could it be the intention of those who gave this [judicial] power, to say that, in using it, the constitution should not be looked into? That a case arising under the constitution should be decided without examining the instrument under which it arises? This is too extravagant to be maintained.") We may not insulate government action from constitutional review by referring to it as a "funding decision."

powers to enact laws for the purpose of promoting public health, safety, morals, and the general welfare") (citing *Robinson Township*, 83 A.3d at 946); *Nebbia v. People of New York*, 291 U.S. 502 (1934) ("[T]his court from the early days affirmed that the power to promote the general welfare is inherent in government.").  All legislative power in this Commonwealth is vested in the General Assembly.  PA. CONST. art. II, § 1 ("The legislative power of this Commonwealth shall be vested in a General Assembly[.]").  When the Legislature enacts funding bills it is engaging in action on behalf of the Commonwealth. Article I, Section 26 sets limits on the permissible range of this activity: "the Commonwealth … shall [not] … discriminate against any person in the exercise of any civil right."  PA. CONST. art. I, § 26.  While the General Assembly is not obligated to provide any specific benefits and it has wide latitude to determine how to allocate benefits, once it decides to do so in a way that implicates a civil right, it must do so "with genuine indifference."  *Moe*, 417 N.E.2d at 42.[171]  If a funding statute implicates the exercise of a constitutional right and it is not neutral with respect to how any person exercises that right, then the courts will engage in a means-end review based on the right at issue and the appropriate level of inquiry.

Any challenge under Article I, Section 26 begins with the question of whether a constitutional right is implicated by the funding scheme.  It is the right at issue and not the fact that there have been legislative policy choices that determines the level of scrutiny. Contrary to *Fischer* and its federal jurisprudential sources, a challenge to a legislative allocation for the provision of benefits does not start with the presumption that such funding decisions are entitled to deference by the Court, least of all when they involve a fundamental right.  *See Fischer*, 502 A.2d at 121 ("As we view it, the right with which we

---

[171]  While *Moe* found a neutrality requirement in the constitutionally protected right to choose, *id.*, we conclude that the neutrality principle is embedded in the non-discrimination clause of Article I, Section 26.

are here concerned is the purported right to have the state subsidized the individual exercise of a constitutionally protected right, when it chooses to subsidize alternative constitutional rights.").

### d. Policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence

As we discussed earlier with respect to the Equal Rights Amendment, *Edmunds* instructs to "go beyond the bare text and history of that provision as it was drafted … and consider its application within the modern scheme of Pennsylvania jurisprudence." *Edmunds*, 586 A.2d at 901. Given that we are faced with the same question answered by this Court in *Fischer*, judicial policy as expressed in the doctrine of stare decisis is implicated. "[S]tare decisis is a principle of policy," *Alexander*, 243 A.3d at 199 (quoting *Helvering v. Hallock*, 309 U.S. 106, 119 (1940)), which "commands judicial respect for prior decisions of this Court and the legal rules contained in those decisions[,]" *Stilp*, 905 A.2d at 954 n.31. While this Court honors stare decisis to maintain reliable and consistent jurisprudence, we "should not perpetrate error solely for the reason that a previous decision although erroneous, has been rendered on a given question." *Olin Mathieson Chem. Corp. v. White Cross Stores, Inc., No. 6*, 199 A.2d 266, 268 (Pa. 1964). We determine "whether it is appropriate for this Court to overrule prior precedent [based] on a number of factors, all of which are implicated under the doctrine of stare decisis." *Alexander*, 243 A.3d at 196 (quoting *Freed v. Geisinger Med. Ctr.*, 5 A.3d 212, 216 (Pa. 2010)).

### Quality of reasoning

One of the questions before us is "whether we are bound to the [challenged] interpretation … when, by any rules of constitutional construction recognized at the time of those decisions or now, the interpretation is patently flawed. The answer is that we are not." *McLinko*, 279 A.3d at 573. We have previously recognized that "general faithfulness

to precedent is not sufficient to buttress judicial decisions proven wrong in principle or 'which are unsuited to modern experience and which no longer adequately serve the interests of justice.'" *Tincher*, 104 A.3d at 336 (quoting *In re Carney*, 79 A.3d at 505). To disregard the text of Section 26 along with its history, as the *Fischer* Court did, would only serve to perpetuate error. The doctrine of stare decisis cannot be used as an absolute shield to protect and perpetuate such legal error.

In presuming—without employing an actual analysis of the text or history—that challenges under Section 26 reach identical results to those under a federal equal protections analysis, the *Fischer* Court relied on the High Court's decisions in *Maher* and *Harris*, which serve as the closest federal analogs to the questions presented to the *Fischer* Court as well as the Court today.

In *Maher*, the High Court addressed an equal protections challenge to a Connecticut regulation under which Medicaid recipients received full coverage of childbirth medical services but no coverage of medical services incidental to nontherapeutic abortions. It first addressed whether the legislation operated to disadvantage a suspect class or burden a fundamental right. According to the High Court, the case did not involve discrimination against a suspect class given that indigency is not recognized as a suspect classification. *Maher*, 432 U.S. at 471. In its fundamental right analysis, the High Court explained that the Connecticut regulation "place[d] no obstacles absolute or otherwise in the pregnant woman's path to an abortion." *Id*. at 474. It stated that the indigent woman "suffer[ed] no disadvantages as a consequence of Connecticut's decision to fund childbirth[.]" *Id*. The High Court emphasized that the woman's indigency (not the regulation) is at fault for the woman's difficulty. It therefore concluded that the Connecticut regulation "d[id] not impinge upon the fundamental right recognized in *Roe*." *Id*.

The *Maher* Court rejected the plaintiffs' reliance on *Shapiro* and *Maricopa County*,[172] two cases in which the High Court found that durational residence requirements for the receipt of public welfare benefits were unconstitutional because they penalized the exercise of the constitutional right to travel. *Maher*, 432 U.S. at 475 n.8. The High Court stated that there was only a semantic difference between an assertion that the law "unduly interferes" with the constitutional right and that it "penalizes" the exercise of the right. *Id*. It observed that penalties are most familiar to criminal law, and indeed, in *Shapiro* and *Maricopa County*, the Court considered denial of welfare to be "sufficiently analogous to a criminal fine to justify strict judicial scrutiny." *Id*. The situations were distinguishable, according to the High Court, because Connecticut was not denying general welfare benefits to all women who had obtained abortions. It highlighted that "*Shapiro* and *Maricopa County* did not hold that States would penalize the right to travel interstate by refusing to pay the bus fares of indigent travelers." *Id*. Therefore, it found no support in the right-to-travel cases for the view that Connecticut was required to show a compelling interest to justify its decision not to fund elective abortions. *Id*.

As previously discussed, in *Harris*, the High Court reviewed the Hyde Amendment, which restricted federal funding for abortion, to determine whether it violated any substantive rights secured by the federal Constitution. *Harris*, 448 U.S. 297. In addressing whether the coverage exclusion constituted an unlawful infringement, the Court reasoned:

> The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde

---

[172] *See* supra notes 42 and 43.

Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all.

*Id.* at 316-17. Accordingly, the Court viewed the woman's indigency as the cause of the infringement of her right to terminate her pregnancy. *Id.* at 317. Thus, the High Court concluded that the government may refuse to fund abortion coverage without impinging on the right recognized in *Roe v. Wade*, 410 U.S. 113 (1973), *overruled by Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *Harris v. McRae*, 448 U.S. at 317.

*Fischer*'s reliance on *Maher* and *Harris* ignores the unique protections afforded by Section 26; particularly, Section 26's express prohibition of governmental discrimination in any person's exercise of any civil right. The *Fischer* Court embraced a penalty analysis for determining when a law implicates a right for purposes of applying Section 26, reciting only *Maher*'s footnote discussion regarding the "penalty" analysis. *Fischer*, 502 A.2d at 124 (citing *Maher*, 432 U.S. 474 n.8). Although the *Fischer* Court made explicit its adoption of the "penalty" analysis when considering a Section 26 challenge, it failed to contextualize how that part of the analysis fits within the larger equal protection framework. Based on *Fischer*'s inquiry as to whether the "right to choose" was being penalized, *Fischer* must have presumed that it was being confronted with the fundamental right to choose, as understood in *Roe v. Wade*. *Fischer*, 502 A.2d 124. This is in direct contradiction with what the *Fischer* Court stated at the outset of its opinion, namely, that "[t]his case does not concern the right to an abortion." *Id.* at 116. When addressing the other two equal protections provisions earlier in its opinion, the *Fischer* Court made its position clear that it viewed the right at issue as "the purported right to have the state subsidize the individual exercise of a constitutionally protected right, when it chooses to subsidize alternative constitutional rights." *Id.* at 121. In other words, the *Fischer* Court

proceeded as if it was confronted with a fundamental right under its Section 26 analysis, despite that it had already concluded, under its Article I, Section 1 and Article III, Section 32 analysis, that it was not. Because the *Fischer* Court considered our equal protection provisions to be analyzed identically with the federal Equal Protection Clause, then it should have addressed the three challenges identically, and, at the very least, consistently.

Even more critically, the *Fischer* Court skipped over the part of the analysis that is crucial to any equal protection claim: identifying what level of scrutiny applied to the Section 26 claim brought before it. Knowing how *Shapiro, Maricopa County* and other cases challenging the allocation of welfare benefits operated, we know that when no fundamental right is penalized, prohibited or denied, strict scrutiny does not apply, and courts would, at least, apply rational basis. *See, e.g.*, *Bowen v. Gilliard*, 483 U.S. at 602-03. The *Fischer* Court did not, within this section of the opinion, apply any level of scrutiny, nor did it explicitly incorporate its preceding application of intermediate scrutiny or rational basis, despite the notion that, based on its analysis, rational basis would have been required. Thus, even *Fischer*'s adoption of a penalty analysis for Section 26 claims was flawed in its application.

Moreover, *Fischer* offered no insight as to what constitutes a "penalty" for purposes of our constitutional analysis. We hesitate to say for certain that the High Court has provided a straightforward application of what constitutes a "penalty," given that, as some scholars have highlighted, the High Court has never indicated "what a 'penalty' is or does, nor what level of burden on a right rises to the level of a penalty[.]" Charles R. Bogle, *"Unconscionable" Conditions: A Contractual Analysis of Conditions on Public Assistance*

*Benefits*, 94 COLUM. L. REV. 193, 208 (1994).[173] This Court has certainly never expounded on what constitutes a penalty in this context.[174] Nevertheless, even if penalty is a clear and workable standard for federal equal protections, our review has demonstrated that Section 26 does not accommodate a penalty analysis.

Pursuant to its most natural meaning, the term "discriminate," does not mean punishment, but rather partiality. Thus, Section 26's prohibition against partiality toward any person's exercise of any civil right mandates that the government maintain neutrality with respect to citizens' exercise of their rights, unless the Commonwealth can otherwise demonstrate that a classification is justified, pursuant to our means-end review. For purposes of enforcement of Section 26's non-discrimination provision, the question is straightforward: has the government expressed a preference for the manner in which a right is exercised? By the design of Section 26, the threshold is less rigid than an amorphous penalty analysis and it is a more workable standard. *See Alexander*, 243 A.3d at 196-97 (citing "workability of the rule" established by precedent as a consideration for stare decisis); *Ramos*, 140 S. Ct. at 1414-15 (Kavanaugh, J., concurring in part)

---

[173] In attempting to frame a definition, one scholar stated that the High Court "considers a government benefits allocation to be a burden or penalty on the exercise of a constitutional right if the benefit allocation permits individuals to exercise the constitutional right only by forfeiting either another a constitutional right, a property right, or statutory entitlement to something other than direct funding of the constitutional right at stake." Yvette Marie Barksdale, *And the Poor Have Children: A Harm-Based Analysis of Family Caps and the Hollow Procreative Rights of Welfare Beneficiaries*, 14 L. & INEQ. 1, 26 (1995).

[174] Contrary to Chief Justice Todd's citation to *Probst* as a case offering insight as to what constitutes a penalty under Section 26, Concurring & Dissenting Op. at 13-14 (Todd, C.J.), *Probst* merely recited *Fischer*'s unhelpful language that a penalty is a penalty. *Probst*, 849 A.2d at 1142 n.14 (stating that the focus of the penalty analysis "is whether a person has been somehow penalized for the exercise of a constitutional freedom"); *Fischer*, 502 A.2d at 124 (stating that the focus of the penalty analysis "is whether a person has been somehow penalized for the exercise of a constitutional freedom"). The *Probst* Court went no further because the appellee in that case did not develop (and the trial court did not address) an Article I, Section 26 challenge.

(same); *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1506 (2019) (Breyer, J., dissenting) (suggesting that a logical basis for overruling precedent is when it "defies practical workability").

Following *Edmunds*, we must give the Pennsylvania Constitution meaning, and unique meaning where appropriate. *See Edmunds*, 586 A.2d 887. As explained, Article I, Section 26 requires unique meaning. *Fischer*'s treatment of this Pennsylvania constitutional claim suffers from incomplete reasoning and a disregard of our unique constitutional provisions in favor of blind (and incomplete) adherence to federal principles of Equal Protection. *See Robinson Township*, 83 A.3d at 946 ("[W]here prior decisional law had obscured the manifest intent of a constitutional provision as expressed in its plain language, engagement and adjustment of precedent as a prudential matter is fairly implicated and salutary[.]").

We also observe that the foundation on which *Fischer*'s equal protection analyses were built has been overruled. That is, with *Roe* overruled*,* the case law in its wake, including the primary cases *Fischer* cited in order to justify its penalty analysis, is also disrupted. All of these cases were premised on the existence of a right to abortion based in the federal Constitution. Therefore, following *Dobbs*, it is logical and necessary for this Court to reconsider the premise of *Fischer* and address the unique state constitutional questions that are otherwise unanswered.

**Stare Decisis and constitutional issues**

As we recognized earlier in our discussion of the Equal Rights Amendment, the weight of stare decisis is lowest when we interpret the Constitution "because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Alexander*, 243 A.3d at 197 (quoting *Agostini v. Felton*, 521 U.S. 203, 235 (1997)). This is to ensure courts "balance the importance of having constitutional

questions **decided** against the importance of having them **decided right**." *Ramos*, 140 S. Ct. at 1413 (Kavanaugh, J., concurring in part). Because we are tasked with a constitutional interpretation of Article I, Section 26, the power of stare decisis is at its weakest.

**Age and lineage**

Despite its incomplete reasoning, in *Fischer*'s thirty-eight year history, this Court has cited *Fischer* multiple times for its equal protection analysis framework. *See, e.g.*, *Commonwealth v. Parker White Metal Co.*, 515 A.2d 1358 (Pa. 1986) (plurality); *Driscoll v. Corbett*, 69 A.3d 197 (Pa. 2013); *Klein v. Commonwealth, State Employees' Ret. System*, 555 A.2d 1216 (Pa. 1989) (Opinion Announcing Judgment of the Court) (Larsen, J.). In these instances, the Court has recited *Fischer*'s incantation of the equal protection framework, including that the framework tracks federal Equal Protection Clause jurisprudence. However, as we have discussed at length in addressing *McCusker* and *Driscoll*,[175] *Fischer*'s unique holding with respect to Section 26, i.e., that we embrace a "penalty" analysis, has been seldom cited and never applied.

While subsequent judicial reliance evidences a sort of age and lineage which would indicate a need for deference, *Alexander*, 243 A.3d at 196, here there is none. *League of Women Voters* explained the defect in equating adherence to the federal equal protection analytical framework with a conclusion that Article I, Section 26 and its federal counterpart are substantively coterminous. It also signaled a departure from any such jurisprudence. Moreover, to hold otherwise would be contrary to our emphatic holding in *Edmunds* that we must give the Pennsylvania Constitution meaning, and unique meaning where it so provides. *Edmunds*, 586 A.2d 887. Absent a compelling *Edmunds* analysis justifying treating the provisions as coterminous—to date, there has been none—

---

[175] *See* supra pp. 190-93.

*Fischer*'s summary dismissal of the Pennsylvania constitutional claim is not entitled to greater deference than the commands of *Edmunds*.

**Reliance**

We restate that when overruling a decision would "dislodge settled rights and expectations or require an extensive legislative response[,]" stare decisis has added force. *Hilton*, 502 U.S. at 202 (emphasis omitted). Moreover, we have acknowledged that there is force to legislators' arguments that "they rely on this Court's interpretation of the law and precedent when crafting legislation, and that such reliance should not be undercut except for good reason." *Stilp*, 905 A.2d at 967.

While the General Assembly has continued to fund the current Medical Assistance scheme with the Coverage Exclusion in place, no legislation has been brought to our attention and our review has uncovered no evidence that the General Assembly has otherwise crafted any statutes since *Fischer* that have relied upon the *Fischer* Court's interpretation of Section 26 and its adoption of a penalty analysis. Similarly, as we did in our discussion with respect to the Equal Rights Amendment, we again emphasize that the General Assembly's reliance interests cannot exceed a citizen's constitutional rights under Article I, Section 26.

**3.     Conclusion and Application**

**a.     Conclusion**

Given the *Fischer* Court's incomplete reasoning and the lack of reliance on such reasoning in our subsequent case law, we find no basis to continue following *Fischer*'s flawed holding relative to Article I, Section 26. Accordingly, we overrule *Fischer* in this respect. With the benefit of an *Edmunds* analysis, it becomes clear that Section 26 of our Charter affords broader protections than the federal Equal Protection Clause. As commanded by the text and history of Section 26, we adopt an analysis that adheres to principles of neutrality. Thus, when a court is presented with a legislative classification

that touches on the exercise of a civil right and it is being challenged on the basis that it is discriminatory, the court shall determine whether the classification operates neutrally with regard to the exercise of that right. If it does not, the court shall then conduct a commensurate means-end review.

In essence, equal protections generally provide that like persons in like circumstances will be treated similarly. *Albert*, 758 A.2d at 1151. That does not necessarily require that all persons enjoy identical protection under the law; thus, the Commonwealth is not absolutely prohibited from classifying individuals for the purposes of receiving different treatment, so long as those classifications are appropriately justified. *Id.* Based upon judicial review, pursuant to the means-end test, the courts must determine whether such a classification is constitutional. By its express terms, the Abortion Control Act creates a classification. The Coverage Exclusion differentiates between pregnant women on Medical Assistance who would seek to obtain abortions and pregnant women on Medical Assistance who would seek to carry their pregnancies to term. The former receives no government funding for the reproductive care they seek, whereas the latter receives full coverage for the reproductive care they seek. The controlling factor influencing the statutory funding scheme is how a pregnant woman on medical assistance decides to exercise her reproductive choices.

Section 26 prohibits not only the denial to any person the enjoyment of any civil right, but it explicitly prohibits the discrimination against any person in the exercise of any civil right. PA. CONST. art. I, § 26. Despite the *Fischer* Court's adoption of an ambiguous "penalty" analysis, we recognize that, based on its plain meaning, the term "discriminate," as used in Section 26, does not presume punishment; but rather, it presumes partiality. In other words, "to discriminate" suggests a lack of neutrality. Thus, the government must maintain a position of neutrality with regard to citizens' exercise of their constitutional

rights. It may only depart from this neutrality when there is a justification to sustain a legislative classification.

**b. Application of Article I, Section 26's neutrality requirement to the Coverage Exclusion[176]**

Based on our analysis, the right to reproductive autonomy, like other privacy rights, is fundamental. In our view, the right to reproductive autonomy is clearly implicated by the partiality towards carrying a pregnancy to term embedded in the Coverage Exclusion. Accordingly, we would remand to the Commonwealth Court to apply strict scrutiny based on the framework of the Section 26 analysis discussed above.

The government does not bear a constitutional obligation to provide medical care to the indigent, nor is the government required to financially support the exercise of a fundamental right, including a woman's exercise of her right to reproductive autonomy. However, once the government chooses to provide medical care for the indigent, including necessary care attendant to pregnancy for those women exercising their right to reproductive autonomy who decide to carry a pregnancy to term, the government is obligated to maintain neutrality so as not to intrude upon the constitutional right to full reproductive autonomy, which includes the right to terminate a pregnancy. The General Assembly's decision to "encourag[e] childbirth over abortion," 18 Pa.C.S. § 3202(c), as embodied by the Coverage Exclusion, demonstrates that the government has not maintained a position of neutrality with respect to this choice.

This choice between carrying a pregnancy to term or terminating the pregnancy is inherent in the right itself. While the *Fischer* Court relied on a perceived continued ability to make an unsubsidized choice as a basis to conclude that the Coverage Exclusion is

---

[176] This author and Justice Wecht have identified the right at issue as the fundamental right to reproductive autonomy. *See* Part III.E. The use of "we" and "our" in Part III.F.3.b. refer only to this author and Justice Wecht.

not discriminatory, the government is prohibited from discriminating against, i.e., treating differently, a woman based on the choice she makes. The right cannot be so encumbered. Under Medical Assistance, the government funds one of these options but not the other. The Coverage Exclusion thus discriminates against those women who choose to exercise their fundamental right to terminate a pregnancy. By so doing, the government is not maintaining a position of neutrality with respect to women's exercise of these rights, as is required by Article I, Section 26 of our Constitution. This lack of neutrality triggers an analysis under Section 26 for discrimination against a civil right. Pursuant to an equal protection analysis under Article I, Section 26, the Coverage Exclusion fails to treat the fundamental right to reproductive autonomy neutrally and therefore is subject to strict scrutiny to determine whether the legislative classification is justified.

A statute that discriminates against any person in the exercise of a fundamental right is deemed unconstitutional unless the state can demonstrate it is "necessary to the achievement of a compelling state interest." *Commonwealth v. Bell*, 516 A.2d 1172, 1178 (Pa. 1986). In other words, the lower court "must determine if the infringement is supported by a compelling state interest and if the infringement is narrowly tailored to effectuate that interest." *Hiller v. Fausey*, 904 A.2d 875, 885-86 (Pa. 2006). The state bears a heavy burden of justification, and the statute must be closely scrutinized in light of its asserted purposes. *Dunn v. Blumstein*, 405 U.S. 330, 342-43 (1972). The statute must be drawn with precision and tailored to serve its legitimate objectives. *Id*. at 343 (internal citations omitted). "[I]f there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.'" *Id*. (internal citation omitted).

The Coverage Exclusion treats the fundamental right to reproductive autonomy non-neutrally. Thus, at the appropriate point in this litigation, on remand, the Coverage Exclusion should be subject to strict scrutiny.[177]

## IV. Mandate

In this appeal by Providers from the orders of the Commonwealth Court, we rule as follows:

1. On the issues raised in preliminary objections, we decide that it was error to conclude that Providers lacked standing to assert the Pennsylvania constitutional claims raised in the petition for review.

2. We conclude that the lower court erred in granting the petitions to intervene filed by certain individual Pennsylvania Senators and Legislators.

3. Further, on the Commonwealth Court's apparent alternative grounds for dismissing the petition for review by the grant of a preliminary objection demurring to the claims raised in the petition based upon this Court's prior decision in *Fischer v. Department of Public Welfare*, 502 A.2d 114 (Pa. 1985), we reverse.

4. We overrule *Fischer*'s interpretation of Article I, Section 28, and we hold that when a statute, such as the Coverage Exclusion, is challenged as violative of Section 28, a sex-based distinction is presumptively unconstitutional, and it is the government's burden to rebut the presumption with evidence of a compelling state interest in creating the classification and that no less intrusive methods are available to support the expressed policy.

5. We overrule *Fischer*'s interpretation of Article I, Section 26, and we hold that a court, presented with a challenge to a legislative classification that touches on the exercise of a civil right on the basis that it violates Article I, Section 26, must determine whether the classification operates neutrally with

---

[177] Contrary to Justice Mundy's statements, *see* Concurring & Dissenting Op. at 19 (Mundy, J.), we do not resolve the question of the constitutionality of the Coverage Exclusion under Article I, Sections 1, 8 or 26, nor do we consider arguments regarding legislative interests. *See* supra note 83.

> regard to the exercise of that right. If it does not, the court
> shall then conduct a commensurate means-end review.

This appeal does not resolve the ultimate issues challenging the constitutionality of the Coverage Exclusion under the Pennsylvania Constitution. In response to the issues raised in the appeal, we reverse the January 28, 2020 order of the Commonwealth Court granting intervention, and we reverse the March 26, 2021 order of the Commonwealth Court sustaining the preliminary objections of DHS and dismissing the petition for review. We remand to the Commonwealth Court for further proceedings consistent with the mandate contained in Part IV of this opinion.

Justice Wecht joins the opinion.

Justice Wecht files a concurring opinion.

Chief Justice Todd files a concurring and dissenting opinion.

Justice Dougherty files a concurring and dissenting opinion.

Justice Mundy files a concurring and dissenting opinion.

Justice Brobson did not participate in the consideration or decision of this matter.